## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SIMRET SEMERE TEKLE, | Case No.: 1:18-cv-211 |
| *Plaintiff*, | |
| v. | **FIRST AMENDED COMPLAINT** |
| NOUF BINT NAYEF ABUL-AZIZ AL SAUD | **JURY TRIAL DEMANDED** |
| MOHAMMAD BIN ABDULLAH AL SAUD | |
| *Defendants*. | |

## FIRST AMENDED COMPLAINT

Simret Semere Tekle, by and through her undersigned counsel, files this Complaint against Nouf bint Nayef Abul-Aziz Al Saud and Mohammad bin Abdullah Al Saud.  In support thereof, she alleges the following:

## INTRODUCTION

1.      Plaintiff Simret Semere Tekle, a citizen of Eritrea, brings this action for damages resulting from human trafficking and forced labor in the United States.  The Defendants, members of the Saudi royal family, recruited Ms. Tekle to work as a nanny in the United States. They promised her excellent wages and a legal job to induce her to come to the United States. Ms. Tekle agreed to move to Virginia.  But instead of the decent salary and reasonable working conditions that Defendants promised Ms. Tekle, and which federal law required to be guaranteed in her contract, Ms. Tekle found herself held in forced labor as a domestic servant.

2.      Defendants Nouf bint Nayef Abul-Aziz Al Saud (hereinafter "Defendant Mrs. Al Saud"), and Mohammad bin Abdullah Al Saud (hereinafter "Defendant Mr. Al Saud") are wealthy and influential members of the Saudi royal family.  Defendants held Ms. Tekle in their homes in Saudi Arabia and the United States, forcing her to work long hours each day for

meager, illegal wages.  Defendants coerced Ms. Tekle to remain in their compound, both personally and through their agents, subjecting her to threats and psychological abuse.  Both Defendants knowingly benefited from their participation in this venture.  The heavy physical labor and psychological abuse that Ms. Tekle endured caused both physical and mental harm.  Ms. Tekle is entitled to the agreed-upon pay for her labor.  She is also entitled to damages.

## PARTIES

3.      Simret Semere Tekle is a citizen of Eritrea who currently resides in Virginia.

4.      Defendant Mrs. Al Saud is a resident of Virginia and a citizen of Saudi Arabia.  Defendant Mrs. Al Saud is the daughter of Maha bint Mohammed bin Ahmad Al Sudairi (hereinafter "Princess Maha") and the late crown prince Nayef bin Abdul-Aziz Al Saud.

5.      Defendant Mr. Al Saud is a resident of Virginia and a citizen of Saudi Arabia.  Defendant Mr. Al Saud is the son of the late King Abdullah bin Abdulaziz Al Saud.

6.      Defendants Mr. Al Saud and Mrs. Al Saud are married.  At all relevant times, Defendants Mr. and Mrs. Al Saud were Ms. Tekle's employers.  At the time of the events that gave rise to this Complaint, the Defendants resided at 1034 Aziza Court in Great Falls, Virginia.

## JURISDICTION AND VENUE

7.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 as this action involves questions of federal law; 18 U.S.C. § 1595 as this action involves an offense under the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1584, 1589, 1590, 1592; and 18 U.S.C. § 1596, as the offender is present in the United States, irrespective of nationality.

8.      This Court has supplemental jurisdiction over Ms. Tekle's state law claims pursuant to 28 U.S.C. § 1367.

2

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### Trafficking to Saudi Arabia for Forced Labor

10.     Simret Semere Tekle was born in Asmara, Eritrea, where she resided with her family.

11.     In 2008, a friend of Ms. Tekle's mother, Okuba Gebreyesus, offered to help Ms. Tekle find a job.  Ms. Gebreyesus comes from the same village in Eritrea as Ms. Tekle's mother and had worked for the Saudi royal family for several decades.  Ms. Tekle has long referred to Ms. Gebreyesus as her "aunt."  At all relevant times, Ms. Gebreyesus owned the home in Asmara in which Ms. Tekle's family lived; Ms. Tekle's family rented the home from Ms. Gebreyesus.

12.     Ms. Gebreyesus recruited Ms. Tekle to work as a maid in the household of Princess Maha in Saudi Arabia.  At the time, Ms. Tekle spoke Tigrinya.  Ms. Tekle could speak, understand, and read very little English.

13.     In 2008, Ms. Tekle traveled from Eritrea to Saudi Arabia.

14.     Princess Maha was a demanding and difficult employer.  She enforced a system of rules meant to make Ms. Tekle and other staff members believe that they were inferior.  She was not permitted to approach her employer unless summoned.  Princess Maha told Ms. Tekle and other staff that they were like "toilet shoes" and should know their place.

15.     Public executions and physical punishments of convicted criminals were sometimes televised in Saudi Arabia during Ms. Tekle's time in Princess Maha's employ.  Ms. Tekle witnessed these events on television.  On one occasion, Princess Maha pointed to the television and told Ms. Tekle that she would suffer similar treatment if she lied or stole.

3

16.     On another occasion, Princess Maha became angry when she noticed that Ms. Tekle was wearing a crucifix around her neck.  Princess Maha pushed Ms. Tekle, causing her to fall.  The fall injured Ms. Tekle's back, elbow, and legs.

17.     While employed in Saudi Arabia, Ms. Tekle witnessed another employee being physically abused by Princess Maha.  She also witnessed Princess Maha throw a glass at a domestic worker.

**Recruitment and Trafficking to the United States**

18.     In 2011, Princess Maha's daughter, Defendant Mrs. Al Saud, came to visit her family in Saudi Arabia from the United States.  Defendant Mrs. Al Saud offered Ms. Tekle a position as a nanny for one of her three children in the United States.  Ms. Tekle was told that she would work forty hours per week, with two full days off per week, and earn $4,500.00 per month.  This represented a significant raise for Ms. Tekle.  Ms. Tekle also believed that her working conditions would be better in the United States than the conditions she faced in Saudi Arabia.  Ms. Tekle planned to use the extra money to help her family in Eritrea.  Relying on Defendant Mrs. Al Saud's assurances and promises regarding the terms and conditions of employment, Ms. Tekle agreed to come to the United States.

19.     In Saudi Arabia, an aide to Princess Maha's family arranged for Ms. Tekle's visa paperwork and travel arrangements.  This aide gave Ms. Tekle a contract to sign.  The contract was in Arabic, a language that Ms. Tekle could not read.  Ms. Tekle never received a copy of the contract.

20.     In order to receive a U.S. visa, Ms. Tekle was interviewed by an official at the U.S. Consulate in Jeddah, Saudi Arabia.  Employees of the Saudi royal family escorted Ms. Tekle to her visa interview.

4

21.     Defendants falsely represented to the American consular authorities in Jeddah, Saudi Arabia that Ms. Tekle would be compensated at a lawful rate for childcare services in the United States and that she would be provided with legally acceptable conditions of employment. As members of a royal family, the Defendants were eligible to bring a domestic worker to the United States on an A-3 visa, a category also used for the domestic workers of diplomats.

22.     Ms. Tekle was granted an A-3 visa in September 2011.

23.     A member of the Saudi military escorted Ms. Tekle from Saudi Arabia to the United States. This escort held her passport the entire time. The only time that Ms. Tekle had possession of her passport was to provide it to a U.S. customs official at Dulles International Airport. Ms. Tekle was then taken to the family's compound in Great Falls, Virginia. Ms. Tekle's escort did not return her passport, and she did not know where it was stored. On one later occasion, Ms. Tekle asked an agent of the Defendants to see her passport, but the Defendants' agent refused.

24.     Upon her arrival at the Defendants' residence, Defendant Mrs. Al Saud told Ms. Tekle that she had paid a lot of money to bring Ms. Tekle to the United States and that Ms. Tekle should be grateful.

25.     At the time of Ms. Tekle's arrival, she felt completely isolated. At that time, she had no contact with family members or friends living in the United States.

**Forced Labor and Exploitation in the United States**

26.     When Ms. Tekle arrived in Great Falls, she was told that she would work as a domestic worker, not a nanny as originally promised. The Defendants employed two other domestic workers, as well as two nannies for each of the three children, a total of six nannies.

27.     Ms. Tekle received orders from three of Defendant Mrs. Al Saud's personal aides: Milen, Frail, and Faisa.  These aides accompanied and attended to Defendant Mrs. Al Saud.  Ms. Tekle was not permitted to speak directly to Defendant Mrs. Al Saud.  At all relevant times, Milen, Frail, and Faisa were agents of Defendants who relayed orders from the Defendants.

28.     Ms. Tekle was then put to work.  Ms. Tekle performed a heavy load of housekeeping duties in addition to helping the nannies care for the Defendants' three children. In return, Defendants paid Ms. Tekle only meager wages.

29.     On a typical work-day, Ms. Tekle would wake at 5:30 A.M. and begin cleaning the house.  Ms. Tekle would also wash and iron the family's clothing and laundry.  In addition to these duties, Ms. Tekle was required to assist both the cook and the nannies.  Ms. Tekle usually worked until after 9:00 P.M.  Ms. Tekle was also on-call at night.

30.     Ms. Tekle lived in the Defendants' home and was on-call to serve her employers at all hours.

31.     The family frequently traveled.  Ms. Tekle was required to go with the family on their trips, and the travel meant more work for Ms. Tekle.  She packed and carried the family's bags—each child traveled with several suitcases.  In addition, Ms. Tekle helped care for the children on these trips.  Ms. Tekle was required to go wherever the family went to assist the nannies and tend to the children during the family's vacations.  During these trips, Ms. Tekle's passport remained in the possession of her employers at all times.

32.     As a result of this physical labor, Ms. Tekle developed chronic back pain which persists today.  At times, Ms. Tekle could not sleep because the pain was so severe.  Ms. Tekle asked Defendant Mrs. Al Saud's personal aide several times if she could see a doctor, but she never received a response.

6

**Failure to Pay Promised Wages**

33.     Defendants did not pay Ms. Tekle her promised salary.  Ms. Tekle only received

$400.00 to $500.00 per month in cash.  This was significantly less than the $4,500.00 per month

Defendants promised Ms. Tekle to induce her to come to the United States, and significantly less

than what was required by federal law.  After several months, Ms. Tekle attempted to complain

about her lower wages and treatment to Defendant Mrs. Al Saud, but Defendant Mrs. Al Saud

instructed Ms. Tekle to speak to one of her aides.  Ms. Tekle complained to the aides about her

treatment, but the aides told Ms. Tekle not to complain because her salary was more than she had

been paid in Saudi Arabia.

34.     When Ms. Tekle inquired about her heavy workload and illegal wages, one of the

Defendants' aides told her that that the Defendants had lied to bring Ms. Tekle to the United

States on an A-3 visa.

35.     Ms. Tekle consistently worked more than 80 hours each week.

36.     Ms. Tekle was held in forced labor in the United States for seven months,

working morning to night, seven days a week, with no days off.  For this entire period,

Defendants paid Ms. Tekle only about $3,000.00, less than $2 per hour.

**Psychological Abuse, Disparagement, and Humiliation**

37.     Defendants, both directly and through their agents, treated Ms. Tekle in an

abusive manner.  Ms. Tekle was terrified of the Defendants.

38.     Defendants' agents repeatedly abused, demeaned, and humiliated Ms. Tekle on

behalf of the Defendants.  Ms. Tekle was subjected to constant verbal abuse and called offensive

names in Arabic, including "whore", "colored", "donkey", and "garbage."  Ms. Tekle was also

reprimanded if she spoke with a man.

7

39.     On at least three occasions, Defendant Mrs. Al Saud was in the same room and within hearing distance when her aides verbally abused Ms. Tekle.

**Enforced Isolation**

40.     Defendants restricted Ms. Tekle's contact with persons other than Defendants' staff for the purpose of keeping her in a situation of coerced labor and involuntary servitude.

41.     Defendant Mrs. Al Saud gave Ms. Tekle several ground rules when she first arrived at the residence.  Ms. Tekle was prohibited from leaving the residence without an escort. She was forbidden from interacting with people outside the residence, and she was told that she could never run away.  Defendant Mrs. Al Saud told Ms. Tekle that she would be attacked by Americans if she went outside alone.  When she was allowed outside to shop or run errands for the family, Ms. Tekle was always accompanied by another staff member.  Defendant Mrs. Al Saud instructed Ms. Tekle not to speak to anyone when she was outside the residence.

42.     On one occasion, during a trip to Florida, an American man started a conversation with Ms. Tekle.  Defendant Mrs. Al Saud saw this and called Ms. Tekle over.  Defendant Mrs. Al Saud told Ms. Tekle that she should not talk to strangers because, if she did, they would kidnap her and deport her.  This frightened Ms. Tekle, and from then on she would become frightened if a stranger approached her.

43.     Defendant Mrs. Al Saud told Ms. Tekle that her activities would be closely monitored at all times.  Defendant Mrs. Al Saud and the Defendants' agents showed Ms. Tekle surveillance cameras placed throughout the residence, including a camera in Ms. Tekle's bedroom.  Defendant Mrs. Al Saud indicated that these cameras were monitored at all times by security personnel.   The cameras and constant monitoring caused Ms. Tekle to feel anxious,

afraid, and uncomfortable.  Ms. Tekle would dress and undress in her bathroom to avoid being

seen by the camera in her bedroom.  She felt that she could not escape.

44.     Defendant Mrs. Al Saud also told Ms. Tekle the residence was guarded by armed

security, threatening that Ms. Tekle would be arrested and deported if she tried to run away.  Ms.

Tekle could see for herself that the gated compound was guarded by armed men.

45.     On one occasion, Ms. Tekle left the house to attend church services with a fellow-

employee.  When Defendant Mrs. Al Saud found out that Ms. Tekle had left the compound, she

became angry.  She reminded Ms. Tekle that she could not leave the residence, even for church

services, and forbade Ms. Tekle from attending church.

**Abuse of Legal Process**

46.     Defendants and their agents abusively threatened Ms. Tekle with legal

consequences for the purpose of keeping her in a situation of forced labor and involuntary

servitude.

47.     Defendants led Ms. Tekle to believe that, if she did not continue working for the

Defendants, she would suffer serious legal harm.  The day Ms. Tekle arrived, Defendant Mrs. Al

Saud told her that she would be arrested and deported if she ran away.

48.     Defendant Mrs. Al Saud verbally abused and threatened a kitchen staff member

with deportation in the presence of Ms. Tekle.  Defendant Mrs. Al Saud was aware that Ms.

Tekle was present and witnessed the threats.

49.     Defendants' personal aides also conveyed Defendants' threats to Ms. Tekle.

Whenever Ms. Tekle complained about her work to Defendants' aides, they would relay these

complaints to Defendants.  Through these aides, Defendants would threaten Ms. Tekle with

deportation if she continued to complain.

9

50.     As a result of Defendants' threats and psychological abuse, Ms. Tekle became too afraid to ask for her passport again.  Stripped of her passport, believing herself to be alone in the United States, and facing threats of arrest or deportation, Ms. Tekle remained in the Defendants' employ and continued working against her will.  Ms. Tekle was effectively trapped in the employ of the Defendants.

**Escape from Defendants' Compound**

51.     While in the Defendants' compound, Ms. Tekle spoke with her mother rarely, relying on the calling cards to make contact.  Approximately one month before Ms. Tekle fled, her mother told her that relatives of theirs lived in Northern Virginia.  Ms. Tekle had never met these relatives and did not know that they were living in the United States.

52.     Ms. Tekle contacted her relatives and described her working conditions.  Her relatives encouraged her to leave and offered her refuge.  Ms. Tekle was afraid and feared reprisals from the Defendants if she left.

53.     One day in April 2012, Ms. Tekle was sent out to run errands for the family at the local mall.  As usual, Ms. Tekle was escorted by one of the family's drivers, who was instructed to accompany her everywhere.  On this excursion, the driver told Ms. Tekle that he had other work to do and that he would meet her back at the mall.

54.     Ms. Tekle seized the driver's unexpected departure as an opportunity to call her relatives in Northern Virginia, who gave Ms. Tekle their address.  Ms. Tekle fled to their house in a taxi.

55.     Following her escape, Ms. Tekle remained terrified that the Defendants would find her.  She rarely left the house.  Ms. Tekle suffered nightmares and frequently woke up screaming.

56.     After Ms. Tekle escaped, she was afraid to file a civil suit against the Defendants because she feared the safety of Ms. Gebreyesus, who continued to work for Princess Maha.  Ms. Tekle feared that Ms. Gebreyesus would be seriously harmed if Ms. Tekle made her story public or filed suit against the family.  In addition to having been physically harmed and threatened by Princess Maha herself, Ms. Tekle had previously seen Princess Maha verbally and physically abuse Ms. Gebreyesus.  On one occasion, Ms. Tekle saw Princess Maha throw a glass at Ms. Gebreyesus in anger.

57.     In mid-2012, shortly after Ms. Tekle's escape, Ms. Gebreyesus called Ms. Tekle's family.  Ms. Gebreyesus said that the Defendants' family blamed her, had lost trust and faith in her, and had threatened her, all because Ms. Tekle—whom Ms. Gebreyesus had recommended to them—had escaped.  Ms. Tekle's family relayed all of this to Ms. Tekle.  These calls frightened Ms. Tekle and made her fear for Ms. Gebreyesus's safety.

58.     Ms. Gebreyesus continued to call Ms. Tekle's family frequently—every few weeks—inquiring about Ms. Tekle.  Specifically, during these phone calls, Ms. Gebreyesus repeatedly asked what Ms. Tekle planned to do, where Ms. Tekle was living, with whom Ms. Tekle was living, how to contact Ms. Tekle, what Ms. Tekle was doing, and whether Ms. Tekle had been in contact with Ms. Tekle's family.  These calls continued, with slightly less frequency over time, until 2015.  Ms. Tekle's family relayed all of this to Ms. Tekle.  These calls terrified Ms. Tekle.

59.     In April 2013, Ms. Tekle met with federal law enforcement officials with the Department of Homeland Security, the Department of State's Diplomatic Security Service, and the Department of Justice regarding her trafficking.  Ms. Tekle understood her testimony to be confidential, and she expressed her fears for Ms. Gebreyesus's safety during her interview.

Federal law enforcement officers certified in 2015 that, based on their investigation of the facts, Ms. Tekle was a victim of human trafficking in violation of the forced labor statute, 18 U.S.C. § 1589.

60.     In 2015, Ms. Gebreyesus returned from Saudi Arabia to Eritrea.  Shortly after Ms. Gebreyesus arrived, she threatened to evict Ms. Tekle's family from their home in Asmara.  Ms. Gebreyesus then sought the assistance of local police in attempting to evict Ms. Tekle's family. Ms. Tekle's family communicated all of this to Ms. Tekle.

61.     On information and belief, Defendants informed Princess Maha, who is Mrs. Al Saud's mother, and/or her agents that Ms. Tekle had escaped from their compound in Virginia.

62.     Defendants knew that Ms. Gebreyesus worked for Princess Maha, as Ms. Gebreyesus had worked for the Defendants' family for decades.

63.     Defendants were aware of Princess Maha's abusive treatment of her domestic employees.

64.     On information and belief, threats were made against Ms. Gebreyesus at the Defendants' behest or as the result of the actions of the Defendants or their agents, and were made with the intention of preventing Ms. Tekle from filing suit.

65.     On information and belief, Ms. Gebreyesus made several calls to Ms. Tekle's family asking about Ms. Tekle's whereabouts and intentions at the Defendants' behest or as the result of the actions of the Defendants or their agents, and were made with the intention of preventing Ms. Tekle from filing suit.

## SUSPENSION OF STATUTES OF LIMITATIONS

66.     Any statute of limitations relating to the causes of action alleged in this complaint on behalf of Ms. Tekle has been suspended and equitably tolled for the period during which Ms.

Tekle was held in forced labor and involuntary servitude and for a reasonable time following her escape.  Ms. Tekle was obstructed from filing this lawsuit during this time period as a result of Defendants' statements and actions and/or the actions of their agents.  As a result of the Defendants' statements and actions, Defendants are also equitably estopped from invoking the statute of limitations.

## FIRST CLAIM FOR RELIEF

**Trafficking With Respect to Peonage, Slavery, Involuntary Servitude or Forced Labor in Violation of 18 U.S.C. § 1590**

67.    Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

68.    As alleged herein, Defendants knowingly recruited, harbored, transported, provided and/or obtained Ms. Tekle, bringing her to the United States from Saudi Arabia, for the purpose of involuntary servitude and forced labor in violation of 18 U.S.C. § 1590.  Ms. Tekle is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

69.    Defendants recruited Ms. Tekle with false promises of good working conditions and wages in the United States, transported Ms. Tekle to the United States, and harbored Ms. Tekle in their residence, all for the purpose of forced labor and involuntary servitude.

70.    As a direct and proximate result of Defendants' actions, Ms. Tekle has suffered severe emotional distress, physical injuries, and economic losses.

71.    Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## SECOND CLAIM FOR RELIEF

### Forced Labor in Violation of 18 U.S.C. § 1589

72.     Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

73.     Defendants knowingly obtained Ms. Tekle's forced and coerced labor through a scheme, plan, pattern and practice of physical and psychological abuse, enforced isolation, threats of serious harm, and threatened abuse of legal process, in violation of 18 U.S.C. § 1589. Ms. Tekle is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

74.     Defendants confiscated Ms. Tekle's passport, isolated her, psychologically abused her, and warned her that if she ever tried to escape, she would be arrested, deported, or attacked.

75.     Defendant Mrs. Al Saud and her agents subjected Ms. Tekle to threats and psychological abuse designed to demean Ms. Tekle and prevent her from seeking help from authorities or others who could have assisted her in leaving Defendants' compound.

76.     Defendants and their agents repeatedly threatened Ms. Tekle with arrest and deportation.  Because of the abuse she had suffered at the hands of Princess Maha in Saudi Arabia, Ms. Tekle was highly vulnerable to Defendants' threats. Defendants exploited her vulnerability.  Defendants were aware that Ms. Tekle feared deportation to her home country of Eritrea.  Defendants threatened Ms. Tekle with deportation with the intention and design of coercing Ms. Tekle to remain in their home, to continue her work for them, and to prevent her from seeking the help of law enforcement or reporting the offenses against her.

77.     Defendants knowingly benefited from Ms. Tekle's labor and services because they did not compensate her as the law requires.

14

78.     As a direct and proximate result of the actions of the Defendants, Ms. Tekle has suffered severe emotional distress, physical injuries, and economic losses.

79.     Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## THIRD CLAIM FOR RELIEF

### Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of 18 U.S.C. § 1592

80.     Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

81.     Defendants knowingly removed, confiscated, concealed, and possessed Ms. Tekle's actual passport.  Defendants removed, confiscated, concealed, and possessed Ms. Tekle's passport in order to prevent or restrict Ms. Tekle's liberty to move or travel for the purpose of subjecting her to involuntary servitude and forced labor, in violation of 18 U.S.C. § 1592.  Ms. Tekle is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

82.     As a direct and proximate result of the actions of the Defendants, Ms. Tekle has suffered severe emotional distress, physical injuries, and economic losses.

83.     Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## FOURTH CLAIM FOR RELIEF

### Involuntary Servitude in Violation of 18 U.S.C. § 1584

84.     Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

85.     Defendants knowingly and willfully subjected Ms. Tekle to a condition of involuntary servitude for a period of seven months in the United States.  Defendants forced Ms.

Tekle to work long hours against her will, holding her in isolation and paying her a pittance for her services.

86.     Defendants kept Ms. Tekle in a condition of involuntary servitude through physical and legal coercion.  Defendants and their agents confiscated Ms. Tekle's passport, isolated her from anyone who might be able to help her, and threatened her with legal retaliation (including arrest or deportation) if she ran away.

87.     Ms. Tekle was highly vulnerable to Defendants' threats, and Defendants exploited her vulnerability.  Defendants were aware that Ms. Tekle feared deportation to her home country of Eritrea.

88.     Through the conduct of the Defendants, alleged herein, acting individually and in concert, these Defendants created and perpetuated a system of involuntary servitude, and led Ms. Tekle to reasonably believe she had no way of avoiding this servitude, in violation of 18 U.S.C. § 1584.  Ms. Tekle is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

89.     As a direct and proximate result of the actions of the Defendants, Ms. Tekle has suffered severe emotional distress, physical injuries, and economic losses.

90.     Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## FIFTH CLAIM FOR RELIEF

### Breach of Contract

91.     Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

92.     Ms. Tekle, Defendant Mrs. Al Saud, and Defendant Mr. Al Saud entered into a valid, legally enforceable employment agreement in 2011, whereby Ms. Tekle agreed to work as

a nanny in their home in the United States, and, in return, Defendants agreed to pay Ms. Tekle a lawful, agreed-upon wage for her services.  Ms. Tekle's duties were to include caring for one of Defendants' three children.

93.     Ms. Tekle fully performed the terms of the agreement by working as a domestic worker and nanny in the Defendants' household.

94.     The Defendants materially breached the contract by, *inter alia*, failing to pay the agreed amount, forcing Ms. Tekle to work more than 80 hours per week, forcing her to assume non-contractual duties such as housecleaning, subjecting her to harsh and abusive working conditions, confiscating her passport, refusing to allow Ms. Tekle to leave, refusing to allow Ms. Tekle to take time off, and by withholding a copy of Ms. Tekle's contract.

95.     As a direct and proximate result of the actions of the Defendants' breach of contract, Ms. Tekle has suffered damages, including but not limited to unpaid wages and other economic losses.

96.     Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

97.     Ms. Tekle respectfully requests that judgment be entered in her favor against all Defendants and prays as follows:

98.     Award Ms. Tekle damages in an amount to be calculated at trial including but not limited to the full amount of Ms. Tekle's losses for violation of federal laws including: trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of 18 U.S.C. § 1590; forced labor in violation of 18 U.S.C. § 1589; unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced

labor in violation of 18 U.S.C. § 1592; and involuntary servitude in violation of 18 U.S.C. § 1584.

99.     Award Ms. Tekle punitive damages for Defendants' violation of the Trafficking Victims Protection Act.  *See Doe v. Howard*, No. 1:11-cv-01105, 2012 WL 3834867, at *2 (E.D. Va. Sept. 4, 2012) (citing *Ditullio v. Boehm*, 662 F.3d. 1091, 1100 (9th Cir. 2011)).

100.    Award Ms. Tekle compensatory and punitive damages in an amount to be calculated at trial for Defendants' breach of contract;

101.    Award Ms. Tekle prejudgment and post judgment interest;

102.    Award Ms. Tekle reasonable attorneys' fees, together with the cost and disbursement of this action; and

103.    Grant such other relief as this Court deems just and proper.

## JURY DEMAND

104.    Ms. Tekle respectfully demands a trial by jury of all issues for which she has a right to demand a trial by jury.

Dated: June 22, 2018

Richard F. Levy (*pro hac vice*)
Jonathan A. Langlinais (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639-6000
rlevy@jenner.com

Agnieszka M. Fryszman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

Respectfully submitted,

/s/ Nicholas Cooper Marritz
Nicholas Cooper Marritz, VSB #89795
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 720-5607
nicholas@justice4all.org

18

Le'ake Fesseha (*pro hac vice*)
LE'AKE FESSEHA LAW OFFICE
901 S. Highland Street, Suite 312
Arlington, VA 22204
(703) 302-3410
leakef@hotmail.com

Martina E. Vandenberg (*pro hac vice*)
Sarah L. Bessell (*pro hac vice*)
THE HUMAN TRAFFICKING LEGAL CENTER
1030 15th Street NW, #104B
Washington, D.C. 20005
(202)-716-8485
mvandenberg@htlegalcenter.org

*Counsel for Plaintiff Simret Semere Tekle*

## CERTIFICATE OF SERVICE

I certify that I uploaded the foregoing document to the Court's CM/ECF system today, which will cause a Notice of Electronic Filing and a link to the document to be sent to all counsel of record.

/s/ Nicholas Cooper Marritz                                             June 22, 2018
Nicholas Cooper Marritz, VSB #89795
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 720-5607
nicholas@justice4all.org