# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | |
|---|---|
| SIMRET SEMERE TEKLE, | Case No.: 1:18-cv-211-TSE-JFA |
| *Plaintiff*, | |
| v. | |
| NOUF BINT NAYEF ABUL-AZIZ AL SAUD, MOHAMMAD BIN ABDULLAH AL SAUD | |
| *Defendants*. | |

# PLAINTIFF'S MEMORANDUM IN OPPOSITION
# <u>TO DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTORY STATEMENT ..................................................................................... 1

FACTS ............................................................................................................................... 2

LEGAL STANDARD......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.    Ms. Tekle Has Sufficiently Alleged That Defendants Materially Breached The
Parties' Contract. ...................................................................................................... 6

    A.    Ms. Tekle has specifically alleged the material terms of the contract............................ 6

        1.    Ms. Tekle alleges that Defendants promised to pay her $4,500 per month to
work as a nanny.................................................................................................. 6

        2.    It is fairly inferable that the written contract memorialized the parties' oral
agreement. ......................................................................................................... 7

        3.    Defendants' agent told Ms. Tekle that Defendants had lied to American
consular authorities by submitting a written contract they had no intention
of honoring. ...................................................................................................... 7

    B.    As a matter of federal law, the contract contained mandatory terms that
Defendants breached. ..................................................................................... 8

        1.    By law, applicants for A-3 visas must have contracts with their employers
that contain certain terms. ............................................................................... 8

        2.    Ms. Tekle has sufficiently alleged that Defendants breached those
mandatory terms. ............................................................................................. 9

    C.    Ms. Tekle has sufficiently alleged her own performance of the contract...................... 10

II.    Ms. Tekle's Breach-Of-Contract Claim Is Timely Because Defendants Obstructed
Her Filing............................................................................................................... 10

    A.    The Court must deny Defendants' Motion unless the application of their statute-
of-limitations defense is apparent on the face of the complaint. .................................... 11

    B.    Ms. Tekle has raised several issues of fact as to whether her claim is timely
under Virginia Law................................................................................................ 12

i

C.   Ms. Tekle has sufficiently alleged that tolling applied under Section 8.01-229(D) through April 2012. ................................................................................................. 13

D.   Ms. Tekle has sufficiently alleged that tolling applied under Section 8.01-229(D) for at least 10 months in the period between April 2012 and February 2018. ............... 14

    1.   Defendants obstructed Ms. Tekle's filing by threatening Ms. Gebreyesus. ........... 16

    2.   Defendants obstructed Ms. Tekle's filing by enlisting Ms. Gebreyesus to help intimidate Ms. Tekle ..................................................................................... 18

E.   Defendants improperly attempt to limit the scope of tolling by alleging new facts in their Rule 12(b)(6) Motion. ..................................................................................... 21

CONCLUSION ..................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................5, 16

*Butler v. United States*,
  702 F.3d 749 (4th Cir. 2012) ..........................................................................5, 11

*Cruz v. Maypa*,
  773 F.3d 138 (4th Cir. 2014) ........................................................................14, 15

*Culpeper Nat'l Bank v. Tidewater Improvement Co.*,
  89 S.E. 118 (Va. 1916)........................................................................................12

*Deressa v. Gobena*,
  No. 1:05CV1334(JCC), 2006 WL 335629 (E.D. Va. Feb. 13, 2006)....................13

*Goodman v. Praxair, Inc.*,
  494 F.3d 458 (4th Cir. 2007) ........................................................................11, 15

*Hamlet v. Hayes*,
  641 S.E.2d 115 (Va. 2007)....................................................................................6

*Kiwanuka v. Bakilana*,
  844 F. Supp. 2d 107 (D.D.C. 2012) ......................................................13, 17, 21

*McPike v. Zero-Gravity Holdings, Inc.*,
  280 F. Supp. 3d 800 (E.D. Va. 2017) ..................................................................11

*Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*,
  855 F.3d 573 (4th Cir. 2017) ..............................................................................11

*Newman v. Walker*,
  618 S.E.2d 336 (Va. 2005)..................................................................................12

*Richmond, Fredericksburg & Potomac R. Co. v. Forst*,
  4 F.3d 244 (4th Cir. 1993) ..................................................................................11

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ....................5, 16

iii

**STATUTES**

8 U.S.C. § 1375c(b)(1).................................................................................................7, 8

8 U.S.C. § 1375c(b)(2)...................................................................................................9

18 U.S.C. § 1592............................................................................................................9

29 U.S.C. § 206(a), (f)...................................................................................................9

Va. Code § 8.01-229(D).........................................................................................passim

Va. Code § 8.01-246(2) ................................................................................................12

Va. Code § 40.1-28.10 ..................................................................................................10

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,
    Pub. L. 110-457, 122 Stat. 5044 (2008)....................................................................8

**OTHER AUTHORITIES**

5B Charles Alan Wright et al., *Federal Practice and Procedure* § 1357 (3d ed.
    2008 & Supp. 2017)................................................................................................11

Plaintiff Simret Semere Tekle respectfully opposes Defendants' Motion to Dismiss Count Five of the First Amended Complaint for breach of contract, Dkt. 31.

Defendants ask the Court to ignore the well-established legal standard applicable on a motion to dismiss.  Ms. Tekle has sufficiently alleged a cause of action for breach of contract under Virginia law.  She has also sufficiently alleged that her claim for breach of contract was timely filed because Defendants obstructed her filing for at least ten months through a pattern of threats and intimidation.  *See* Va. Code § 8.01-229(D).  For these reasons, Defendants' motion must be denied.

## INTRODUCTORY STATEMENT

Defendants' argument, in a nutshell, is that Count Five must be dismissed because Plaintiff cannot rely on the written contract she signed.  "Because Plaintiff had never had or read the contract," Defendants argue, "she could not possibly know the scope of the contract or what provision Defendant allegedly breached."  Defs' Mem. in Supp. of Mot. to Dismiss, Dkt. 32, at 11.

Defendants also argue that "[u]nder the Federal Rules of Evidence Plaintiff's testimony about the written contract she has never read would be inadmissible," *id.* and that "[b]ecause there is no way for Plaintiff to allege either that she fulfilled her obligations under the contract, or  that Defendants failed to fulfill their obligations to her under the contract, the Court should dismiss the breach of contract claims. (Fifth Claim)."  *Id*.  Defendants make the same argument under the parol evidence rule.  *Id.*

This is sophistry at its worst.  It is also a remarkable position for Defendants to take.  In submitting Ms. Tekle's application for a visa to the American consular authorities in Saudi Arabia, Defendants were required by law to provide a copy of the contract.  Defendants argue that Ms. Tekle had no way of knowing what Defendants' contractual obligations to her were, and

1

therefore there was no binding contract.  Defendants fail to acknowledge that they represented to the American government that they had a contract to pay Ms. Tekle a lawful wage under state and federal law at the time of her visa application.  But Defendants now insist on arguing that there was no binding contract between Ms. Tekle and the Defendants.

## FACTS

Ms. Tekle is a citizen of Eritrea.  Am. Compl., Dkt. 28, ¶¶ 1, 10.  In 2008, she was recruited by Okuba Gebreyseus, a friend of Ms. Tekle's mother, to work as a maid for Princess Maha bint Mohammad bin Ahmad Al Sudairi in Saudi Arabia.  *Id.* ¶¶ 11-12.  Ms. Gebreyesus had worked for the Saudi royal family for several decades, and Ms. Tekle has long referred to Ms. Gebreyesus as her "aunt."  *Id.* ¶ 11.

Princess Maha proved to be a difficult and dangerous employer.  *Id.* ¶¶ 14-17.  She regularly used physical and verbal abuse to make her employees feel inferior and to enforce discipline.  On several occasions, this abuse took extreme forms.  For example, on one occasion Princess Maha pushed Ms. Tekle down because she saw that Ms. Tekle was wearing a crucifix around her neck.  *Id.* ¶ 16.  On another occasion, Princess Maha told Ms. Tekle that she would suffer the same punishment as criminals whose punishments were broadcast on Saudi television if she lied or stole.  *Id.* ¶ 15.  Ms. Tekle had also seen Princess Maha throw a glass at Ms. Gebreyesus.  *Id.* ¶ 56.

### A.    Defendants breached the parties' contract.

In 2011, Defendant Nouf bint Nayef Abul-Aziz Al Saud—Princess Maha's daughter—visited her mother in Saudi Arabia.  *Id.* ¶ 18.  During her visit, Defendant Ms. Al Saud offered Ms. Tekle a job working for her as a nanny for one of her three children in the United States.  *Id.* She offered to pay Ms. Tekle $4,500 per month—a significant raise for Ms. Tekle—and promised that Ms. Tekle would be required to work forty hours per week with two days off each

2

week.  *Id.*  Ms. Tekle accepted the offer, *id. ¶¶* 18-19, and was given a contract to sign.  *Id. ¶* 19.
But the contract was in Arabic—a language Ms. Tekle could not read—and Defendants never
gave Ms. Tekle a copy of the contract.  *Id.*

Ms. Tekle needed a visa so that she could enter and work in the United States.  Princess
Maha's family prepared her application for a visa and made her travel arrangements.  *Id. ¶¶* 19-
23.  To obtain the visa, Defendants submitted a copy of the parties' contract to American
consular authorities in Jeddah, Saudi Arabia.  Defendants falsely represented that Ms. Tekle
would be paid at a lawful rate for childcare services, with legally acceptable conditions of
employment.  *Id. ¶¶* 21, 34.  Ms. Tekle was granted an A-3 visa and began working for
Defendants in Virginia in September 2011.  *Id. ¶¶* 22-24.

Defendants did not honor the terms of their contract.  *Id. ¶¶* 91-96.  Far from it.  When
Ms. Tekle arrived at Defendants' home, Defendants required Ms. Tekle to work as a domestic
worker, not as a nanny as promised.  *Id. ¶¶* 26, 28.  Ms. Tekle worked seven days per week with
no days off, regularly working more than 80 hours per week.  *Id. ¶¶* 35-36.  Defendants also
refused to pay Ms. Tekle the promised salary of $4,500 per month.  Instead, Defendants paid Ms.
Tekle only $400 to $500 per month in cash.  *Id. ¶¶* 33, 36.  In total, Defendants paid Ms. Tekle
only about $3,000 over the course of seven months—less than $2 per hour.  *Id. ¶* 36.

## B.     Defendants obstructed Ms. Tekle's filing of this suit after she escaped.

After seven months of forced labor and involuntary servitude, Ms. Tekle escaped from
Defendants' control in April 2012 when the family sent Ms. Tekle and her escort on a shopping
errand.  *Id. ¶¶* 51-54.  Even after her escape, Ms. Tekle remained terrified that Defendants would
find her.  *Id. ¶* 55.  She rarely left the house out of fear.  *Id.*  She suffered nightmares and

frequently woke up screaming.  *Id.*  She especially feared for the safety of Ms. Gebreyesus, who continued to work for Princess Maha.  *Id. ¶* 56.

After Ms. Tekle escaped from Defendants' home, Defendants embarked on a course of threatening conduct designed to deter her from filing a civil suit for damages resulting from their illegal conduct.  *Id. ¶¶* 56-65.  Soon after Ms. Tekle's escape, Ms. Gebreyesus began making frantic calls to Ms. Tekle's family from Saudi Arabia.  Ms. Gebreyesus told Ms. Tekle's family that the Defendants' family blamed her for Ms. Tekle's escape and had threatened Ms. Gebreyesus.  *Id. ¶* 57.  Ms. Tekle's family relayed these messages to Ms. Tekle.  The calls intensified Ms. Tekle's fears for Ms. Gebreyesus's safety.  *Id.*  Ms. Gebreyesus continued to call Ms. Tekle's family every few weeks to inquire about Ms. Tekle.  *Id. ¶* 58.  Ms. Gebreyesus began demanding to know "what Ms. Tekle planned to do, where Ms. Tekle was living, with whom Ms. Tekle was living," and "how to contact Ms. Tekle."  *Id.*  These inquiries continued for several years; they terrified Ms. Tekle.  *Id.*

Because of these constant and detailed inquires, Ms. Tekle reasonably understood that Defendants had threatened Ms. Gebreyesus and prevailed upon her to help them make contact with Ms. Tekle.  *Id. ¶¶* 61-65.  Ms. Tekle reasonably understood that these efforts were made to deter her from filing suit against Defendants, and they did indeed deter her from filing suit.  *Id. ¶¶* 56-65.

In April 2013, approximately one year after Ms. Tekle escaped, she met with federal law enforcement officials to report Defendants' crimes.  *See id. ¶* 59.  Ms. Tekle understood that her testimony would be confidential, and she told her interviewers at the time that she continued to fear for the safety of Ms. Gebreyesus, who remained in Saudi Arabia.  *Id.*

4

Defendants' efforts to deter Ms. Tekle from filing suit did not end in April 2013.  Ms. Gebreyesus continued to call Ms. Tekle to inquire about Ms. Tekle's whereabouts, presumably on Defendants' behalf, until 2015.  *Id.* ¶ 58.  That year, Ms. Gebreyesus returned to Eritrea and threatened to evict Ms. Tekle's family from their home in Asmara.  *Id.* ¶ 60.  Ms. Tekle concluded that Ms. Gebreyesus's threats were made at Defendants' instruction in order to deter Ms. Tekle from filing suit.  *Id.* ¶ 64.

Ms. Tekle filed her original complaint on February 23, 2018.  Dkt. 1.  Ms. Tekle filed her amended complaint on June 22, 2018.  Dkt. 28.  Defendants filed the present motion to dismiss on July 6, 2018.  Dkt. 31.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), plaintiff's allegations are accepted as true and are construed in a light most favorable to the plaintiff.  *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015).  A complaint survives a motion to dismiss if it contains "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the plaintiff's claim, not to "resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses."  *Butler v. United States*, 702 F.3d 749, 752 (4th Cir. 2012) (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

**ARGUMENT**

I.     **Ms. Tekle Has Sufficiently Alleged That Defendants Materially Breached The Parties' Contract.**

Defendants contend that Count Five should be dismissed for failure to state a claim under Rule 12(b)(6).  Defs' Mem. at 10.  Virginia law provides that "[t]he essential elements of a cause of action for breach of contract are (1) a legal obligation of a defendant to a plaintiff, (2) a violation or breach of that obligation, and (3) a consequential injury or damage to the plaintiff." *Hamlet v. Hayes*, 641 S.E.2d 115, 117 (Va. 2007).  Ms. Tekle has sufficiently alleged all three elements.

Defendants do not dispute that Ms. Tekle has adequately alleged the existence of an employment contract or that she suffered damages.  *See* Am. Compl. ¶¶ 18-19, 33, 36.  Yet Defendants argue that because Ms. Tekle "never had or read the contract, she could not possibly know the scope of the contract—or what provision Defendants allegedly breached."  Defs' Mem. at 11.  This argument fails for two reasons.

A.     **Ms. Tekle has specifically alleged the material terms of the contract.**

Defendants' argument fails because Ms. Tekle has made several specific allegations about the terms of her contract with Defendants and because those terms are fairly inferable from other allegations in the complaint.

1.     **Ms. Tekle alleges that Defendants promised to pay her $4,500 per month to work as a nanny.**

First, Ms. Tekle specifically alleges that Defendants made an oral promise to employ her as a nanny in the United States at a wage of $4,500 per month in exchange for forty hours of work per week.  *Id.* ¶ 18.  Ms. Tekle agreed to these terms, after which she was told to sign a written contract drafted in a language *she could not read* by an aide to Defendant Mrs. Al Saud's

6

mother, Princess Maha. *Id.* ¶¶ 18-19. These are the key material terms that Ms. Tekle alleges Defendants breached.

### 2. It is fairly inferable that the written contract memorialized the parties' oral agreement.

Second, it is fairly inferable from the complaint that the parties' written contract memorialized the terms of the parties' oral agreement. *See id.* Defendants make much of the difference between oral and written contracts, but the simple fact is that parties often come to an understanding about the key terms of an agreement in conversation and then memorialize that understanding in a written contract. That is plausibly what happened here, since a written contract is required by law before an applicant may receive an A-3 visa. *Id.* ¶¶ 19-22; 8 U.S.C. § 1375c(b)(1). It is also fairly inferable that Defendants or their agents drafted the written contract because it was written in a language that Ms. Tekle could not read. Am. Compl ¶ 19. Defendants presumably will not contend that they materially altered the agreed-upon terms or used Ms. Tekle's limited knowledge of Arabic to conceal terms from her. Accordingly, one can reasonably infer from the complaint that the written contract reflects the terms of the parties' oral agreement.

### 3. Defendants' agent told Ms. Tekle that Defendants had lied to American consular authorities by submitting a written contract they had no intention of honoring.

Third, Ms. Tekle specifically alleges that Defendants submitted their contract with Ms. Tekle to American consular officials in Jeddah, and that Defendants represented that the contract complied with the requirements of federal law. *Id.* ¶¶ 20-21. Later, when Ms. Tekle complained about her wages to one of Defendants' agents, the agent responded that "Defendants had lied" about Ms. Tekle's wages "to bring Ms. Tekle to the United States on an A-3 visa." *Id.* ¶ 34. In other words, as Ms. Tekle alleges elsewhere, Defendants "falsely represented to the American

consular authorities . . . that Ms. Tekle would be compensated at a lawful rate for childcare services in the United States." *Id.* ¶ 21. Accordingly, at a minimum, one can reasonably infer that the contract required Defendants to pay significantly more than Ms. Tekle in fact received.

Under all of these circumstances, it is absurd to contend that Ms. Tekle "could not possibly know" what the material terms of the written contract were. Defs' Mem. at 11. For the purposes of Rule 12(b)(6), Ms. Tekle has more than adequately alleged what those terms required. Moreover, Ms. Tekle is prepared to present evidence that the written contract did indeed memorialize at least the agreed upon wage of $4,500 per month.

**B.      As a matter of federal law, the contract contained mandatory terms that Defendants breached.**

Furthermore, Ms. Tekle alleges that she entered the United States on an A-3 visa. Am. Compl. ¶¶ 22-23. That allegation has several implications for the contractual relationship between the parties. Because Ms. Tekle entered on an A-3 visa, federal law required that the Defendants' contract with Ms. Tekle include certain minimum terms. Ms. Tekle has alleged that Defendants breached even those minimum terms. *See id.* ¶¶ 19, 33, 36, 80-83.

**1.      By law, applicants for A-3 visas must have contracts with their employers that contain certain terms.**

Congress has long recognized that non-citizens who travel the United States to work as domestic employees are particularly vulnerable to their employers. In 2008, Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5044 (2008), in order to add extra protections for non-citizens entering the United States on employment-based visas. Most relevant here, the Act amended the Immigration and Nationality Act to impose special conditions the issuance of A-3 visas. Under the Act, the Secretary of State "may not issue" an A-3 visa unless the applicant "has executed a contract with

the employer or prospective employer" that contains certain mandatory terms.  8 U.S.C. §

1375c(b)(1).  In particular, contracts between employers and A-3 visa recipients must include (1)

"an agreement by the employer to abide by all Federal, State, and local laws in the United

States"; (2) "information on the frequency and form of payment, work duties, weekly work

hours, holidays, sick days, and vacation days"; and (3) "an agreement by the employer not to

withhold the passport, employment contract, or other personal property of the employee."  *Id.* §

1375c(b)(2).  Accordingly, it is virtually certain—and thus fairly inferable—that the written

contract between the parties contains all three terms.  Moreover, those terms are plainly material

insofar as it would have been impossible for Ms. Tekle to work for Defendants in Virginia unless

their contract included such terms.  *See id.* § 1375c(b)(1).

## 2.    Ms. Tekle has sufficiently alleged that Defendants breached those mandatory terms.

Ms. Tekle has sufficiently alleged that Defendants breached these terms of the contract in

several respects.  For instance, Defendants breached the contract by withholding a copy of it

from Ms. Tekle.  *See* Am. Compl. ¶ 19.  Ms. Tekle has also alleged that Defendants violated the

terms of the contract by withholding Ms. Tekle's passport, which is also a serious federal offense

and the subject of Count Three of the complaint.  *See* 18 U.S.C. § 1592; Am. Compl. ¶¶ 80-83.

Defendants do not even dispute that Ms. Tekle has adequately alleged a violation of Section

1592, which makes their argument doubly puzzling.  *See* Defs' Mem. at 1 ("only one of

Plaintiff's claims is legally deficient").

Furthermore, Ms. Tekle has alleged that Defendants failed to abide by their promise to

obey state and federal law, including state and federal labor laws.  *See* 8 U.S.C. § 1375c(b)(2).

In 2011, the minimum wage for live-in domestic employees under the Fair Labor Standards Act

was $7.25 per hour.  *See* 29 U.S.C. § 206(a), (f).  Virginia law incorporates the federal minimum

wage. *See* Va. Code § 40.1-28.10. As Ms. Tekle expressly alleges in her complaint, Defendants paid her a wage of less than $2 per hour. Am. Compl. ¶¶ 33-36.

### C. Ms. Tekle has sufficiently alleged her own performance of the contract.

Regarding Ms. Tekle's compliance with her end of the bargain, Ms. Tekle alleges that the contract obliged her to work forty hours per week for Defendants as a nanny to one of their three children. *Id.* ¶ 18. Ms. Tekle traveled the United States to perform under the terms of the contract, and after she arrived, she was regularly required to work more than 80 hours per week performing whatever tasks Defendants demanded. Ms. Tekle continued to do so until well after Defendants first breached the contract. *Id.* ¶¶ 26-31, 35. As far as Ms. Tekle is aware, and as far as the parties' negotiations and course of performance would indicate, her performance satisfied all of the material terms of the contract.

If Defendants would like to allege that Ms. Tekle committed the first material breach of the contract, they may do so in their answer, and they will have ample opportunity to develop their proof in discovery. Ms. Tekle is not required to anticipate in her complaint and rebut every conceivable defense that Defendants might assert, and she is certainly not required to plead all of the contractual terms that she did *not* violate.

## II. Ms. Tekle's Breach Of Contract Claim Is Timely Because Defendants Obstructed Her Filing.

Defendants also contend that Ms. Tekle's breach of contract claim is barred by Virginia's five-year statute of limitations. Defs' Mem. at 3. But it is far too early to resolve Defendants' statute-of-limitations defense. Ms. Tekle has plausibly alleged that her complaint was in fact timely under Virginia law because Defendants obstructed her from filing suit for at least ten months in total.

10

### A.       The Court must deny Defendants' Motion unless the application of their statute-of-limitations defense is apparent on the face of the complaint.

A motion to dismiss under Rule 12(b)(6) is not meant to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Butler*, 702 F.3d at 752.  For that reason, the Fourth Circuit has consistently held that courts may dismiss a claim as time-barred on a motion to dismiss only when the "face of the complaint includes all necessary facts for the defense to prevail."  *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 577 (4th Cir. 2017) (quoting *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 850–51 (4th Cir. 2016)); *see also Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) ("a motion to dismiss . . . generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred"); *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993) (a statute-of-limitations defense "may be raised under Rule 12(b)(6), but only if it clearly appears on the face of the complaint").

Accordingly, when the application of a defense turns on issues of fact that are not apparent on the face of the complaint—including whether the complaint is in fact timely filed—the motion should be denied.  *See, e.g.*, *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 806–08 (E.D. Va. 2017); 5B Charles Alan Wright et al., *Federal Practice and Procedure* § 1357 (3d ed. 2008 & Supp. 2017) ("the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion").  Defendants must also show "that the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint."  *Praxair*, 494 F.3d at 466.  That same reasoning applies here, where Ms. Tekle's rejoinder is that her complaint was in fact timely under Virginia law.

**B.** **Ms. Tekle has raised several issues of fact as to whether her claim is timely under Virginia Law.**

Under Virginia law, the statute of limitations for breach of a written contract is five years. Va. Code § 8.01-246(2).  However, Section 8.01-229(D) provides that "[w]hen the filing of an action is obstructed by a defendant's . . . using any other direct or indirect means to obstruct the filing of an action, then the time that such obstruction has continued shall not be counted as any part of the period within which the action must be brought."  Va. Code § 8.01-229(D).  As the Supreme Court of Virginia has explained, Section 8.01-229(D) applies not "only when a defendant acts to conceal the existence of a cause of action."  *Newman v. Walker*, 618 S.E.2d 336, 338 (Va. 2005).  Rather, the statute applies to any affirmative acts taken to directly or indirectly obstruct the filing of an action.  And as Defendants concede, those affirmative acts toll the statute of limitations for as long as they reasonably deter the plaintiff from filing suit.  Defs' Mem. at 6-7; *see also Newman*, 618 S.E.2d at 339; *Culpeper Nat'l Bank v. Tidewater Improvement Co.*, 89 S.E. 118, 121 (Va. 1916).

Ms. Tekle alleges that Defendants used threats and intimidation tactics involving Ms. Gebreyesus to obstruct Ms. Tekle from filing suit.  Am. Compl. ¶¶ 56-65.  Whether Count Five is time-barred therefore turns on several important factual issues, including: (1) what actions Defendants took to deter Ms. Tekle from filing suit, and specifically what interactions they had with Ms. Gebreyesus after Ms. Tekle escaped; and (2) whether Ms. Tekle's reactions to Defendants' actions were objectively reasonable, and for how long.  These issues must be resolved before the Court can determine whether Ms. Tekle's complaint was timely filed under Virginia law, and the complaint does not definitively resolve those issues in Defendants' favor.  Therefore, Defendants' motion should be denied.

**C.      Ms. Tekle has sufficiently alleged that tolling applied under Section 8.01-229(D) through April 2012.**

It is well established that threats of reprisals and intimidation tactics "constitute affirmative acts designed to prevent [an employee] from obtaining her wages or taking steps to enforce her contractual and common law rights" under Section 8.01-229(D). *Deressa v. Gobena*, No. 1:05CV1334(JCC), 2006 WL 335629, at *4 (E.D. Va. Feb. 13, 2006). In *Deressa*, a human trafficking case, the plaintiff alleged that her employers "implied that they were holding a lump sum of [her] money for her, threatened [her] with deportation when she asked about her pay, forbade [her] from leaving their residence, and took several measures to ensure that [she] would not venture outside of the residence." *Id.* On that basis, the court denied the defendants' motion to dismiss the plaintiff's breach of contract claim as time-barred, concluding that these activities tolled the statute of limitations under Section 8.01-229(D) at least until the end of her employment, which sufficed to render the plaintiff's claims timely. *Id.*

The District Court for the District of Columbia adopted the same interpretation of Section 8.01-229(D) in *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107 (D.D.C. 2012). In that case, the district court held that the defendants' "confiscating [plaintiff's] identity documents and passport and keeping her in isolation," *id.* at 120, along with defendants' threats of deportation, *id.* at 118, sufficed to toll the statute of limitations on the plaintiff's Virginia state-law claims until the plaintiff "was free from the defendants' control *and* able to assert her legal rights in July 2009, when her first contact with the FBI took place." *Id.* at 120 (emphasis added). Although the plaintiff had returned to Tanzania between periods of forced labor, the court also equitably tolled the statute of limitations during that period. The court stated, "[W]hen [the plaintiff] returned to Tanzania, [the defendant] refused to return [the plaintiff's] passport, and [the defendant's] family retained possession of [the plaintiff's] passport and belongings." *Id.* at 118.

Here, Ms. Tekle has alleged that Defendants held her in forced labor and involuntary servitude until April 2012 using a variety of coercive tactics designed to prevent her from escaping.  Am. Compl. ¶ 53.  These included verbal and psychological abuse, *id.* ¶¶ 37-39, confiscating Ms. Tekle's passport, *id.* ¶¶ 23, 31, 50, and repeatedly threatening Ms. Tekle with deportation.  *Id.* ¶¶ 44, 47, 49.  For the purposes of Section 8.01-229(D), these allegations are indistinguishable from the allegations at issue in *Deressa* and *Kiwanuka*.  Defendants offer no reason to doubt the holdings or applicability of *Deressa* or *Kiwanuka*.  Indeed, they do not even cite these cases.  Defendants also offer no reason to doubt that Ms. Tekle's allegations sufficiently allege tolling until at least April 2012, when Ms. Tekle finally escaped from the Defendants' home.  Accordingly, as an initial matter, Ms. Tekle has adequately alleged that the statute of limitations on her breach-of-contract claim was tolled until at least April 2012.

> **D.     Ms. Tekle has sufficiently alleged that tolling applied under Section 8.01-229(D) for at least 10 months in the period between April 2012 and February 2018.**

Ms. Tekle filed her original complaint in February 2018, approximately five years and ten months after Ms. Tekle escaped from Defendants' home in April 2012.  Dkt. 1.  Accordingly, Ms. Tekle's complaint was timely filed under Virginia law if Defendants obstructed her from filing her breach of contract claim for at least ten months in total between April 2012 and February 2018.  *See* Va. Code § 8.01-229(D).

Defendants therefore focus their argument on whether Ms. Tekle has plausibly alleged that tolling continued to apply *after* Ms. Tekle escaped in April 2012.  Defs' Mem. at 5-10.  The Fourth Circuit has indicated that Section 8.01-229(D) continues to apply after a plaintiff escapes from the defendants' control if the defendants take some action "to deter her from filing suit *after* her escape."  *Cruz v. Maypa*, 773 F.3d 138, 147 (4th Cir. 2014) (emphasis in original).  Unlike the plaintiff in *Maypa*, Ms. Tekle has plausibly alleged that Defendants did take such actions

14

after April 2012.  *Compare Maypa*, 773 F.3d 138 at 147 (no allegations of post-escape conduct) *with* Am. Compl. ¶¶ 55-65.  And, contrary to Defendants' claims, the allegations in the complaint plausibly allege that tolling applied for at least ten months in total between April 2012 and February 2018.

In her complaint, Ms. Tekle alleges on information and belief that Defendants directly or indirectly acted to obstruct Ms. Tekle from suing them for breach of contract on multiple occasions between April 2012 and 2015.  Am. Compl. ¶¶ 57-65.  Defendants took advantage of the fact that Ms. Gebreyesus—a friend of Ms. Tekle's family and a long-time employee of the Saudi royal family—continued to work for Princess Maha after Ms. Tekle escaped.  *Id.* ¶ 56. Based on Ms. Tekle's own experience as an employee of Princess Maha, and as a witness to physical violence inflicted by Princess Maha, Ms. Tekle feared for Ms. Gebreyesus's safety.  *Id.* ¶¶ 14-17, 56.  Specifically, Ms. Tekle has alleged that Defendants threatened Ms. Gebreyesus in order to prevent Ms. Tekle from filing suit.  *Id.* ¶ 64.  Ms. Tekle has also alleged that Defendants caused Ms. Gebreyesus to call Ms. Tekle's family incessantly to complain that she had been threatened, to learn Ms. Tekle's whereabouts, how to contact her, and "what she planned to do." *Id.* ¶ 58.  This too was done in order to intimidate Ms. Tekle and prevent her from filing suit.  *Id.* ¶ 65.  Defendants do not dispute that these specific allegations would suffice to toll the statute of limitations under Section 8.01-229(D).

Rather, Defendants appear to argue that these allegations are simply not plausible for the purposes of Rule 12(b)(6).  *See* Motion to Dismiss 5-10.  But under established Fourth Circuit precedent, Defendants must show that Ms. Tekle's theory about the application of Section 8.01-229(D) "was foreclosed by the allegations in the complaint."  *Praxair, Inc.*, 494 F.3d at 466. Defendants have failed to do so.  Ms. Tekle's allegations are not the type of conclusory

allegations or "naked assertions" that are not entitled to the assumption of truth.  *See Black &*

*Decker*, 801 F.3d at 422.  Ms. Tekle's allegations are specific, and she has alleged ample facts to

support them.  *See infra* sections II.D.1, II.D.2.  Once these allegations are accepted as true, and

once all reasonable inferences from these allegations are drawn in Ms. Tekle's favor, they firmly

support the conclusion that Ms. Tekle's breach of contract claim is timely.

        **1.**      **Defendants obstructed Ms. Tekle's filing by threatening Ms.**
                 **Gebreyesus.**

     First, Ms. Tekle has alleged that Defendants acted either directly or indirectly to threaten

Ms. Gebreyesus in order to deter Ms. Tekle from filing suit.  Shortly after Ms. Tekle escaped

from Defendants' home, Ms. Gebreyesus called Ms. Tekle's family in Eritrea and told them that

"the Defendants' family blamed her" for Ms. Tekle's escape, "had lost trust and faith in her, and

had threatened her, all because Ms. Tekle . . . had escaped."  *Id.* ¶ 57.  Predictably, Ms. Tekle's

family relayed this to Ms. Tekle, which "made her fear for Ms. Gebreyesus's safety."  *Id.* ¶ 58.

Defendants knew that Ms. Gebreyesus worked for Princess Maha and knew about Ms.

Gebreyesus's relationship to Ms. Tekle's family.  *See id.* ¶ 62.  After all, Ms. Gebreyesus had

worked for the royal family for decades and was the one who had recruited Ms. Tekle to work

for Princess Maha in 2008.  *Id.*  ¶¶ 18-19.  Defendants also knew about Princess Maha's abusive

treatment of her employees and her tendency to punish her employees with physical violence.

*Id.* ¶¶ 14-17, 56, 63.

     From these allegations, the Court could draw the "reasonable inference" that Defendants

threatened Ms. Gebreyesus or told Princess Maha about Ms. Tekle's escape with the intention

and expectation that Princess Maha would make such threats.  *Iqbal*, 556 U.S. at 678.  The Court

could also infer that this was done in order to prevent Ms. Tekle from filing suit.  Why else

would Defendants take such actions against Ms. Gebreyesus in response to Ms. Tekle's escape?

Moreover, Defendants knew about Ms. Gebreyesus's relationship to Ms. Tekle's family, Am. Compl. ¶ 62, and it is thus plausible that they knew that Ms. Gebreyesus would relay these threats to Ms. Tekle's family.

The Court can also reasonably infer that Ms. Tekle's fear for Ms. Gebreyesus's safety was objectively reasonable and that this fear reasonably deterred her from filing suit until at least April 2013, when Ms. Tekle sat for her first interview with federal law enforcement officers. *See Kiwanuka*, 844 F. Supp. 2d at 120. Ms. Tekle knew that Ms. Gebreyesus continued to work for Princess Maha, and she knew the violence and abuse Princess Maha was capable of committing. Ms. Tekle herself had been physically and verbally abused by Princess Maha, *id.* ¶¶ 14-17, and she had witnessed Princess Maha throw a glass at Ms. Gebreyesus. *Id.* ¶ 56. Moreover, it was Ms. Gebreyesus herself who had reported the threats she was receiving, and Ms. Gebreyesus apparently found these threats frightening enough to tell Ms. Tekle's family about them. Under these circumstances, Ms. Tekle had every reason to believe that the threats against Ms. Gebreyesus were serious and that Ms. Gebreyesus would suffer serious harm if Ms. Tekle filed suit. Ms. Tekle specifically alleges that she expressed her fears for Ms. Gebreyesus's safety to federal law enforcement officials in April 2013. *Id.* ¶ 59.

Defendants insist that no threats were made against Ms. Gebreyesus and suggest that Ms. Gebreyesus was a content employee. Defs' Mem. at 8. They will have an opportunity to develop evidence for those assertions and prove them at trial, but they are no basis for a motion to dismiss. Defendants also mischaracterize Ms. Tekle's complaint in several respects. For example, Defendants assert—with no basis whatsoever—that Ms. Tekle's allegations were "simply made up" to survive this motion to dismiss. Defs' Mem. at 9 n.2. In fact, Ms. Tekle's

17

expressed her fears for Ms. Gebreyesus's safety on the record to law enforcement in *April 2013*. Am. Compl. ¶ 59.

Next, according to Defendants, Ms. Tekle admitted that Ms. Gebreyesus "contentedly continued to work" for Princess Maha and "frequently returned home to Eritrea during this period." Defs' Mem. at 9. The complaint does not contain any such statements. The complaint does state that Ms. Gebreyesus continued to work for Princess Maha, but many employees choose to put up with constant verbal and physical abuse because they need money. That is especially true of domestic workers in foreign countries, like Ms. Gebreyesus. And though Ms. Gebreyesus returned to Eritrea on at least one occasion, that occurred in 2015. Am. Compl. ¶ 60. Ms. Tekle does not need to demonstrate that she reasonably feared for Ms. Gebreyesus safety until 2015. She needs to show only that she reasonably feared for Ms. Gebreyesus's safety until at least February 2013 or for some combination of ten months between April 2012 and February 23, 2018. *See* Va. Code § 8.01-229(D). And a contemporaneous statement made to a federal law enforcement officer in *April 2013* indicates that she did have that objective fear. Am. Compl. ¶ 59.

> **2. Defendants obstructed Ms. Tekle's filing by enlisting Ms. Gebreyesus to help intimidate Ms. Tekle.**

Second, Ms. Tekle has alleged that Defendants used Ms. Gebreyesus to relay implicit threats to Ms. Tekle. Ms. Gebreyesus continued to call Ms. Tekle's family "frequently—every few weeks," repeatedly asking "what Ms. Tekle planned to do, where Ms. Tekle was living, with whom Ms. Tekle was living, how to contact Ms. Tekle directly, what Ms. Tekle was doing, and whether Ms. Tekle had been in contact with Ms. Tekle's family." *Id.* ¶ 58. Again, these calls reasonably terrified Ms. Tekle. *Id.* Ms. Gebreyesus—who was then in the employ of the Defendants' family—had suddenly begun calling Ms. Tekle's family shortly after Ms. Tekle's

escape. Ms. Gebreyesus was apparently aware of that escape. Ms. Gebreyesus indicated that she had learned about Ms. Tekle's escape from the Defendants or the Defendants' family. *Id.* ¶ 57. And in her frequent calls to Ms. Tekle's family, Ms. Gebreyesus suspiciously sought information about Ms. Tekle's precise whereabouts in Virginia and what Ms. Tekle's future plans would be. *Id.* ¶ 58.

Ms. Tekle drew a highly plausible and reasonable conclusion from that bizarre behavior: Defendants and Defendants' family, lacking any other way to reach Ms. Tekle and desperate to either find her in Virginia or prevent her from filing suit, were using Ms. Gebreyesus to fish for specific information from Ms. Tekle's family. That conclusion was reasonable given that Ms. Gebreyesus had already complained that she was being threatened because of Ms. Tekle's escape. Ms. Tekle was reasonably "terrified" that these calls indicated that Defendants were still looking for her and would be waiting for her should she decide to file a public lawsuit. *Id.*

Defendants assert that Ms. Gebreyesus's threatening phone calls merely indicate a family friend who wanted to "call[] sporadically to check for news regarding her 'niece' who, having just left Defendants' home, was presumably alone and unemployed and foreign country . . . ." Defs' Mem. at 6. But on a motion-to-dismiss posture, Defendants are not entitled to the most favorable inferences that could reasonably be drawn from the complaint's allegations. Rather, *Ms. Tekle* is entitled to any such inference. And Ms. Tekle's allegations adequately support such an inference. Am. Compl. ¶¶ 55-65.

Defendants next argue that there is nothing connecting Ms. Gebreyesus's actions to the Defendants, asserting that Ms. Tekle has no indication that Ms. Gebreyesus's calls were "as a result of" Defendants' acts or "at the behest of" Defendants. Defs' Mem. at 7. What Defendants overlook is that the obvious connection between Defendants and Ms. Gebreyesus: Defendants

19

(and their agents) were the only individuals aware that Ms. Tekle fled Defendants' compound. Thus, when Ms. Gebreyesus contacted Ms. Tekle's family, she necessarily must have been doing so as a result of Defendants' or their agents' actions. Defendants' apparent theory—that Ms. Gebreyesus, in Saudi Arabia, had somehow intuited that Ms. Tekle had escaped the compound at the precise moment that she did—is fanciful. More importantly, it is directly belied by the complaint, which states that Ms. Gebreyesus was calling Ms. Tekle's family as a direct result of conversations between the Defendants' family and herself to report that she, Ms. Gebreyesus, had been threatened. Am. Compl. ¶ 57.

Finally, it was utterly reasonable for Ms. Tekle to believe that Ms. Gebreyesus was acting at the behest of Defendants. Ms. Gebreyesus's phone calls had begun suddenly and immediately after Ms. Tekle's escape. *Id.* ¶ 57. In those phone calls, Ms. Gebreyesus seemed obsessed with obtaining specific information about Ms. Tekle that would be immensely useful to someone in Virginia seeking to find her, but that were likely of little interest to Ms. Gebreyesus, who lived in Saudi Arabia and who had never asked for that type of information about Ms. Tekle before. *Id.* ¶ 58. Finally, Ms. Tekle knew that the *only* way that Defendants could have sought to get word to Ms. Tekle—or to convey an implicit threat—would be to communicate via Ms. Gebreyesus. Ms. Gebreyesus was the only person that the Defendants *knew* could get in touch with Ms. Tekle's family, because Defendants' family knew that Ms. Gebreyesus had recruited Ms. Tekle to work for the Defendants in the first place. It would have been a remarkable coincidence if the only person that Defendants could use to contact Ms. Tekle had, shortly after Ms. Tekle fled the Defendants' compound, reached out to Ms. Tekle and asked exactly the types of questions to which the Defendants would have wanted to know the answers. Given what she had seen of the

20

Defendants—and particularly Defendants' family's threats toward, and verbal and physical abuse of, their workers—Ms. Tekle reasonably believed that it was not a coincidence.

Defendants' threats and intimidation tactics continued to influence Ms. Tekle after she escaped until at least April 2013. Accordingly, Ms. Tekle has adequately alleged a basis for tolling under Section 8.01-229(D) until at least February 23, 2013.

### E. Defendants improperly attempt to limit the scope of tolling by alleging new facts in their Rule 12(b)(6) Motion.

Defendants argue that tolling applies, at most, only until January 2013, when law enforcement began investigating the Defendants for human trafficking and visa fraud. Defs' Mem. at 9-10. Defendants have improperly cited and relied on a document outside the pleadings without even submitting it to the Court for its review. *Id.* This is not the only place where Defendants have tried to sneak alleged facts outside the pleadings into the record. For example, Defendants allege in a footnote that Mrs. Gebreyesus "has endured no repercussions as a result of Plaintiffs filing of this lawsuit." *See* Defs' Mem. at 9 n.1. Attempting to introduce new facts to support a 12(b)(6) is plainly improper, and Ms. Tekle respectfully submits that the Court should not consider Defendants' arguments insofar as they rely on those tactics.

Ms. Tekle has alleged in her complaint that she did not even meet with federal law enforcement officials to report the Defendants' crimes until April 2013. *Id.* ¶ 59. This would suffice to render Ms. Tekle's complaint timely under Virginia law. *See Kiwanuka*, 844 F. Supp. 2d at 111, 120 (holding that tolling applied until plaintiff made contact with the FBI as part of an investigation concerning the defendant). At any rate, Virginia's tolling statute does not require that tolling be applied for one, and only one, unbroken period. Rather, it applies to any period or periods of time during which defendants obstruct the filing of an action. *See* Va. Code § 8.01-229(D). And here, the complaint clearly alleges that the threatening phone calls and threats from

Ms. Gebreyesus did not end in early 2013.  Those threats and threatening phone calls persisted

until 2015.  The year 2015 is also when Ms. Gebreyesus reappeared in Eritrea and threatened to

evict Ms. Tekle's family because of Ms. Tekle's escape.  Am. Compl. ¶ 59.  Under these

circumstances, and at this stage of the proceedings, it would be highly speculative to conclude

that these continued efforts to prevent Ms. Tekle from filing suit against Defendants had *no effect*

*whatsoever* on Ms. Tekle's decision-making or that any such effect would be unreasonable.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Dated: July 20, 2018

Richard F. Levy (*pro hac vice*)
Jonathan A. Langlinais (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 923-2648
rlevy@jenner.com

Agnieszka M. Fryszman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

Le'ake Fesseha (*pro hac vice*)
LE'AKE FESSEHA LAW OFFICE
901 S. Highland Street, Suite 312
Arlington, VA 22204
(703) 302-3410
leakef@hotmail.com

Respectfully submitted,

/s/ Nicholas Cooper Marritz
Nicholas Cooper Marritz, VSB #89795
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 720-5607
nicholas@justice4all.org

Martina E. Vandenberg (*pro hac vice*)
Sarah L. Bessell (*pro hac vice*)
THE HUMAN TRAFFICKING LEGAL
CENTER
1030 15th Street NW #104B
Washington, DC 20005
(202)-716-8485
mvandenberg@htlegalcenter.org

*Counsel for Plaintiff Simret Semere Tekle*

22

## CERTIFICATE OF SERVICE

I certify that on July 20, 2018, I uploaded the foregoing document to the Court's CM/ECF system, which will cause a Notice of Electronic Filing and a link to the document to be sent to all counsel of record.

Respectfully submitted,

/s/ Nicholas Cooper Marritz
Nicholas Cooper Marritz, VSB #89795
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 720-5607
nicholas@justice4all.org

23