**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SIMRET SEMERE TEKLE, | Case No.: 1:18-cv-211 |
| *Plaintiff*, | |
| v. | **SECOND AMENDED COMPLAINT** |
| NOUF BINT NAYEF ABDUL-AZIZ AL SAUD MOHAMMAD BIN ABDULLAH AL SAUD | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## SECOND AMENDED COMPLAINT

Simret Semere Tekle, by and through her undersigned counsel, files this Complaint against Nouf bint Nayef Abdul-Aziz Al Saud and Mohammad bin Abdullah Al Saud.  In support thereof, she alleges the following:

## INTRODUCTION

1.      Plaintiff Simret Semere Tekle, a citizen of Eritrea, brings this action for damages resulting from human trafficking and forced labor in the United States.  The Defendants, members of the Saudi royal family, recruited Ms. Tekle to work as a nanny in the United States.  They promised her excellent wages and a legal job to induce her to come to the United States.  Ms. Tekle agreed to move to Virginia.  But instead of the decent salary and reasonable working conditions that Defendants promised Ms. Tekle, and which federal law required to be guaranteed in her contract, Ms. Tekle found herself held in forced labor as a domestic servant.

2.      Defendants Nouf bint Nayef Abdul-Aziz Al Saud (hereinafter "Defendant Mrs. Al Saud"), and Mohammad bin Abdullah Al Saud (hereinafter "Defendant Mr. Al Saud") are wealthy and influential members of the Saudi royal family.  Defendants held Ms. Tekle in their

homes in Saudi Arabia and the United States, forcing her to work long hours each day for meager, illegal wages.  Defendants coerced Ms. Tekle to remain in their compound, both personally and through their agents, subjecting her to threats and psychological abuse.  Both Defendants knowingly benefited from their participation in this venture.  The heavy physical labor and psychological abuse that Ms. Tekle endured caused both physical and mental harm.  Ms. Tekle is entitled to the agreed-upon pay for her labor.  She is also entitled to damages.

## PARTIES

3.     Simret Semere Tekle is a citizen of Eritrea who currently resides in Virginia.

4.     Defendant Mrs. Al Saud is a resident of Virginia and a citizen of Saudi Arabia.  Defendant Mrs. Al Saud is the daughter of Maha bint Mohammed bin Ahmad Al Sudairi (hereinafter "Princess Maha") and the late crown prince Nayef bin Abdul-Aziz Al Saud.

5.     Defendant Mr. Al Saud is a resident of Virginia and a citizen of Saudi Arabia.  Defendant Mr. Al Saud is the son of the late King Abdullah bin Abdulaziz Al Saud.

6.     Defendants Mr. Al Saud and Mrs. Al Saud are married.  At all relevant times, Defendants Mr. and Mrs. Al Saud were Ms. Tekle's employers.  At the time of the events that gave rise to this Complaint, the Defendants resided at 1034 Aziza Court in Great Falls, Virginia.

## JURISDICTION AND VENUE

7.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 as this action involves questions of federal law; 18 U.S.C. § 1595 as this action involves an offense under the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1584, 1589, 1590, 1592; and 18 U.S.C. § 1596, as the offender is present in the United States, irrespective of nationality.

8.     This Court has supplemental jurisdiction over Ms. Tekle's state law claims pursuant to 28 U.S.C. § 1367.

2

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### Trafficking to Saudi Arabia for Forced Labor

10.     Simret Semere Tekle was born in Asmara, Eritrea, where she resided with her family.

11.     In 2008, a friend of Ms. Tekle's mother, Okuba Gebreyesus, offered to help Ms. Tekle find a job.  Ms. Gebreyesus comes from the same village in Eritrea as Ms. Tekle's mother and had worked for the Saudi royal family for several decades.  Ms. Gebreyesus worked directly for Princess Maha, Defendant Mrs. Al Saud's mother, serving as a domestic worker and nanny to Defendant Mrs. Al Saud and her siblings when they were children. Ms. Tekle has long referred to Ms. Gebreyesus as her "aunt."  At all relevant times, Ms. Gebreyesus owned the home in Asmara in which Ms. Tekle's family lived; Ms. Tekle's family rented the home from Ms. Gebreyesus.

12.     Ms. Gebreyesus recruited Ms. Tekle to work as a maid in the household of Princess Maha in Saudi Arabia.  At the time, Ms. Tekle spoke Tigrinya.  Ms. Tekle could speak, understand, and read very little English.

13.     In 2008, Ms. Tekle traveled from Eritrea to Saudi Arabia.

14.     Princess Maha was a demanding and difficult employer.  She enforced a system of rules meant to make Ms. Tekle and other staff members believe that they were inferior.  Ms. Tekle was not permitted to approach her employer unless summoned.  Princess Maha told Ms. Tekle and other staff that they were like "toilet shoes" and should know their place.

15.     Princess Maha's staff members, including Ms. Gebreyesus, were expected to follow not only Princess Maha's orders, but those of her family, including the Defendants and their agents, as well.  Princess Maha, on occasion, ordered Ms. Tekle to clean and prepare Defendant Mrs. Al Saud's house when Defendant visited Saudi Arabia.

16.     Public executions and physical punishments of convicted criminals were sometimes televised in Saudi Arabia during Ms. Tekle's time in Princess Maha's employ.  Ms. Tekle witnessed these events on television.  On one occasion, Princess Maha pointed to the television and told Ms. Tekle that she would suffer similar treatment if she lied or stole.

17.     On another occasion, Princess Maha became angry when she noticed that Ms. Tekle was wearing a crucifix around her neck.  Princess Maha pushed Ms. Tekle, causing her to fall.  The fall injured Ms. Tekle's back, elbow, and legs.

18.     While employed in Saudi Arabia, Ms. Tekle witnessed another employee being physically abused by Princess Maha.  She also witnessed Princess Maha throw a glass at a domestic worker.

**Recruitment and Trafficking to the United States**

19.     In 2011, Princess Maha's daughter, Defendant Mrs. Al Saud, came to visit her family in Saudi Arabia from the United States.  Defendant Mrs. Al Saud offered Ms. Tekle a position as a nanny for one of her three children in the United States.  Ms. Tekle was told that she would work forty hours per week, with two full days off per week, and earn $4,500.00 per month.  This represented a significant raise for Ms. Tekle.  Ms. Tekle also believed that her working conditions would be better in the United States than the conditions she faced in Saudi Arabia.  Ms. Tekle planned to use the extra money to help her family in Eritrea.  Relying on

Defendant Mrs. Al Saud's assurances and promises regarding the terms and conditions of employment, Ms. Tekle agreed to come to the United States.

20.     In Saudi Arabia, Defendants' agent, a male employed in the Defendants' office, arranged for Ms. Tekle's visa paperwork and travel to the United States.

21.     In order to receive a U.S. visa, Ms. Tekle was interviewed by an official at the U.S. Consulate in Jeddah, Saudi Arabia.  Defendants' agent escorted Ms. Tekle to her visa interview.

22.     Defendants falsely represented to the American consular authorities in Jeddah, Saudi Arabia that Ms. Tekle would be compensated at a lawful rate for childcare services in the United States and that she would be provided with legally acceptable conditions of employment. As members of a royal family, the Defendants were eligible to bring a domestic worker, such as Ms. Tekle, to the United States on an A-3 visa, a category also used for the domestic workers of diplomats.

23.     At the U.S. Embassy, Defendants' agent provided Ms. Tekle's documents and a copy of Ms. Tekle's employment contract with the Al Saud family to the U.S. Embassy official in order to receive the visa.  The U.S. Embassy official reviewed the employment contract with Ms. Tekle to make sure that she understood the terms.  The contract was in a language Ms. Tekle could not read, so the Defendants' agent summarized the terms of the contract aloud to Ms. Tekle in Arabic, which she understood.  The contract reviewed by the U.S. Embassy officer and summarized aloud in Arabic to Ms. Tekle in the presence of the U.S. Embassy officer provided that Ms. Tekle would work forty hours per week, with two full days off per week, and earn $4,500.00 per month, as previously promised.  Ms. Tekle saw the number $4,500.00 in the paper contract summarized by the Defendants' agent.  The amount of $4,500.00 was also recorded as

5

the salary in the visa application, which Ms. Tekle received from the Department of State through a FOIA request after her escape.

24.     The Defendants' agent had Ms. Tekle sign the employment contract at the U.S. Embassy in the presence of the U.S. Embassy officer.

25.     United States law does not permit the issuance of an A-3 visa unless the applicant is employed or has signed a contract to be employed that satisfies certain mandatory provisions set out by statute (Public Law 110-457 at Sec. 203(a)(1)(A)).  The mandatory provisions include: an agreement by the employer to abide by all Federal, State and local laws in the United States; information on the frequency and form of payment; a list of duties and other employment related details; and an agreement by the employer not to withhold the passport, employment contract, or other personal property of the employee.  *Id*. (Public Law 110-457 at Sec. 203(b)(2)).

26.     Ms. Tekle was granted an A-3 visa in September 2011.

27.     Ms. Tekle never received a copy of the contract, a violation of Public Law 110-457.  Her employers later also withheld her passport, another violation of the same law.

28.     A member of the Saudi military escorted Ms. Tekle from Saudi Arabia to the United States.  This escort held her passport the entire time.  The only time that Ms. Tekle had possession of her passport was to provide it to a U.S. customs official at Dulles International Airport.  Ms. Tekle was then taken to the family's compound in Great Falls, Virginia.  Ms. Tekle's escort did not return her passport, and she did not know where it was stored.  On one later occasion, Ms. Tekle asked an agent of the Defendants to see her passport, but the Defendants' agent refused.

29.     Upon her arrival at the Defendants' residence, Defendant Mrs. Al Saud told Ms. Tekle that she had paid a lot of money to bring Ms. Tekle to the United States and that Ms. Tekle should be grateful.

30.     At the time of Ms. Tekle's arrival, she felt isolated.  At that time, she had no contact with family members or friends living in the United States.

**Forced Labor and Exploitation in the United States**

31.     When Ms. Tekle arrived in Great Falls, she was told that she would work as a domestic worker, not a nanny as originally promised.  The Defendants employed two other domestic workers, as well as two nannies for each of the three children, a total of six nannies.

32.     Ms. Tekle received orders from three of Defendant Mrs. Al Saud's personal aides: Milen, Frail, and Faisa.  These aides accompanied and attended to Defendant Mrs. Al Saud.  The aides informed Ms. Tekle that she was not permitted to speak directly to Defendant Mrs. Al Saud, but should speak only with them.  At all relevant times, Milen, Frail, and Faisa were agents of Defendants who relayed orders from the Defendants.

33.     Ms. Tekle was then put to work.  Ms. Tekle performed a heavy load of housekeeping duties in addition to helping the nannies care for the Defendants' three children. In return, Defendants paid Ms. Tekle only meager wages.

34.     On a typical work-day, Ms. Tekle would wake at 5:30 A.M. and begin cleaning the house.  Ms. Tekle would also wash and iron the family's clothing and laundry.  In addition to these duties, Ms. Tekle was required to assist both the cook and the nannies.  Ms. Tekle usually worked until after 9:00 P.M.  Ms. Tekle was also on-call at night.

35.     Ms. Tekle lived in the Defendants' home and was on-call to serve her employers at all hours.

36.     The Defendants and their children frequently traveled.  Ms. Tekle was required to go with the family on their trips, and the travel meant more work for Ms. Tekle.  She packed and carried the family's bags—each child traveled with several suitcases.  In addition, Ms. Tekle helped care for the children on these trips.  Ms. Tekle was required to go wherever the family went to assist the nannies and tend to the children during the family's vacations.  During these trips, Ms. Tekle's passport remained in the possession of Defendants at all times.

37.     As a result of this physical labor, Ms. Tekle developed chronic back pain which persists today.  At times, Ms. Tekle could not sleep because the pain was so severe.  Ms. Tekle asked Defendant Mrs. Al Saud's personal aide several times if she could see a doctor, but she never received a response.

**Failure to Pay Promised Wages**

38.     Defendants did not pay Ms. Tekle her promised salary.  Ms. Tekle only received $400.00 to $500.00 per month in cash.  This was significantly less than the $4,500.00 per month Defendants promised Ms. Tekle to induce her to come to the United States, and significantly less than what was required by federal law.  After several months, Ms. Tekle attempted to complain about her lower wages and treatment to Defendant Mrs. Al Saud, but Defendant Mrs. Al Saud instructed Ms. Tekle to speak to one of her aides.  Ms. Tekle complained to the aides about her treatment, but the aides told Ms. Tekle not to complain because her salary was more than she had been paid in Saudi Arabia.

39.     When Ms. Tekle inquired about her heavy workload and illegal wages, one of the Defendants' aides told her that that the Defendants had lied to bring Ms. Tekle to the United States on an A-3 visa.

8

40.     Defendants failed to pay Ms. Tekle a legal minimum wage in violation of federal law and United States Department of State standards.

41.     The United States Department of State sets the standards for A-3 visas.  These standards are communicated to the Chiefs of Mission and by diplomatic note.  On March 22, 2011—before Ms. Tekle arrived in the United States to work for the Defendants—the State Department provided that:

- The prevailing hourly wage for "Maids and Housekeeping Cleaners" in the Washington, D.C. area was $8.24.  Effective March 22, 2011, all domestic employees on an A-3 visa must, at minimum, be paid the prevailing wage;

- It is not permissible to withhold from wages any amount for lodging;

- No more than 20% of wages may be withheld for a minimum of three daily meals;

- No deductions from wages are allowable for any other expense, such as the provision of medical care, medical insurance or travel.

42.     Upon information and belief, Defendants failed to keep hour and wage records, as required by federal law, and failed to pay federal and state taxes on the wages paid to Ms. Tekle.

43.     Ms. Tekle consistently worked more than 80 hours each week.

44.     Ms. Tekle was held in forced labor in the United States for seven months, working long hours, seven days a week, with no days off.  For this entire period, Defendants paid Ms. Tekle only about $3,000.00, less than $2 per hour.

**Psychological Abuse, Disparagement, and Humiliation**

45.     Defendants, both directly and through their agents, treated Ms. Tekle in an abusive manner.  Ms. Tekle was terrified of the Defendants.

46.    Defendants' agents repeatedly abused, demeaned, and humiliated Ms. Tekle on behalf of the Defendants.  Ms. Tekle was subjected to verbal abuse and called offensive names in Arabic, including "whore", "colored", "donkey", and "garbage."

47.    On at least three occasions, Defendant Mrs. Al Saud was in the same room and within hearing distance when her aides verbally abused Ms. Tekle.

**Enforced Isolation**

48.    Defendants restricted Ms. Tekle's contact with persons other than Defendants' staff for the purpose of keeping her in a situation of coerced labor and involuntary servitude.

49.    Defendant Mrs. Al Saud gave Ms. Tekle several ground rules when she first arrived at the residence.  Ms. Tekle was prohibited from leaving the residence without an escort. She was forbidden from interacting with people outside the residence, and she was told that she could never run away.  Defendant Mrs. Al Saud told Ms. Tekle that she would be attacked by Americans if she went outside alone.  When she was allowed outside to shop or run errands for the family, Ms. Tekle was accompanied by another staff member.  Defendant Mrs. Al Saud instructed Ms. Tekle not to speak to anyone when she was outside the residence.

50.    On one occasion, during a trip to Florida, an American man started a conversation with Ms. Tekle.  Defendant Mrs. Al Saud saw this and called Ms. Tekle over.  Defendant Mrs. Al Saud told Ms. Tekle that she should not talk to strangers because, if she did, they would kidnap her and deport her.  This frightened Ms. Tekle, and from then on she would become frightened if a stranger approached her.

51.    Defendant Mrs. Al Saud told Ms. Tekle that her activities would be closely monitored.  Defendant Mrs. Al Saud and the Defendants' agents showed Ms. Tekle surveillance cameras placed throughout the residence, including a camera in Ms. Tekle's bedroom.

Defendant Mrs. Al Saud indicated that these cameras were always monitored by security personnel.   The cameras and constant monitoring caused Ms. Tekle to feel anxious, afraid, and uncomfortable.  Ms. Tekle would dress and undress in her bathroom to avoid being seen by the camera in her bedroom.  She felt that she could not escape.

52.     Defendant Mrs. Al Saud also told Ms. Tekle the residence was guarded by armed security, threatening that Ms. Tekle would be arrested and deported if she tried to run away.  Ms. Tekle could see for herself that the gated compound was guarded by armed men.

53.     On one occasion, Ms. Tekle left the house to attend church services with a fellow-employee.  When Defendant Mrs. Al Saud found out that Ms. Tekle had left the compound, she became angry.  She reminded Ms. Tekle that she could not leave the residence, even for church services, and forbade Ms. Tekle from attending church.

**Abuse of Legal Process**

54.     Defendants and their agents abusively threatened Ms. Tekle with legal consequences for the purpose of keeping her in a situation of forced labor and involuntary servitude.

55.     Defendants led Ms. Tekle to believe that, if she did not continue working for the Defendants, she would suffer serious legal harm.  The day Ms. Tekle arrived, Defendant Mrs. Al Saud told her that she would be arrested and deported if she ran away.

56.     Defendant Mrs. Al Saud verbally abused and threatened a kitchen staff member with deportation in the presence of Ms. Tekle.  Defendant Mrs. Al Saud was aware that Ms. Tekle was present and witnessed the threats.

57.     Defendants' personal aides also conveyed Defendants' threats to Ms. Tekle. When Ms. Tekle complained about her work to Defendants' aides, they would relay these

complaints to Defendants.  Through these aides, Defendants would threaten Ms. Tekle with

deportation if she continued to complain.

58.     As a result of Defendants' threats and psychological abuse, Ms. Tekle became too

afraid to ask for her passport again.  Stripped of her passport, with no copy of her employment

contract, believing herself to be alone in the United States, and facing threats of arrest or

deportation, Ms. Tekle remained in the Defendants' employ and continued working against her

will.  Ms. Tekle was effectively trapped in the employ of the Defendants.

**Escape from Defendants' Compound**

59.     While in the Defendants' compound, Ms. Tekle rarely spoke with her mother,

relying on calling cards to make contact.  Approximately one month before Ms. Tekle fled, her

mother told her that relatives of theirs lived in Northern Virginia.  Ms. Tekle had never met these

relatives and did not know that they were living in the United States.

60.     Ms. Tekle contacted her relatives and described her working conditions.  Her

relatives encouraged her to leave and offered her refuge.  Ms. Tekle was afraid and feared

reprisals from the Defendants if she left.

61.     One day in April 2012, Ms. Tekle was sent out to run errands for the family at the

local mall.  As usual, Ms. Tekle was escorted by one of the family's drivers, who was instructed

to accompany her.  On this excursion, the driver told Ms. Tekle that he had other work to do and

that he would meet her back at the mall.

62.     Ms. Tekle seized the driver's unexpected departure as an opportunity to call her

relatives in Northern Virginia, who gave Ms. Tekle their address.  Ms. Tekle fled to their house

in a taxi.

63.     Following her escape, Ms. Tekle remained terrified that the Defendants would find her.  As a result, she insisted that the family that gave her refuge keep the curtains closed.

64.     For the first month after her escape, Ms. Tekle was too terrified to leave the house.  Even after a month, Ms. Tekle rarely left the house.  When she did, it was only for short excursions.  Still traumatized by her experience in the Al Saud home, Ms. Tekle would disguise herself with a hat and sunglasses before leaving the house.

65.     Ms. Tekle suffered nightmares and frequently woke up screaming.

66.     After Ms. Tekle escaped, she was afraid to file a civil suit against the Defendants because she feared the safety of Ms. Gebreyesus, who continued to work for Princess Maha, Defendant Mrs. Al Saud's mother.  Ms. Tekle feared that Ms. Gebreyesus would be seriously harmed if Ms. Tekle made her story public or filed suit against the family.  In addition to having been physically harmed and threatened by Princess Maha herself, Ms. Tekle had previously seen Princess Maha verbally and physically abuse Ms. Gebreyesus.  On one occasion, Ms. Tekle saw Princess Maha throw a glass at Ms. Gebreyesus in anger.

67.     Upon information and belief, shortly after Ms. Tekle's escape, Defendants Mr. and Mrs. Al Saud returned to Saudi Arabia.

68.     In mid-2012, shortly after Ms. Tekle's escape, Ms. Gebreyesus, who was still in Saudi Arabia working for Princess Maha, began calling Ms. Tekle's family in Eritrea.

69.      Ms. Gebreyesus would not have known about Ms. Tekle's escape unless Defendants or their agents communicated that fact to Ms. Gebreyesus.  Ms. Gebreyesus had a relationship with Defendant Mrs. Al Saud, who had grown up with Ms. Gebreyesus as a member of the household staff when Defendant Mrs. Al Saud was a child.

13

70.     Ms. Gebreyesus called Ms. Tekle's family frequently after her escape.  Ms. Tekle's family members estimated that at first, Ms. Gebreyesus called approximately twice a week.  Ms. Tekle's brother recalls that he spoke to Ms. Gebreyesus at least 20 times and that she also spoke to his mother a number of times.

71.     Prior to these phone calls, Ms. Gebreyesus had rarely, if ever, called Ms. Tekle's family.  She had not previously called to ask about Ms. Tekle.

72.     When Ms. Gebreyesus called, she was not alone.  She told Ms. Tekle's family that one of her employers was right there with her.

73.     Ms. Tekle's family members could hear, over the phone, that Ms. Gebreyesus was not alone.  Ms. Tekle's family members heard a woman's voice speaking Arabic to Ms. Gebreyesus on the other end of the line.

74.     Ms. Tekle's brother recalled that he could hear a woman's voice speaking in Arabic to Ms. Gebreyesus on at least three calls.

75.     A typical call lasted approximately 20 to 30 minutes.

76.     Ms. Gebreyesus was angry on these calls.  She demanded to know where Ms. Tekle was.

77.     Ms. Gebreyesus said that Ms. Tekle should not "go to any court or claim any rights or they will attack me."

78.     The calls upset Ms. Tekle's family, causing them distress and fear.  Ms. Tekle's mother, who was terminally ill, would cry when Ms. Gebreyesus called.

79.     Ms. Gebreyesus told Ms. Tekle's family members that if Ms. Tekle did "anything" against the Al Sauds that she (Ms. Gebreyesus) would lose her job, be put in prison, or be deported.

80.     Ms. Gebreyesus also told Ms. Tekle's family that she (Ms. Gebreyesus) would evict Ms. Tekle's family from their house if Ms. Tekle did "anything" against the Al Sauds.  Ms. Gebreyesus told them that Ms. Tekle must return to the Al Saud family.

81.     In these calls, Ms. Gebreyesus repeatedly asked Ms. Tekle's family what Ms. Tekle planned to do, where Ms. Tekle was living, with whom Ms. Tekle was living, how to contact Ms. Tekle, what Ms. Tekle was doing, and whether Ms. Tekle had been in contact with Ms. Tekle's family.  Ms. Gebreyesus said that the Defendants' family blamed her, had lost trust and faith in her, and had threatened her, all because Ms. Tekle—whom Ms. Gebreyesus had recommended to them—had escaped.

82.     Ms. Tekle's family felt threatened and believed that something terrible would happen if Ms. Tekle did anything to challenge the Al Sauds.  Ms. Tekle's family did not divulge Ms. Tekle's contact information to Ms. Gebreyesus, although they knew where she was hiding.

83.     Ms. Tekle's family feared for Ms. Tekle's safety.  The family also feared that Ms. Gebreyesus would carry out her threat to evict them from their home, which, due to a housing shortage in Asmara, would have rendered the family homeless.

84.     Ms. Tekle's brother and her mother relayed Ms. Gebreyesus' threats to Ms. Tekle.  Ms. Tekle's family members urged Ms. Tekle not to do anything to make her employers angry.  Because of the threats, Ms. Tekle's family asked her not to say anything, not to file any reports, and not to take any legal action.

85.     These calls frightened Ms. Tekle and made her fear for Ms. Gebreyesus's safety, as well as for the safety of her own family.

86.      Ms. Gebreyesus continued to call, with slightly less frequency over time, until 2015.  Ms. Tekle's family relayed this to Ms. Tekle.  These calls terrified Ms. Tekle.

87.     In addition to the calls from Saudi Arabia, two Eritrean women who lived in Saudi Arabia came to the Tekle family's home four times.  On each visit, they demanded to know Ms. Tekle's address, her whereabouts, and her phone number.  Ms. Tekle's mother did not provide them with this information.  Ms. Tekle's mother had never met these Eritrean women before; they were strangers to the Tekle family.

88.     In April 2013, Ms. Tekle met with federal law enforcement officials with the Department of Homeland Security, the Department of State's Diplomatic Security Service, and the Department of Justice regarding her trafficking.  Ms. Tekle understood her testimony to be confidential, and she expressed her fears for Ms. Gebreyesus's safety during her interview. Federal law enforcement officers certified in 2015 that, based on their investigation of the facts, Ms. Tekle was a victim of human trafficking in violation of the forced labor statute, 18 U.S.C. § 1589.

89.     In 2015, Ms. Gebreyesus returned from Saudi Arabia to Eritrea.  Shortly after Ms. Gebreyesus arrived, she attempted to evict Ms. Tekle's family from their home in Asmara.  Ms. Tekle's brother appealed for help to the local administrative authority, which blocked the eviction.  Ms. Tekle's family communicated this to Ms. Tekle.

90.     At the time of the attempted eviction, Ms. Tekle's family had lived in their home for 38 years.  They were current on their rent payments.

91.     Defendant Mrs. Al Saud and Princess Maha, her mother, spoke frequently.  They had homes on the same compound in Saudi Arabia.

92.     On information and belief, Defendants informed Princess Maha and/or her agents, including Ms. Gebreyesus, that Ms. Tekle had escaped from their compound in Virginia.

93.     Defendants knew that Ms. Gebreyesus worked for Princess Maha, as Ms. Gebreyesus had worked for the Defendants' family for decades and had worked as a servant and nanny to Defendant Mrs. Al Saud throughout her childhood.

94.     Defendants were aware that Princess Maha, Defendant Mrs. Al Saud's mother, had abused her domestic employees.  Indeed, as reported in the *New York Times*, Princess Maha physically assaulted a domestic worker and another servant while visiting Florida.  Florida sheriff's deputies witnessed the assault on the servant.

95.     Ms. Gebreyesus told Ms. Tekle's family that the royal family blamed her for Ms. Tekle's escape and that she would be attacked if Ms. Tekle took any legal action against the Defendants.  Ms. Gebreyesus communicated these threats to Ms. Tekle's family shortly after Ms. Tekle escaped and Defendants returned to Saudi Arabia, and she would not have known of Ms. Tekle's escape except through Defendants or their agents.   And Ms. Gebreyesus was not alone when making these calls—another woman was present and speaking Arabic to Ms. Gebreyesus in the background on multiple occasions.  During these calls, Ms. Gebreyesus repeatedly inquired about Ms. Tekle—something she had not done before—and she explicitly warned against Ms. Tekle taking any legal action against the Defendants.

96.     On information and belief, Ms. Gebreyesus acted on Defendants' behalf. On information and belief, Defendants or their agents directed or induced Ms. Gebreyesus to make the calls to Ms. Tekle's family or intentionally induced others to direct or induce Ms. Gebreyesus to make these calls.  On information and belief, the calls from Ms. Gebreyesus were made with the intention of preventing Ms. Tekle from filing suit.  On information and belief, Ms. Gebreyesus threatened to evict Ms. Tekle's family from their home at Defendants' behest or as

the intended result of the actions of Defendants and/or their agents.  On information and belief, this threat of eviction was made with the intention of preventing Ms. Tekle from filing suit.

97.     On information and belief, Defendants or their agents directed the two Eritrean women to visit Ms. Tekle's family to inquire about Ms. Tekle's address, whereabouts, and phone number or intentionally induced others to do so.  On information and belief, these visits were made with the intention of preventing Ms. Tekle from filing suit.  The two Eritrean women were strangers to Ms. Tekle's family and began showing up at the family's home shortly after Ms. Tekle's escape for the specific purpose of obtaining information about Ms. Tekle.  Furthermore, the timing of these visits coincided with Ms. Gebreyesus's phone calls, during which she explicitly warned against Ms. Tekle taking any legal action against Defendants.

98.     After her escape, Ms. Tekle made several attempts to obtain her employment contract, including through a FOIA request to the State Department.  The State Department refused to release the contract without authorization from Defendants, citing the confidentiality provisions of the Immigration and Nationality Act. 8 U.S.C. § 1202(f).  Despite requests from Ms. Tekle's counsel for Defendants' authorization to the State Department to release the contract, Defendants refused to provide the necessary authorization.  Ms. Tekle has consented to release of this document through FOIA.

## SUSPENSION OF STATUTES OF LIMITATIONS

99.     Any statute of limitations relating to the causes of action alleged in this complaint on behalf of Ms. Tekle has been suspended and tolled for the period during which Ms. Tekle was held in forced labor and involuntary servitude and for a reasonable time following her escape. Ms. Tekle was obstructed from filing this lawsuit during this time period as a result of Defendants' statements and actions and/or the actions of their agents.  As a result of the

18

Defendants' statements and actions, Defendants are also equitably estopped from invoking the statute of limitations.

## FIRST CLAIM FOR RELIEF

**Trafficking With Respect to Peonage, Slavery, Involuntary Servitude or Forced Labor in Violation of 18 U.S.C. § 1590**

100.    Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

101.    As alleged herein, Defendants knowingly recruited, harbored, transported, provided and/or obtained Ms. Tekle, bringing her to the United States from Saudi Arabia, for the purpose of involuntary servitude and forced labor in violation of 18 U.S.C. § 1590.  Ms. Tekle is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

102.    Defendants recruited Ms. Tekle with false promises of good working conditions and wages in the United States, transported Ms. Tekle to the United States, and harbored Ms. Tekle in their residence, all for the purpose of forced labor and involuntary servitude.

103.    As a direct and proximate result of Defendants' actions, Ms. Tekle has suffered severe emotional distress, physical injuries, and economic losses.

104.    Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## SECOND CLAIM FOR RELIEF

**Forced Labor in Violation of 18 U.S.C. § 1589**

105.    Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

106.    Defendants knowingly obtained Ms. Tekle's forced and coerced labor through a scheme, plan, pattern and practice of physical and psychological abuse, enforced isolation,

threats of serious harm, and threatened abuse of legal process, in violation of 18 U.S.C. § 1589. Ms. Tekle is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

107.    Defendants confiscated Ms. Tekle's passport, isolated her, psychologically abused her, and warned her that if she ever tried to escape, she would be arrested, deported, or attacked.

108.    Defendant Mrs. Al Saud and her agents subjected Ms. Tekle to threats and psychological abuse designed to demean Ms. Tekle and prevent her from seeking help from authorities or others who could have assisted her in leaving Defendants' compound.

109.    Defendants and their agents repeatedly threatened Ms. Tekle with arrest and deportation.  Because of the abuse she had suffered at the hands of Princess Maha in Saudi Arabia, Ms. Tekle was highly vulnerable to Defendants' threats. Defendants exploited her vulnerability.  Defendants were aware that Ms. Tekle feared deportation to her home country of Eritrea.  Defendants threatened Ms. Tekle with deportation with the intention and design of coercing Ms. Tekle to remain in their home, to continue her work for them, and to prevent her from seeking the help of law enforcement or reporting the offenses against her.

110.    Defendants knowingly benefited from Ms. Tekle's labor and services because they did not compensate her as the law requires.

111.    As a direct and proximate result of the actions of the Defendants, Ms. Tekle has suffered severe emotional distress, physical injuries, and economic losses.

112.    Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## THIRD CLAIM FOR RELIEF

**Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of 18 U.S.C. § 1592**

113.     Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

114.     Defendants knowingly removed, confiscated, concealed, and possessed Ms. Tekle's actual passport.  Defendants removed, confiscated, concealed, and possessed Ms. Tekle's passport in order to prevent or restrict Ms. Tekle's liberty to move or travel for the purpose of subjecting her to involuntary servitude and forced labor, in violation of 18 U.S.C. § 1592.  Ms. Tekle is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

115.     As a direct and proximate result of the actions of the Defendants, Ms. Tekle has suffered severe emotional distress, physical injuries, and economic losses.

116.     Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## FOURTH CLAIM FOR RELIEF

### Involuntary Servitude in Violation of 18 U.S.C. § 1584

117.     Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

118.     Defendants knowingly and willfully subjected Ms. Tekle to a condition of involuntary servitude for a period of seven months in the United States.  Defendants forced Ms. Tekle to work long hours against her will, holding her in isolation and paying her a pittance for her services.

119.     Defendants kept Ms. Tekle in a condition of involuntary servitude through physical and legal coercion.  Defendants and their agents confiscated Ms. Tekle's passport, isolated her from anyone who might be able to help her, and threatened her with legal retaliation (including arrest or deportation) if she ran away.

120.    Ms. Tekle was highly vulnerable to Defendants' threats, and Defendants exploited her vulnerability.  Defendants were aware that Ms. Tekle feared deportation to her home country of Eritrea.

121.    Through the conduct of the Defendants and their agents alleged herein, acting individually and in concert, these Defendants created and perpetuated a system of involuntary servitude, and led Ms. Tekle to reasonably believe she had no way of avoiding this servitude, in violation of 18 U.S.C. § 1584.  Ms. Tekle is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

122.    As a direct and proximate result of the actions of the Defendants, Ms. Tekle has suffered severe emotional distress, physical injuries, and economic losses.

123.    Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## FIFTH CLAIM FOR RELIEF

### Breach of Contract

124.    Ms. Tekle realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

125.    Ms. Tekle, Defendant Mrs. Al Saud, and Defendant Mr. Al Saud entered into a valid, legally enforceable employment agreement in 2011, whereby Ms. Tekle agreed to work as a nanny in their home in the United States, and, in return, Defendants agreed to pay Ms. Tekle a lawful, agreed-upon wage for her services.  Ms. Tekle's duties were to include caring for one of Defendants' three children.

126.    Ms. Tekle was aware of the contract's terms because these terms were reviewed with her by an officer at the U.S. Embassy in Saudi Arabia when she signed the contract.

127.     Ms. Tekle fully performed the terms of the agreement by working as a domestic worker and nanny in the Defendants' household.

128.     The Defendants materially breached the contract by, *inter alia*, failing to pay the agreed amount, forcing Ms. Tekle to work more than 80 hours per week, forcing her to assume non-contractual duties such as housecleaning, subjecting her to harsh and abusive working conditions, confiscating her passport, refusing to allow Ms. Tekle to leave, refusing to allow Ms. Tekle to take time off, and by withholding a copy of Ms. Tekle's contract.

129.     As a direct and proximate result of the actions of the Defendants' breach of contract, Ms. Tekle has suffered damages, including but not limited to unpaid wages and other economic losses.

130.     Ms. Tekle is therefore entitled to recover damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

131.     Ms. Tekle respectfully requests that judgment be entered in her favor against all Defendants and prays as follows:

132.     Award Ms. Tekle damages in an amount to be calculated at trial including but not limited to the full amount of Ms. Tekle's losses for violation of federal laws including: trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of 18 U.S.C. § 1590; forced labor in violation of 18 U.S.C. § 1589; unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor in violation of 18 U.S.C. § 1592; and involuntary servitude in violation of 18 U.S.C. § 1584.

133.    Award Ms. Tekle punitive damages for Defendants' violation of the Trafficking

Victims Protection Act.  *See Doe v. Howard*, No. 1:11-cv-01105, 2012 WL 3834867, at *2 (E.D.

Va. Sept. 4, 2012) (citing *Ditullio v. Boehm*, 662 F.3d. 1091, 1100 (9th Cir. 2011)).

134.    Award Ms. Tekle compensatory and punitive damages in an amount to be

calculated at trial for Defendants' breach of contract;

135.    Award Ms. Tekle prejudgment and post judgment interest;

136.    Award Ms. Tekle reasonable attorneys' fees, together with the cost and

disbursement of this action; and

137.    Grant such other relief as this Court deems just and proper.

## **JURY DEMAND**

138.    Ms. Tekle respectfully demands a trial by jury of all issues for which she has a

right to demand a trial by jury.

Dated: September 27, 2018

Richard F. Levy (*pro hac vice*)
Jonathan A. Langlinais (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639-6000
rlevy@jenner.com

Agnieszka M. Fryszman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

Respectfully submitted,

/s/ Nicholas Cooper Marritz
Nicholas Cooper Marritz, VSB #89795
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 720-5607
nicholas@justice4all.org

24

Le'ake Fesseha (*pro hac vice*)
LE'AKE FESSEHA LAW OFFICE
901 S. Highland Street, Suite 312
Arlington, VA 22204
(703) 302-3410
leakef@hotmail.com

Martina E. Vandenberg (*pro hac vice*)
Sarah L. Bessell (*pro hac vice*)
THE HUMAN TRAFFICKING LEGAL CENTER
1030 15th Street NW, #104B
Washington, D.C. 20005
(202)-716-8485
mvandenberg@htlegalcenter.org

*Counsel for Plaintiff Simret Semere Tekle*