```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION

3   ------------------------------------x
                                        :
4   SIMRET SEMERE TEKLE,                : Civil Action No.
                                        :
5                    Plaintiff,         : 1:18-CV-211
                                        :
6              versus                   :
                                        :
7   NOUF BIN NAYEF ABUL-AL SAUD, et al, :
                                        :
8                    Defendants.        : September 7, 2018
    ------------------------------------x
9
                 The above-entitled Motions was continued before
10  the Honorable T.S. Ellis, III, United States District Judge.

11                    A P P E A R A N C E S

12  FOR THE PLAINTIFF:

13            NICHOLAS COOPER MARRITZ, ESQ.
              Legal Aid Justice Center (Falls Church)
14            6066 Leesburg Pike
              Suite 520
15            Falls Church, VA 22041

16            RICHARD F. LEVY, ESQ.
              JONATHAN ALEXANDER LANGLINAIS, ESQ.
17            Jenner & Block LLP
              353 N. Clark Street
18            Chicago, IL 60654

19            AGNIESZKA MARIA FRYSZMAN, ESQ.
              Cohen Milstein Sellers & Toll
20            1100 New York Ave, NW
              Suite 500
21            Washington, DC 20005

22

23

24

25
```

1  FOR THE DEFENDANTS:

2              STUART G. NASH, ESQ.
             JOHN LESLIE BROWNLEE, ESQ.
3              DAVID L. HALLER, ESQ.
             Holland & Knight LLP (McLean)
4              1650 Tysons Blvd.
             Suite 1700
5              Tysons Corner, VA 22102

6        OFFICIAL UNITED STATES COURT REPORTER:

7              MS. TONIA M. HARRIS, RPR
             United States District Court
8              Eastern District of Virginia
             401 Courthouse Square
9              Ninth Floor
             Alexandria, VA 22314
10             703-646-1438

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2  (Court proceedings commenced at 12:10 p.m.)

3          THE DEPUTY CLERK:  Simret Semere Tekle versus Nouf

4  bin Nayef Abul-Al Saud, et al.  Criminal Case No. 1:18-CV-211.

5          THE COURT:  All right.  Who is here for the

6  plaintiff?

7          MR. MARRITZ:  Nicholas Marritz from the Legal Aid

8  Justice Center, Your Honor.

9          THE COURT:  This is the plaintiff, yes?  You're here

10  for the plaintiff?

11          MR. MARRITZ:  Yes, Your Honor.

12          THE COURT:  Your name, sir.

13          MR. MARRITZ:  Nicholas Marritz from the Legal Aid

14  Justice Center.

15          THE COURT:  All right, sir.  Who will argue today?

16          MR. MARRITZ:  That will be Agnieszka Fryszman of

17  Cohen Milstein.  With me at counsel table are Alex Langlinais

18  and Richard Levy of Jenner and Block.

19          THE COURT:  All right.  And who, again, will argue?

20          MS. FRYSZMAN:  I will, Your Honor.

21          THE COURT:  You say that reluctantly as if having

22  seen what happened in the previous argument.  You now are

23  concerned about whether you should put your head on the

24  chopping block.  Don't worry about it.  In fact, you should

25  take this seat because you're going to argue.

1          And who is here for the defendants?

2          MR. NASH:  Good afternoon, Your Honor.  Stuart Nash

3   for the defendants.  I'm here with my colleagues David Haller

4   and John Brownlee.

5          THE COURT:  All right.  And Mr. Nash I assume you

6   will argue.

7          MR. NASH:  That is correct.

8          THE COURT:  All right.  Just as a matter of

9   disclosure, I happen to know Mr. Nash.  I know Mr. Nash

10  because he served as my law clerk nearly 30 years ago.  But I

11  don't recuse myself in cases involving former law clerks, much

12  to their dismay.  So we're going to proceed.

13         Does that present a problem for the plaintiff?

14         MR. LEVY:  It does not, Your Honor.

15         THE COURT:  Thank you.  All right.

16         Now, the issue today, as I see it, distilled to its

17  essence, is whether the plaintiff can proceed on its breach of

18  contract claim despite the fact that the statute of

19  limitations has essentially, by agreement, run, because the

20  plaintiff believes that it has alleged sufficient facts to

21  warrant the invocation of the tolling provision and that it

22  should be tolled.  And, essentially, the plaintiff argues that

23  blandishments or threats, or whatever they're called, were

24  made to another relative.  And that that should be construed

25  as -- as, in effect, threats not to file this lawsuit.  And,

1    therefore, tolling should apply.  I don't think there's much

2    dispute that tolling might apply.  The dispute is whether

3    facts alleged in the complaint are sufficient to warrant or

4    justify the tolling provision.  And so we have a motion to

5    dismiss.

6         So, Mr. Nash, you're first.  Do I have the issue

7    essentially correct?

8         MR. NASH:  You are correct, sir, Your Honor, as it

9    relates to the statute of limitations argument that we've

10    made.  We've made an independent -- advanced independent

11    grounds for dismissal of the complaint on the basis that it

12    was not properly pled as a breach of contract claim.

13         THE COURT:  All right.  Those, I'm interested in.

14    The motion to strike material because its scandalous, and

15    there's one other motion, I think.

16         MR. NASH:  There is the motion to dismiss, which

17    we're discussing, where there's two independent grounds that

18    we're advancing for dismissal of the Count 5 of the complaint.

19    There's a separate motion to strike the immaterial material,

20    pursuant to Rule 12 related to --

21         THE COURT:  I'll decide that on the papers.  You-all

22    don't need to address that.  But I do want to hear argument on

23    the statute of limitations and the motion to dismiss.

24         Are there any other motions, Mr. Nash?

25         MR. NASH:  There are no other pending motions.

1          THE COURT:  All right, sir.  Go ahead.

2          MR. NASH:  Your Honor, you have framed the argument

3    exactly correctly in my view.  We believe that this case is

4    very clearly controlled under the Iqbal Twombly standard.

5    And, as you know, the Iqbal case related to an allegation by a

6    detainee in the wake of September 11th that he had been

7    discriminated against based on his race and national origin

8    and religion and had been subjected to enhanced detention.

9          THE COURT:  You don't need to go over those facts

10   with me.

11         MR. NASH:  Well, but what I think is important in

12   that case, the plaintiff was subject to a motion to dismiss,

13   the plaintiff said, Well, I've pled it right here, I was

14   discriminated based on my race and national origin.  It's

15   right here in the complaint.

16         The Supreme Court said, "Hold on.  We don't accord

17   deference, we don't presume the truth of conclusory

18   allegations or allegations that relate to legal conclusions."

19         And that's exactly the situation that we have here,

20   Your Honor.  The plaintiff says that they have pled factual

21   allegations that are presumed to be true.  And it is true that

22   they have pled some factual allegations and we're prepared to

23   accord a deference to those and allow those -- allow Your

24   Honor to presume those to be true.  But none of those

25   allegations relates to any conduct, whatsoever, by the

1  defendants in this case.  And the tolling statute requires

2  that there be an affirmative act by the defendants that had

3  both the intent and the effect of obstructing the plaintiff

4  from filing her suit.

5          There is no factual allegation made anywhere in the

6  complaint that alleges that our clients did anything, until

7  you get to paragraph 64 and 65 of the complaint, where, in a

8  completely conclusory fashion, the plaintiff alleges that

9  threats were made and the threats were made to -- with the

10  intention of preventing Ms. Tekle from filing suit.

11          THE COURT:  That's an allegation of fact, isn't it?

12          MR. NASH:  It is not, Your Honor.

13          THE COURT:  The threats were made is not an

14  allegation of fact.

15          MR. NASH:  It would -- I think it's important, Your

16  Honor.  I've printed out to hand up to you the allegations

17  related to equitable tolling in the complaint.  It only runs

18  to two pages of the complaint.

19          THE COURT:  I'm familiar with it.

20          MR. NASH:  So it begins --

21          THE COURT:  What I'm asking you is:  Isn't an

22  allegation that A threatened B an allegation of fact?

23          MR. NASH:  In exactly the same way that in Iqbal,

24  when the -- when the plaintiff alleged that Attorney General

25  Ashcroft discriminated against me on the basis of my race and

1   religion --

2           THE COURT:  You don't see any difference between

3   those two?

4           MR. NASH:  Not, not --

5           THE COURT:  All right.  Let's go on.  I do.  But

6   let's go on.

7           MR. NASH:  Well, Your Honor, the --

8           THE COURT:  Well, isn't it also alleged that there

9   was communications with her aunt, was it, or somebody related

10  to her -- employed in another household?

11          MR. NASH:  The only factual allegations -- the only

12  single factual allegations related to an affirmative act that

13  the -- that our clients made, was in paragraph 61 of the

14  complaint on information and belief the defendants informed

15  Princess Maha, who is not a defendant in this action, is not

16  implicated in this action in any way.  On information and

17  belief, the defendants informed Princess Maha, who is

18  defendant's mother, that Ms. Tekle had escaped from their

19  compound in Virginia.  That is the sole factual allegation

20  related to conduct by the defendants in this matter.  That

21  they called someone up in Saudia Arabia and said Ms. Tekle is

22  gone.  And so there's that factual allegation.

23          And the only other thing they say is, then, this

24  woman that they purportedly called in Saudia Arabia, then

25  called Ms. Tekle's family up and began asking questions of:

1  Do you know what happened to her?  Where did she go?  Do you

2  know what her plans are?  Is what the allegations are.

3          Those are -- those are what is spun up by the

4  plaintiff into a threatening, menacing communications by our

5  clients.  And there is no affirmative act pled that -- that

6  even the allegation that they called Princess Maha, they

7  qualify that by saying "upon information and belief."  They

8  don't know that that happened.  "Upon information and belief"

9  is a curious phrase that we've all used it.  I've used it

10  myself.  But upon information and belief, those are two

11  entirely different things.  You either plead something upon

12  information, which means you have facts that back up your

13  allegation or you pleaded upon belief, which means you don't

14  have the facts, but you believe that it might --

15          THE COURT:  This is typically in the conjunctive.

16          MR. NASH:  Well, in this case it is in the

17  conjunctive.

18          THE COURT:  All right.  So they had information and

19  they had a belief.

20          MR. NASH:  Well, they list all their information,

21  Your Honor.

22          THE COURT:  All right.  Let's short-circuit this.

23  Let me hear from the plaintiffs.

24          What are the facts that have been alleged that

25  you've relied on?

1    He says there aren't any facts and he's pointed out,

2  pointed specifically to the allegations that says, in effect,

3  that they don't know, but they believe that they called this

4  other person who's not a member of the defendant's family or

5  at least not the immediate family, and he says that's just not

6  enough to constitute a threat.

7    MS. FRYSZMAN:  So as an initial matter, the statute

8  permits tolling when defendants act indirectly or directly --

9  I mean, indirect or direct method.  So the defendants don't

10  have to make a direct phone call.  They can ask --

11    THE COURT:  But you have to link it to them.

12    MS. FRYSZMAN:  Yes.  And so we've got several

13  tolling allegations.  And those are as follows:  One, the only

14  way the defendants had to connect to Mrs. Simret --

15  Mrs. Tekle, the plaintiff --

16    THE COURT:  I'm sorry.  Speak up.

17    MS. FRYSZMAN:  The only method that the defendants

18  had to reach Mrs. Tekle, the plaintiff, was through

19  Mrs. Gebreyesus, the so-called aunt.  The so-called aunt

20  actually owned Mrs. Tekle's parents' home in Eritrea.  She was

21  their landlady.  She's not a blood relative.  She owns the

22  home.  And that's in paragraph 11.

23    The plaintiff then -- the complaint alleges that the

24  defendants' acted to obstruct Mrs. Tekle from enforcing her

25  rights by threatening Mrs. Gebreyesus and asking her to

1   contact Simret to prevent her from filing. That's in

2   paragraph 65.

3         The complaint alleges that --

4         THE COURT: Read me 65.

5         MS. FRYSZMAN: 65. And that's one of the

6   information. It is on information and belief. Mrs.

7   Gebreyesus made several calls to Ms. Tekle's family asking

8   about Ms. Tekle's whereabouts and intentions at the

9   defendants' behest. Whereas, the result of actions of the

10   defendants or their agents and were made with the intention of

11   preventing Ms. Tekle from filing suit.

12         The complaint alleges in paragraph 57 that Mrs.

13   Gebreyesus herself said that she had been threatened. And

14   that in paragraph 8 that she repeatedly called asking what

15   Mrs. Tekle planned to do, where she was, and how to contact

16   her. The defendants argued on reply that this could plausibly

17   be read as concern for her niece. But the fact is that

18   Mrs. Tekle's family has viewed those calls as threatening,

19   refused to provide that information to Mrs. Gebreyesus, told

20   Mrs. Tekle about it. Mrs. Tekle was terrified. That's in

21   paragraph 58.

22         In paragraph --

23         THE COURT: Is that in the complaint?

24         MS. FRYSZMAN: Yes, it is. It's in paragraph 58,

25   Your Honor.

1          THE COURT:  It says she was terrified?

2          MS. FRYSZMAN:  Yes.  And in paragraph 55, we believe

3    that she was so afraid she stayed in hiding and rarely left

4    the house in Virginia where she was hiding.  And then the next

5    thing that Mrs. Gebreyesus did, and this is in paragraph 60,

6    is she attempted to evict Mrs. Tekle's family from their home.

7    That is not the act of a concerned person who is trying to be

8    kind to her niece.  Those are threatening acts designed to

9    intimidate and threaten the plaintiff.

10          And those are the allegations in the complaint, Your

11   Honor.

12          THE COURT:  All right.  That's helpful.  And you

13   think that's sufficient?

14          MS. FRYSZMAN:  I do.  I also think this standard

15   that governs this argument is the one that the Fourth Circuit

16   discussed in *Goodman v. Praxair* and that this Court adopted

17   last year in *McPike v. Zero Gravity.*  And that standard is

18   that when the defendant seeks to dismiss a complaint, based on

19   an affirmative defense, the standard is tolling foreclosed.

20          THE COURT:  Yes, I'm familiar with that.

21          MS. FRYSZMAN:  In the complaint.

22          THE COURT:  Let me go back to Mr. Nash and have Mr.

23   Nash address that point.  That is the point that whether the

24   arguments you've made foreclosed tolling.  That's your burden.

25          MR. NASH:  It is our burden, consistent with the

1  Iqbal Twombly standard.  And what Ms. Fryszman has pointed

2  are, as I've pointed out, there are paragraphs 56 through 63,

3  all make factual allegations.  And every one of those factual

4  allegations do not mention our clients.  Do not identify

5  anything affirmative that our clients did, with the exception

6  of the one that I raised to you, which is they called -- they

7  allegedly called, upon information and belief, they allegedly

8  called Ms. Gebreyesus up and said, "The plaintiff has left our

9  house."

10        THE COURT:  Well, let me clarify that.  As you say

11 you've used it.  Everyone has used "on information and

12 belief."  But that's a factual allegation.

13        MR. NASH:  Fair enough.

14        THE COURT:  And it's a factual allegation that if

15 it's not true and there is no basis for it, Rule 11 punishes

16 that.  So it is a fact that it must be accepted at this stage.

17        MR. NASH:  I agree with that.

18        THE COURT:  That's --

19        MR. NASH:  That is factual allegation and we accept

20 that as true.

21        THE COURT:  That's good.  Go ahead, sir.

22        MR. NASH:  All of those facts and everything that

23 Ms. Fryszman just talked about the plaintiff being terrified,

24 about the -- Ms. Gebreyesus's apparently trying to evict them

25 from their house in Eritrea, all of those are factual

1    allegations, and all of them the Court is required to accept

2    as truthful in the course of these proceedings.  We understand

3    that.  We do not believe them to be true, but we understand

4    that at this preliminary stage of the proceedings, you have to

5    accept those as true.

6            None of those relate to any affirmative act by our

7    clients to do anything to the plaintiff.  None of those

8    factual allegations.  So that's 56 through 63.  Then you get

9    to the last two paragraphs, paragraph 64 and paragraph 65.

10   And what those paragraphs say, in the most conclusory fashion

11   possible, is the defendants, upon information and belief, were

12   responsible for everything that we have just laid out in 56

13   through 63.

14           There's no basis -- and what Iqbal says is that

15   there has to be a factual basis for the Court to find that

16   element is plausible.

17           THE COURT:  Is there any relationship between the

18   defendant and these people who are being contacted?

19           Are they the same family or anything of that sort?

20           MR. NASH:  The facts, you -- the facts as laid out

21   in the complaint are that this woman, Ms. Gebreyesus, had

22   worked for a branch of the Saudi royal family for a number of

23   years.  She knew the plaintiff, having come from the same

24   small town in Eritrea.  And at some point, she reached out to

25   the plaintiff and said, "Would you like me to come to Saudi

1   Arabia to work for the Saudi royal family?"  That woman is Ms.

2   Gebreyesus and she was responsible for bringing the plaintiff

3   to work in Saudi Arabia.

4           Apparently, according to the complaint, the work

5   situation for the plaintiff in Saudia Arabia was not pleasant.

6   And she did not like the work that she was doing in Saudia

7   Arabia and so she reached out to our clients, who she

8   understood were coming to America, and said, "Will you take me

9   to the United States?"

10          And our clients said, "Yes, we will take you from

11  this relative that you're working for and bring you to the

12  United States," which is what they did.

13          After seven months of being here in the United

14  States, the plaintiff walked away from the family, went --

15  where our clients knew not where.  And the allegation in the

16  complaint is upon that point of time, they called back to

17  Saudia Arabia to Ms. Gebreyesus -- and this is in the

18  complaint --

19          THE COURT:  Who called back?

20          MR. NASH:  The one affirmative act that is listed in

21  the complaint is --

22          THE COURT:  Who called back?

23          MR. NASH:  That our clients phoned Ms. Gebreyesus

24  and said, "Ms. Tekle is gone."

25          That's the affirmative act that is listed in the

1    complaint.  "Ms. Tekle is gone."

2         And what the plaintiff says is that Ms. Gebreyesus

3    then called Ms. Tekle's family in Eritrea and said, "Do you

4    know where she is?  Do you know what's happened to her?"

5    Ms. Tekle says she was terrified by those calls because she

6    believe that it was some -- that there was some intention to

7    find out where she was to do some undisclosed thing to her.

8         What we have said is it's perfectly natural for Ms.

9    Gebreyesus to call the family up and say -- this is someone

10   who is identified in the complaint as close enough that she

11   refers to Ms. -- to the plaintiff as her niece.  Perfectly

12   natural to call up and say, "You know what happened to -- do

13   you know where she is?  She's in a foreign country.  No one

14   has heard from her.  Do you know what's happened to her?"

15   It's completely unreasonable to spin this up as some menacing

16   call.

17        But we have -- we realize we're in a posture where

18   we have to accept even unreasonable positions in the

19   complaint.  What we're saying is there is no evidence, there

20   is nothing that is pled in the complaint that suggests that

21   the calls from Ms. Gebreyesus to the plaintiff's family in

22   Eritrea were motivated or directed or in any way, in effect,

23   of the cause of our client's doing or saying anything.

24        There's just nothing in the complaint that says our

25   clients told Ms. Gebreyesus to do anything.  There's lots in

1   the complaint about the subjective views of Ms. Tekle, the

2   plaintiff, saying, "I was scared; I was afraid."  That's not

3   the standard.  You can't evade the statute of limitations by

4   saying, Subjectively, I was concerned that something might

5   happen to me if I filed lawsuit.

6           What the statute says is:  There has to be an

7   affirmative act by the defendants that causes a legitimate

8   fear on the basis of the plaintiff.  And the -- the complaint

9   is absolutely deficient in saying that our clients did

10  anything to engender this fear in Ms. Tekle.

11          THE COURT:  All right.  Let me hear one last time

12  from the plaintiff and then we'll go on to one other issue.

13          MS. FRYSZMAN:  Your Honor, as this Court concluded

14  in the *McPike* case --

15          THE COURT:  In which case?

16          MS. FRYSZMAN:  *McPike v. Zero-Gravity Holdings*, 280

17  F.Supp.3d 800.

18          THE COURT:  I'm sorry.  Can I hear the name of the

19  case again?

20          MS. FRYSZMAN:  *McPike v. Zero-Gravity*.

21          THE COURT:  This is the around the moon case?

22          MS. FRYSZMAN:  Yes.  The guy on the moon flight.

23          THE COURT:  Yes.

24          MS. FRYSZMAN:  So as in that case, these questions

25  are questions of fact.  And to quote Your Honor, they cannot

1  be resolved on the face of plaintiff's complaint, because

2  these are alleged facts that could cause reasonable jurors to

3  disagree as to when, in the reasonable exercise -- that case

4  was about due diligence, here, it's about tolling -- that

5  could cause reasonable jurors to disagree about whether the

6  threats made --

7       THE COURT:  Have you alleged anything that says --

8       MS. FRYSZMAN:  We have.  And --

9       THE COURT:  Just a minute.  Wait until I finish.

10  Have you alleged anything that says that Mr. Nash's clients

11  did any of this?

12       MS. FRYSZMAN:  We have, Your Honor.  The statute,

13  again, permits indirect or direct methods.  We allege that the

14  defendants used Mrs. Gebreyesus as their method to reach our

15  client and threaten her.  The defendants don't have to make

16  the threat directly.  The statute says "indirect" right in it.

17  In the word.  It says, "indirect method."  They used Mrs.

18  Gebreyesus to make the threats.

19       In fact, Mrs. Gebreyesus said she had been

20  threatened.  And we have that in paragraph 57 when she called

21  the family.  She said that she had been threatened.  And the

22  family took those as threats when Mrs. Gebreyesus asked for

23  Ms. Tekle's contact information and asked what she had

24  planned.  The family refused to provide it, because they felt

25  it was a threat.

1      So these aren't entirely subjective usings.  The

2  family felt it was a threat.  They did not provide the

3  information to Mrs. Gebreyesus.  Mrs. Gebreyesus kept calling

4  and asking where Ms. Tekle was.  Ms. Tekle stayed in hiding.

5  That's in paragraph 55.  And then Ms. Gebreyesus tried to

6  evict the family.  And that's in paragraph 60.

7      In the *Deressa* case, in this jurisdiction, a Court

8  found that threats of deportation were sufficient to prevent a

9  plaintiff from exercising their rights.

10      The threat does not have to be the sort of direct

11  threat by the defendant to say, Please don't file a suit, the

12  way Mr. Nash is saying.  The threats can simply be enough to

13  frighten and impede a person from exercising their rights as

14  they were in *Deressa*.  And certainly, the allegations here are

15  more than plausible.  A reasonable jury could infer that the

16  things happened the way that we said, that these weren't the

17  kind overtures of the concerned fellow Eretreans, but were, in

18  fact, designed to be threatening, were heard by the family to

19  be threatening, or felt as threatening to Mrs. Tekle, the

20  plaintiff.

21      And, in fact, were so frightening that when she

22  eventually went to law enforcement in April of 2013, she told

23  law enforcement that she was afraid contemporaneously, well

24  before this suit was filed.

25      And that allegation, I believe --

1          THE COURT:  All right.  Thank you.  Let me move on

2     to another issue.

3          MS. FRYSZMAN:  Thank you.

4          MR. NASH:  Your Honor, I just want to clarify one

5     thing.  When Ms. Fryszman says that Ms. Gebreyesus was

6     threatened, the complaint does not say threatened by our

7     clients.  The entire -- the entire factual assertion that she

8     just went through with Your Honor is in the complaint and you

9     can see for yourself, but every one of the allegations does

10    not relate to any affirmative act by our clients.

11         THE COURT:  All right.  Let me ask one question,

12    Ms. Fryszman.  I take it that -- well, have you alleged all

13    the facts that you know of?  In other words, if I gave you an

14    opportunity to amend, could you amend to add anything further?

15         MS. FRYSZMAN:  We could, Your Honor.  If given the

16    --

17         THE COURT:  What would you amend to say?

18         MS. FRYSZMAN:  We would --

19         THE COURT:  You have to wait.  She can only get one

20    of us at a time.  You have to wait until I finish.

21         What is it that you could allege?

22         MS. FRYSZMAN:  We could allege more specificity

23    about the threats that were made.  We do allege in paragraph

24    64 that on information and belief, threats were made against

25    Mrs. Gebreyesus at defendants' behest.

1          THE COURT:  What would you allege if I gave you an

2   opportunity to do it, further, about the threat?  Could you

3   allege who made the threat?

4          MS. FRYSZMAN:  Well, for one, we would need

5   discovery to do that.

6          THE COURT:  I'm sorry.  Can you answer my question?

7          MS. FRYSZMAN:  Yes.  We would need discovery to do

8   that, because a lot of that information is solely in the hands

9   of the defendants.  Mrs. Gebreyesus is currently employed by

10  the defendants.  We have no ability to contact her and no

11  ability to reach her to ask her questions.  So, certainly,

12  discovery would determine what threats were made and what she

13  said she said.  It's impossible to know, without discovery,

14  the interworkings of defendants' household.  All we can plead

15  is what our client knows and what her family knows and what

16  they heard.  And we can certainly make --

17         THE COURT:  And tell me again.  Just a moment.  I

18  have the privilege of interrupting.  You've got to persuade

19  me.

20         What's the relationship between the person working

21  in the defendant's household and the plaintiff?

22         MS. FRYSZMAN:  She's the landlady of plaintiff's

23  parents in Eritrea.  And --

24         THE COURT:  No familial relationship?

25         MS. FRYSZMAN:  There's no blood relationship.  They

1  call each other auntie, but I believe that's a cultural term.

2          THE COURT:  But she is an employee of the family of

3  the defendant?

4          MS. FRYSZMAN:  Of the mother.

5          THE COURT:  All right.  Go on.

6          MS. FRYSZMAN:  I'm sorry.  I lost your question.

7          THE COURT:  Yes.  What is it that you would amend to

8  say that isn't already in this fairly extensive complaint?

9          MS. FRYSZMAN:  I think if Your Honor thought we

10  needed greater specificity as to the threats, we would

11  re-interview the witnesses and seek to amend and add

12  specificity.  But as I said, we don't have an ability.  We

13  would need discovery to find out whether the defendants

14  directed those threats and what exactly was said by Mrs.

15  Gebreyesus.  We have no ability to contact her.

16          So there really is no way to allege beyond on

17  information and belief what defendants did, because we're --

18          THE COURT:  All right.  You've also raised the

19  issue, I think appropriately, for me to consider that the

20  defense of the statute of limitations, the argument that it

21  applies, would have to be foreclosed.  In other words, the

22  tolling would have to be foreclosed.

23          Is that right?

24          MS. FRYSZMAN:  That's correct.  That's in *Goodman v.*

25  *Praxair* and the *McPike* case.

1          THE COURT:  Tell me what your argument is about

2   that, very briefly.

3          MS. FRYSZMAN:  That's a high standard.  That --

4          THE COURT:  What has to be foreclosed?

5          MS. FRYSZMAN:  That our -- the words of *Goodman v.*

6   *Praxair* is that our rejoinder, taking the complaint as a whole

7   and any possible allegations in the complaint, has to

8   foreclose our tolling argument.  And that's just not the case

9   here.

10          THE COURT:  All right.  Mr. --

11          MS. FRYSZMAN:  Because it's an affirmative defense,

12   so we don't have to defeat it on the pleadings.

13          THE COURT:  Last word, Mr. Nash.  You're the movant,

14   you have the burden of persuasion.

15          MR. NASH:  Tolling is foreclosed, Your Honor,

16   because the plaintiff has not pled any allegation that --

17          THE COURT:  But you concede, of course, that that is

18   the standard, is foreclosing?

19          MR. NASH:  You've written it, Your Honor, so I'm not

20   going to argue that it should be anything else.  But I think

21   the word that the -- the concept of foreclosed has to be read

22   in conjunction with the Iqbal Twombly standard.  Which means

23   that just because -- as in Iqbal, when the plaintiff in Iqbal

24   said, "Ashcroft discriminated against me because of my race

25   and national origin," the Supreme Court said that is not --

1　should not be accorded deference because it's not a factual

2　allegation.

3　　　　　Here, there are a number of factual allegations that

4　the plaintiff has made.

5　　　　　We are -- we understand that all of those are

6　entitled to deference, but when it comes to the affirmative

7　acts that the defendants made, to put any of this into motion,

8　they have not produced any evidence to the Court and the only

9　thing they have said is a conclusory statement that, Oh, and

10　everything that we've just said that Mrs. Gebreyesus did on

11　information and belief, we think that the defendants are

12　responsible for that.  And that does not satisfy the Iqbal

13　Twombly standard.  And because it doesn't satisfy the Iqbal

14　Twombly standard, the plaintiffs are precluded or foreclosed

15　from any theory of equitable tolling, because they haven't

16　pled sufficient facts.

17　　　　　THE COURT:  All right.  I understand that.  Even

18　after the 15th time, I think I understand it.

19　　　　　Let me ask, now, to switch to the motion to dismiss.

20　There's an argument made that because the contract was in

21　Arabic and the plaintiff doesn't read Arabic, that somehow the

22　defendant isn't bound by what the contract says.

23　　　　　Is that your argument?

24　　　　　MR. NASH:  Not at all, sir.  And I think you know

25　that's not my argument.

1        The argument is that in order to proceed on a breach

2   of contract claim, the plaintiff must, at a minimum, identify

3   a provision of the contract that was breached by the actions

4   of the defendant and, at a minimum, argue that at the time of

5   the breach, she was in compliance with her own obligations

6   under the contract.

7        She has admitted in the complaint that -- first of

8   all, this is -- there's no question that the plaintiffs are

9   proceeding on a written contract.

10        THE COURT:  Is there an interpretation or

11   translation of it in the record?

12        MR. NASH:  No.  And I'll explain why.

13        THE COURT:  Because you haven't put one in.  That's

14   the reason.

15        MR. NASH:  Well --

16        THE COURT:  Or they haven't put one in.

17        MR. NASH:  We haven't responded, you know, we

18   haven't responded -- we haven't answered the complaint yet.

19   We don't have any obligation at this point.

20        THE COURT:  Well, I wouldn't go that far.  You know

21   me better than that.  I mean -- I don't read Arabic either.

22   Let me ask this, let me ask the plaintiff:  Do you intend to

23   submit an interpretation or a translation of the contract?

24        MS. FRYSZMAN:  Your Honor, we asked the defendants

25   for a copy of the contract.  They refused to provide it to us.

1  Mrs. Tekle was not provided a copy of the contract. That's

2  one of the elements of her trafficking claim.

3  Context we've also attempted to FOIA the contract

4  from the Department of State where defendants are required to

5  lodge it when they brought her in on the A-3 visa.

6  THE COURT: And what was the response there?

7  MS. FRYSZMAN: We have not received the -- we might

8  get it in 2025, when after this case is long over, but we have

9  not yet received it from the State Department.

10  THE COURT: Well, there are time limits on the

11  Freedom of Information Act.

12  MS. FRYSZMAN: Well, all I can tell you, Your Honor,

13  is we FOIA'd it twice, we have not received it and we've

14  requested it from defendants and they refused to provide it.

15  THE COURT: All right.

16  MR. NASH: Let me address the last point first. We

17  filed a motion to dismiss the complaint because the plaintiff

18  didn't know what was in the contract. And the very next day,

19  after we filed the motion, we got a -- our first ever request

20  for a copy of the contract. And we said, Well, why -- why --

21  after you have sued us and we've moved the Court to dismiss it

22  because you don't know what's in the contract, why would we

23  provide you with a contract at that time. So that was the

24  first and only.

25  THE COURT: Just a moment. Let me ask you this:

1    Did you ever provide the plaintiff with a contract?  Did your

2    client ever provide the plaintiff with a contract?

3              MR. NASH:  She signed --

4              THE COURT:  That isn't what I asked.

5              MR. NASH:  According to the complaint --

6              THE COURT:  That isn't what I asked.  Did you ever

7    provide the plaintiff with a copy of the contract?

8              MR. NASH:  Not to my knowledge.  I don't know.

9              THE COURT:  Golly, Pete, does that strike you as

10   fair?

11             MR. NASH:  Well, if she never requested a copy of

12   the contract.

13             THE COURT:  She is now.

14             MR. NASH:  Right.  After six years after signing the

15   contract, a year after the statute of limitations has expired,

16   she has asked for -- after suing us on a contract that she

17   admits she doesn't know what the terms of it are, after all of

18   those facts, then I get an e-mail from the plaintiff's counsel

19   after I've -- the day after I move to dismiss the counts

20   saying, "Oh, by the way, we should probably see what the

21   contract is."

22             Again, I don't want to suggest to the Court that

23   we're playing games.  I don't have a copy of the contract.

24   We've asked our clients for the copy of the contract.  They

25   don't have a copy of the contract.  So it's -- even if I was

1   inclined to give plaintiff's counsel a copy of the contract, I

2   couldn't do it.  So I'm not playing any games.  But you know,

3   to get back to the thrust of our complaint, Your Honor --

4           THE COURT:  Let me stop this.  Have you you-all

5   discussed -- she's in the United States, is that right, your

6   client?

7           MS. FRYSZMAN:  That's correct, Your Honor.

8           THE COURT:  Have you-all discussed some reasonable

9   settlement of this matter?  She only worked for them for seven

10  months.

11          MS. FRYSZMAN:  We have, Your Honor.  We've attempted

12  to and the defendants has shown no interest.

13          THE COURT:  I beg your pardon?

14          MS. FRYSZMAN:  We have attempted to and the

15  defendants, to my understanding, they have no interest.

16          THE COURT:  Because it seems to me that it's a

17  fairly simple negotiation.  She worked for them for seven

18  months.  She doesn't claim, does she, that she wasn't paid

19  during the seven months, does she?

20          MS. FRYSZMAN:  She does claim that she wasn't paid.

21          THE COURT:  All right.  Well, then you need to

22  settle this case.

23          MR. NASH:  Your Honor, when we got this complaint,

24  we went to defense counsel with a 17-minute video tape that

25  was compiled from home movies of seven months that the

1  plaintiff lived in the defendants' home.

2         In those seven months, the home movies showed her go

3  to Jackson Hole on a ski vacation with the plaintiffs in

4  which -- in which the defendants acquired private ski

5  instructors for every member of their household staff.

6         THE COURT:  Have you discussed settlement?

7         MR. NASH:  She was treated -- she was paid thousands

8  of dollars over the minimum wage.  She was -- she had very few

9  duties within the home.  She had a wonderful life in the

10  house.  And our client's -- there is a reporter from the

11  Washington Post here who is going to write a story tomorrow

12  about the fact that our clients are slave traders, because

13  they brought this woman to the house.  It is -- it is

14  unbelievable the damage to our client's reputation that is

15  being brought about by this lawsuit and our clients have no

16  interest in settling.  The money -- they're members of the

17  Saudi royal family.  The money that it would take to settle

18  this case would be -- could be found in the cushions of their

19  couch.  I have no doubt.  But the damage to their reputation

20  of this woman, who they first brought from -- a poverty in

21  Eritrea to Saudi Arabia, then from Saudia Arabia to the United

22  States, who they treated wonderfully while she was a member of

23  their household, and taught her to ski, and brought her to Key

24  West and allowed her to lounge by the pool.

25         During the seven months that she worked for them,

1   they treated her wonderfully, they treated her with respect,

2   and generosity and dignity, and then she walked away because

3   they were going back to Saudia Arabia and she didn't want to

4   go back to Saudia Arabia.  And we have evidence.  This isn't

5   our belief.  We have evidence that she walked away, because

6   she didn't want to go back to Saudia Arabia.

7           And then she was in the country illegally because

8   the terms of her Visa were that she had to be working for this

9   family in order to stay in the United States.  But she found a

10  way to stay in the United States because she went to ICE and

11  she complained that she was the victim of trafficking.  And

12  under the law, victims of trafficking are accorded a visa.

13  And that's why she is in the United States today is because

14  she reported this to ICE.

15          THE COURT:  All right.  That's useful information,

16  which I'm sure the Washington Post will appreciate and

17  probably ignore.

18          MR. NASH:  And let me make one more point for Your

19  Honor and the Washington Post, which is that Ms. Tekle is

20  currently being investigated by the Department of Justice and

21  ICE for fraudulently obtaining a visa by making these

22  misrepresentations.

23          THE COURT:  Well, that's irrelevant to what's before

24  the Court today.

25          MS. FRYSZMAN:  Your Honor, if I could just say.  We

1  have met with the Department of Justice and they have assured

2  us that Ms. Tekle is not under investigation.  That is

3  categorically false, as far as I know.  The only people I know

4  that are under investigation are defendants.  And that's just

5  categorically false.  And I just hope we could stick to the

6  issues that are noticed, which is the breach of contract

7  claim.

8          THE COURT:  All right.  I think that's an

9  appropriate suggestion.

10         What I'm going to do is I'm going to grant the

11 motion to dismiss, but with leave to amend.

12         I think the arguments Mr. Nash makes have some

13 force.  That is to say that you need to allege all the facts

14 that you have.  You're correct when you argue it's either

15 direct or indirect, but you've got to tie this to some extent

16 to the defendants.

17         I don't think tolling would be warranted if she were

18 just frightened of somebody who was threatening her, unrelated

19 to the defendants.  That's Mr. Nash's point.  But if you have

20 facts, I need to know them.

21         Now, the issue of the contract is troublesome to me.

22 It's hard to understand the situation where parties enter into

23 a contract and a party is not provided a copy of the contract.

24 But there must be a contract somewhere.  I urge you to

25 exercise the time limits that are imposed by law on the

1   Department of State to produce documents.

2           MS. FRYSZMAN:  Your Honor, if I might speak to that.

3   Federal law requires the defendants to provide the plaintiff

4   with a copy of the contract.  So they are in violation of the

5   federal law and of the requirements of --

6           THE COURT:  Look, I don't want to hear anymore about

7   accusations.

8           MS. FRYSZMAN:  That's why we don't have the

9   contract, is that --

10          THE COURT:  Has the Department of State told you

11  that they don't have it because they haven't provided it?

12          MS. FRYSZMAN:  The Department of State is not within

13  my control.

14          THE COURT:  Well, you filed a FOIA.  That's within

15  your control.  It's also within your control to move to compel

16  response to it within a particular time.

17          Have you done that?

18          MS. FRYSZMAN:  We will, Your Honor.

19          THE COURT:  Have you done that?

20          MS. FRYSZMAN:  We have not yet.  But, Your Honor,

21  she knows what the provision of the contract is.  So this is

22  not a situation where she's unaware of what the --

23          THE COURT:  Is that in your complaint?

24          MS. FRYSZMAN:  It is, Your Honor.

25          THE COURT:  How does she know that?

1    MS. FRYSZMAN:  Because she knows she was promised

2  $4,500 a month in pay and she knows that she did not receive

3  it.

4    THE COURT:  That's in the complaint.

5    MS. FRYSZMAN:  That is in the complaint --

6    THE COURT:  That's the provision -- just a moment.

7  When I start, you stop.

8    MS. FRYSZMAN:  Apologies, Your Honor.

9    THE COURT:  You've got to address what I'm thinking.

10  And you don't do that if you're talking at the same time I am.

11    I did exactly what you're doing when I argued when I

12  stood where you're standing and I never realized how

13  irritating it can be.

14    It is irritating to a judge.  Mr. Nash knows that

15  because he's heard me complain about that in the past.

16    Let's go back to -- I'm going to grant the motion,

17  but with leave to amend.  And I want you to ensure that you

18  put in all the facts that you have that you can plead under

19  Rule 11 that would warrant an inference that there was some

20  reason for tolling.  That there's a warrant for tolling.  And

21  I'll decide the matter without further oral argument once you

22  do that, because there will be motions after that and I'll

23  decide it on the basis of the motions.  I don't need further

24  oral argument.

25    Now, the issue of the contract I'll also decide on

1    the basis of the arguments that I've already heard. It's a

2    threshold motion.

3            I'm going to deny the motion to strike, because I

4    think it is premature. It looks to me like it may be

5    relevant. I don't know. I don't know. So I'll deny the

6    motion to strike. There was one other motion, Mr. Nash.

7            MR. NASH: There's not another motion, Your Honor.

8    I would just suggest, the principal argument that the

9    plaintiff has made as to the relevance of the material --

10   that's -- that relates to the motion to strike paragraphs 14

11   through 16, is that it goes to the equitable tolling issue.

12   And so if Your Honor ultimately decides not -- to dismiss --

13           THE COURT: Renew your motion then, but I'm not

14   granting it now.

15           MR. NASH: I was just going to suggest that you hold

16   it under advisement.

17           THE COURT: No, I'm not going to hold it under

18   advisement, I'm going to deny it, and then you can renew it if

19   it's necessary.

20           MR. NASH: Thank you.

21           THE COURT: All right. Anything further in this

22   matter today?

23           MR. NASH: You asked -- the question you asked me:

24   Were there any other pending motions? There are none.

25           THE COURT: All right. And you agree with that?

1         MS. FRYSZMAN:  Yes, Your Honor.  The defendants did

2 not move to dismiss the other counts in the complaint.

3         THE COURT:  Yes.  I'm aware of that.

4         MS. FRYSZMAN:  And then I just wanted to be clear

5 that I said that we had alleged she knew what provision of the

6 contract was breached.  It was the payment provision and she

7 --

8         THE COURT:  Yes, I'm aware of that.

9         MR. NASH:  Your Honor, our obligation to answer the

10 complaint is contingent on Your Honor's ruling on the motion

11 to dismiss.  And I just want to be clear, when the time --

12         THE COURT:  I will make clear in the order that the

13 time for answering or otherwise filing responsive pleading is

14 tolled until the amended complaint is filed, and after that,

15 the rules will take over and govern what the times are.

16         MR. NASH:  Thank you.

17         THE COURT:  Under Rule 12.

18         Anything further in this matter today?

19         MS. FRYSZMAN:  No.  Thank you, Your Honor.

20         MR. NASH:  No, Your Honor.  Thank you.

21         THE COURT:  All right.  Well, it's -- thank you for

22 your arguments.

23

24         **(Proceedings adjourned at 12:55 p.m.)**

25

1          <u>CERTIFICATE OF REPORTER</u>

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Motions in

7    the case of the **SIMRET SEMERE TEKLE versus NOUF BIN NAYEF**

8    **ABUL-AL SAUD, et al**, Civil Action No. 1:18-CV-211, in said

9    court on the 7th day of September, 2018.

10          I further certify that the foregoing 36 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this September 19, 2018.

17

18

19

20

21   _____
     Tonia M. Harris, RPR
22   Official Court Reporter

23

24

25