**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

SIMRET SEMERE TEKLE,

               *Plaintiff*,

     v.

NOUF BINT NAYEF ABUL-AZIZ AL SAUD,
MOHAMMAD BIN ABDULLAH AL SAUD

            *Defendants*.

Case No.: 1:18-cv-211

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTORY STATEMENT ..........................................................................................1

FACTS ...........................................................................................................................4

     A.     Defendants breached the parties' contract. .........................................................4

     B.     Defendants obstructed the filing of this suit. .....................................................6

LEGAL STANDARD.........................................................................................................9

ARGUMENT.................................................................................................................11

I.     Ms. Tekle's Breach Of Contract Claim Is Timely Because Defendants Obstructed
Her Filing. .........................................................................................................11

     A.     Ms. Tekle has sufficiently alleged that Defendants were involved in
obstructing Ms. Tekle's filing. .............................................................13

     B.     Ms. Tekle has sufficiently alleged that she was reasonably deterred from
filing suit by Defendants' actions. .........................................................19

II.     Ms. Tekle Has Sufficiently Alleged That Defendants Materially Breached The
Parties' Contract.................................................................................................22

     A.     Ms. Tekle has specifically alleged the material terms of the contract. .................22

     B.     As a matter of federal law, the contract contained mandatory terms that
Defendants breached. ........................................................................23

          1.     By law, applicants for A-3 visas must have contracts with their
employers that contain certain terms. .......................................23

          2.     Ms. Tekle has sufficiently alleged that Defendants breached those
mandatory terms.................................................................24

     C.     Ms. Tekle has sufficiently alleged her own performance of the contract. .............25

     D.     Defendants could resolve these concerns about the specific terms of the
contract by producing a copy of the contract or cooperating with Ms.
Tekle to obtain a copy of the contract.....................................................26

CONCLUSION...............................................................................................................27

# TABLE OF AUTHORITIES

**CASES**

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010)..................................................................................4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................9, 10, 14

*Butler v. United States*,
  702 F.3d 749 (4th Cir. 2012) ...............................................................................10

*Cruz v. Maypa*,
  773 F.3d 138 (4th Cir. 2014) ...............................................................................12

*Culpeper Nat'l Bank v. Tidewater Improvement Co.*,
  89 S.E. 118 (Va. 1916).........................................................................................12

*Deressa v. Gobena*,
  No. 1:05CV1334(JCC), 2006 WL 335629 (E.D. Va. Feb. 13, 2006)....................12

*Dorsey v. Portfolio Equities, Inc.*,
  540 F.3d 333 (5th Cir. 2008) ...............................................................................14

*Fawzy v. Wauquiez Boats SNC*,
  873 F.3d 451 (4th Cir. 2017) .................................................................................2

*Goodman v. Praxair, Inc.*,
  494 F.3d 458 (4th Cir. 2007) ...............................................................10, 14, 19, 22

*Grimes v. Suzukawa*,
  551 S.E.2d 644 (Va. 2001)....................................................................................11

*Hamlet v. Hayes*,
  641 S.E.2d 115 (Va. 2007)....................................................................................22

*Houck v. Substitute Tr. Servs., Inc.*,
  791 F.3d 473 (4th Cir. 2015) ...............................................................................10

*Kiwanuka v. Bakilana*,
  844 F. Supp. 2d 107 (D.D.C. 2012) ................................................................12, 19

*McPike v. Zero-Gravity Holdings, Inc.*,
  280 F. Supp. 3d 800 (E.D. Va. 2017) ...............................................................11, 13

*Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*,
  855 F.3d 573 (4th Cir. 2017) ...............................................................................10

*Newman v. Walker*,
   618 S.E.2d 336 (Va. 2005)...........................................................................11, 12

*Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*,
   4 F.3d 244 (4th Cir. 1993) ....................................................................................10

*Ridenour v. Multi-Color Corp.*,
   147 F. Supp. 3d 452 (E.D. Va. 2015) ...................................................................14

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ....................9, 14

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ...............................................................................18

*U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*,
   745 F.3d 131 (4th Cir. 2014) .................................................................................18

*Woods v. City of Greensboro*,
   855 F.3d 639 (4th Cir.), *cert. denied sub nom. City of Greensboro, N.C. v.
   BNT Ad Agency, LLC*, 138 S. Ct. 558 (2017) ..................................................18, 19

**STATUTES**

8 U.S.C. § 1375c(b)(1)..........................................................................................23, 24

8 U.S.C. § 1375c(b)(2)..........................................................................................24, 2

8 U.S.C. § 1375c(b)(2)(C) ..........................................................................................4

18 U.S.C. § 1592......................................................................................................24

29 U.S.C. § 206........................................................................................................25

Va. Code § 8.01-229(D)...................................................................................... passim

Va. Code § 8.01-246(2) ............................................................................................11

Va. Code § 40.1-28.10 ..............................................................................................25

**OTHER AUTHORITIES**

6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1476 (3d ed.
   2008 & Supp. 2018).................................................................................................2

5B Charles Alan Wright et al., *Federal Practice and Procedure* § 1357 (3d ed.
   2008 & Supp. 2018)...............................................................................................11

Plaintiff Simret Semere Tekle respectfully opposes Defendants' Motion to Dismiss Count Five of the Second Amended Complaint for breach of contract, Dkt. 57. Defendants ask the Court to ignore the well-established legal standard applicable on a motion to dismiss. Ms. Tekle has sufficiently alleged a cause of action for breach of contract under Virginia law. She has also sufficiently alleged that her claim for breach of contract was timely filed because Defendants obstructed her filing for at least ten months through a pattern of threats and intimidation. *See* Va. Code § 8.01-229(D). For these reasons, Defendants' motion must be denied.

## INTRODUCTORY STATEMENT

Although Defendants pay lip service to the well-established principle that the Court must "accept the truthfulness of Plaintiff's allegations" at this stage of the proceedings, Defs' Mem. in Supp. of Motion to Dismiss, Dkt. 57, at 7, most of the ink in Defendants' Motion is spilled trying to argue that the allegations in the Second Amended Complaint are not credible. That, of course, is an issue for another day. And even apart from the fact that Defendant's credibility arguments are entirely irrelevant for present purposes, they are also wrong.

In response to the Court's order that Ms. Tekle "allege all the facts that you have . . . . to tie this to some extent to the defendants," September 7, 2018 Hearing Tr. at 31:13-16, Plaintiff's counsel traveled to Eritrea and interviewed additional witnesses. As a result of that further investigation, in her Second Amended Complaint Ms. Tekle has alleged additional facts that include that: (1) Ms. Gebreyesus clearly stated that Ms. Tekle should not take legal action against Defendants; (2) Ms. Gebreyesus told Ms. Tekle's family that one of Ms. Gebreyesus's employers was present when she made the calls; (3) Ms. Tekle's family could hear a woman speaking Arabic to Ms. Gebreyesus during the phone calls; (4) Ms. Gebreyesus had a longstanding relationship with the Defendants as she had served as a childhood nanny to Defendant Mrs. Al Saud; (5) Ms. Gebreyesus worked for Defendant Mrs. Al Saud's mother, who

lived on the same compound in Saudi Arabia as Defendant Mrs. Al Saud; (6) Defendants

returned to Saudi Arabia after Ms. Tekle escaped; (7) Ms. Gebreyesus called Ms. Tekle's family

from Saudi Arabia; (8) Ms. Gebreyesus began calling Ms. Tekle's family immediately after Ms.

Tekle escaped in 2012; (9) Ms. Gebreyesus could not have known about Ms. Tekle's escape

without Defendants divulging that information; (10) Ms. Gebreyesus had rarely, if ever, called

Ms. Tekle's family previously; (11) Ms. Gebreyesus demanded specific information about Ms.

Tekle, her whereabouts, and her intentions, information that Ms. Gebreyesus had never

previously sought; (12) Ms. Gebreyesus threatened Ms. Tekle's family with eviction if Ms. Tekle

took any action against the Al Sauds; and (13) independent from Ms. Gebreyesus, two Eritrean

women who lived in Saudi Arabia came to Ms. Tekle's family's home to demand information

about Ms. Tekle on four occasions.  Second Am. Compl., Dkt 53, ¶¶ 11, 67-91.

In short, while Plaintiff's counsel conducted a substantial investigation prior to filing the

original Complaint, counsel has now gone further and visited Eritrea to discover new facts and

evidence.  It should come as no surprise, therefore, that some factual allegations in the Second

Amended Complaint differ from allegations in earlier Complaints.  What matters for the

purposes of the pending Motion, however, is that under Fourth Circuit law "a properly filed

amended complaint supersedes the original one and becomes the operative complaint in the case,

it renders the original complaint 'of no effect.'"  *Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451,

455 (4th Cir. 2017) (quoting *Young v. City of Mt. Ranier*, 238 F.3d 567, 573 (4th Cir. 2001)); *see*

6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1476 (3d ed. 2008 & Supp.

2018) ("Once an amended pleading is interposed, the original pleading no longer performs any

function in the case and any subsequent motion made by an opposing party should be directed at

the amended pleading." (footnote omitted)).  Consequently, while Defendants insist on

discussing earlier Complaints, all that matters now are the allegations in the Second Amended Complaint.

The Defendants' focus on earlier Complaints only serves to underscore the lack of any meritorious *legal* challenge to the current Complaint.  The Second Amended Complaint sufficiently alleges that the individual Defendants, acting at times through their agents, obstructed Ms. Tekle's filing for at least ten months through a pattern of threats and intimidation.  Ms. Tekle has alleged that she is entitled to tolling because Defendants enlisted Ms. Okuba Gebreyesus, a decades' long employee of Defendants' family, to make threatening phone calls to Ms. Tekle's family in an attempt to intimidate Ms. Tekle and deter her from filing suit.  It cannot be seriously disputed that these facts permit the court to draw the reasonable inference that Defendants are responsible for these threats and intimidation tactics.

Similarly lacking is Defendants' continued argument that Count Five must be dismissed because Plaintiff cannot rely on the written contract she signed.  Defendants fault Plaintiff for failing "to either cite the language of the contract itself, or to at least be in a position to present competent evidence as to the contractual terms."  Defs' Mem. at 15.  Although Plaintiff has alleged the material terms of the contract—including her job duties, hours, and wages—and alleged facts supporting her contention that the contract included those terms, Defendants argue that this is insufficient because Ms. Tekle has not alleged *all* the specific terms of that contract.  *Id.* at 13-14.

This is a remarkable position for Defendants to take.  Defendants fail to acknowledge that they represented to the American government that they had a contract to pay Ms. Tekle a lawful wage under state and federal law at the time of her visa application.  Ms. Tekle does not have a copy of the contract because Defendants failed to provide her with one, in violation of federal

law.  *See* 8 U.S.C. § 1375c(b)(2)(C).  Defendants seek to use their failure to abide by U.S. law as an argument to render the contract unenforceable.  This is sophistry at its worst.  Ms. Tekle knows and pleaded the essential terms of the contract.  That is all that is required.

### FACTS

Ms. Tekle is a citizen of Eritrea.  Second Am. Compl., Dkt. 53 ¶¶ 1, 10.  In 2008, she was recruited by Okuba Gebreyesus to work as a maid for Princess Maha bint Mohammad bin Ahmad Al Sudairi in Saudi Arabia.  *Id.* ¶¶ 11-12.  Ms. Gebreyesus had worked for the Saudi royal family for several decades, including as a nanny for Defendant Mrs. Al Saud.  *Id.* ¶ 11.  Ms. Gebreyesus was also the Tekle family's landlady; Ms. Tekle's family rented their home in Eritrea from Ms. Gebreyesus.  *Id.*

Princess Maha proved to be a demanding and difficult employer.  *Id.* ¶¶ 14-18.  She used physical and verbal abuse to make her employees feel inferior and to enforce discipline.  *Id.* ¶¶ 14, 16-18.  On several occasions, this abuse took extreme forms.  For example, on one occasion Princess Maha pushed Ms. Tekle down because she saw that Ms. Tekle was wearing a crucifix around her neck.  *Id.* ¶ 17.  On another occasion, Princess Maha told Ms. Tekle that she would suffer the same punishment as criminals whose punishments were broadcast on Saudi television if she lied or stole.  *Id.* ¶ 16.  Ms. Tekle had also seen Princess Maha throw a glass at Ms. Gebreyesus.  *Id.* ¶ 66.

### A.  Defendants breached the parties' contract.

In 2011, Defendant Nouf bint Nayef Abul-Aziz Al Saud—Princess Maha's daughter— visited her mother in Saudi Arabia.  *Id.* ¶ 19.  During her visit, Defendant Mrs. Al Saud offered Ms. Tekle a job working for her as a nanny for one of her three children in the United States.  *Id.* She offered to pay Ms. Tekle $4,500 per month—a significant raise for Ms. Tekle—and

promised that Ms. Tekle would be required to work forty hours per week with two days off each week.  *Id.*  Ms. Tekle accepted the offer, *id.* ¶¶ 19, 24, and was given a contract to sign.  *Id.* ¶ 24.

Ms. Tekle needed a visa so that she could enter and work in the United States. Defendants' agent, a male employed in the Defendants' office, prepared her application for a visa and made her travel arrangements.  *Id.* ¶ 20.  To obtain the visa, Defendants submitted a copy of the parties' contract to American consular authorities in Jeddah, Saudi Arabia.  *Id.* ¶¶ 21-24.  Defendants' agent escorted Ms. Tekle to her visa interview at the U.S. consulate, where he provided a copy of the contract to the consular official.  *Id.* ¶¶ 21, 23.  The Defendants' agent summarized the terms of the contract aloud to Ms. Tekle in Arabic, in the presence of the consular official.  *Id.* ¶ 23.  Ms. Tekle saw the number $4,500 in the paper contract summarized by the Defendants' agent.  *Id.*  Defendants never provided Ms. Tekle with a copy of the contract. *Id.* ¶¶ 23, 27.  The amount of $4,500 was, however, recorded as the salary in Ms. Tekle's visa application, which Ms. Tekle later received from the State Department through a FOIA request. *Id.* ¶ 23.  Defendants falsely represented that Ms. Tekle would be paid at a lawful rate for childcare services, with legally acceptable conditions of employment.  *Id.* ¶ 22.  Ms. Tekle was granted an A-3 visa and began working for Defendants in Virginia in September 2011.  *Id.* ¶¶ 26, 28.

Defendants did not honor the terms of their contract.  *Id.* ¶¶ 124-28.  Far from it.  When Ms. Tekle arrived at Defendants' home, Defendants required Ms. Tekle to work as a domestic worker, not as a nanny as promised.  *Id.* ¶¶ 31, 33.  Ms. Tekle worked seven days per week with no days off, regularly working more than 80 hours per week.  *Id.* ¶¶ 33-36, 43-44.  Ms. Tekle's regular work day began at 5:30 A.M. and lasted until after 9:00 P.M.  *Id.* ¶ 34.  Defendants also refused to pay Ms. Tekle the promised salary of $4,500 per month.  *Id.* ¶ 38.  Instead, Defendants

paid Ms. Tekle only $400 to $500 per month in cash.  *Id.* ¶¶ 38.  In total, Defendants paid Ms.

Tekle only about $3,000 over the course of seven months—less than $2 per hour.  *Id.* ¶ 44.

Defendants' treatment of Ms. Tekle was not limited to requiring her to work long hours

for little pay.  Defendants and their agents also treated Ms. Tekle in an abusive manner.  *Id.* ¶ 45.

Defendants agents' called Ms. Tekle "offensive names in Arabic, including 'whore', 'colored',

'donkey', and 'garbage.'"  *Id.* ¶ 46.  Ms. Tekle was closely monitored while she stayed in

Defendants' residence and was forbidden from interacting with people outside the residence.  *Id.*

¶¶ 49-52.  Defendants even placed a security camera in Ms. Tekle's bedroom.  *Id.* ¶ 51.  In

addition, Ms. Tekle was expressly forbidden from attending church.  *Id.* ¶ 53.  Defendants and

their agents repeatedly threatened Ms. Tekle with arrest and/or deportation if she complained.

*Id.* ¶¶ 55-57.  Stripped of her passport, denied a copy of her employment contract, and facing

threats of arrest and deportation, Ms. Tekle remained effectively trapped in the Defendants'

employ.  *Id.* ¶ 58.

**B.  Defendants obstructed the filing of this suit.**

After seven months of forced labor and involuntary servitude, Ms. Tekle escaped from

Defendants' control in April 2012 when Ms. Tekle went on a shopping errand accompanied by

an escort.  *Id.* ¶¶ 44, 61-62.  Even after her escape, Ms. Tekle remained terrified that Defendants

would find her.  *Id.* ¶ 63.  She rarely left the house out of fear, and when she did, she wore a

disguise.  *Id.* ¶ 64.  She suffered nightmares and frequently woke up screaming.  *Id.* ¶ 65.

Shortly after Ms. Tekle's escape, Defendants returned to Saudi Arabia.  *Id.* ¶ 67.

Defendant Mrs. Al Saud and Princess Maha, her mother, spoke frequently, and had homes on the

same compound in Saudi Arabia.  *Id.* ¶ 91.  Ms. Gebreyesus worked directly for Princess Maha,

Defendant Mrs. Al Saud's mother, and had a relationship with Defendant Mrs. Al Saud, who had

grown up with Ms. Gebreyesus as a member of the household staff when Defendant Mrs. Al

Saud was a child. *Id.* ¶¶ 11, 93. Ms. Gebreyesus served as a nanny to Defendant Mrs. Al Saud and her siblings when they were children. *Id.* ¶ 11.

After Ms. Tekle escaped from Defendants' home, Defendants embarked on a course of threatening conduct designed to deter her from filing a civil suit for damages resulting from their illegal conduct. *Id.* ¶¶ 67-97. On information and belief, Defendants informed Princess Maha and/or her agents, including Ms. Gebreyesus, that Ms. Tekle had escaped from their compound in Virginia. *Id.* ¶ 92.

Shortly after Ms. Tekle's escape, Ms. Gebreyesus began making calls to Ms. Tekle's family from Saudi Arabia. *Id.* ¶¶ 68, 70. Ms. Gebreyesus at first called approximately twice a week, and a typical call lasted approximately 20 to 30 minutes. *Id.* ¶¶ 70, 75. Ms. Gebreyesus was not alone when she made these calls. *Id.* ¶¶ 72-74, 95. She told Ms. Tekle's family that one of her employers was right there with her. *Id.* ¶ 72. Ms. Tekle's family members could hear a woman's voice speaking Arabic to Ms. Gebreyesus on the other end of the line on multiple occasions. *Id.* ¶¶ 73-74.

Ms. Gebreyesus told Ms. Tekle's family that: Ms. Tekle should not "go to any court or claim any rights or they will attack me," *id.* ¶ 77; that she (Ms. Gebreyesus) would evict Ms. Tekle's family from their house if Ms. Tekle did "anything" against the Al Sauds, *id.* ¶ 80; and that Ms. Tekle must return to the Al Saud family. *Id.* ¶ 80.

On the calls, Ms. Gebreyesus was angry and demanded to know where Ms. Tekle was. *Id.* ¶ 76. Ms. Gebreyesus repeatedly asked Ms. Tekle's family what Ms. Tekle planned to do, where Ms. Tekle was living, with whom Ms. Tekle was living, how to contact Ms. Tekle, what Ms. Tekle was doing, and whether Ms. Tekle had been in contact with Ms. Tekle's family. *Id.* ¶ 81. Ms. Tekle's family did not divulge Ms. Tekle's contact information to Ms. Gebreyesus.

*Id.* ¶ 82.  Prior to these calls, Ms. Gebreyesus had rarely called Ms. Tekle's family, and had never called to ask about Ms. Tekle.  *Id.* ¶ 71.  Ms. Gebreyesus would not have known about Ms. Tekle's escape unless Defendants or their agents communicated that fact to Ms. Gebreyesus.  *Id.* ¶¶ 69, 95.  The calls upset Ms. Tekle's family, causing them distress and fear.  *Id.* ¶ 78.  Ms. Tekle's mother, who was terminally ill, would cry when Ms. Gebreyesus called.  *Id.*

Ms. Gebreyesus told Ms. Tekle's family that the Defendants' family blamed her for Ms. Tekle's escape and had threatened Ms. Gebreyesus.  *Id.* ¶¶ 81, 95.  Ms. Gebreyesus told Ms. Tekle's family members that if Ms. Tekle did anything against the Al Saud family, Ms. Gebreyesus would lose her job, be put in prison, or be deported.  *Id.* ¶ 79.  Ms. Tekle's family relayed these messages to Ms. Tekle.  *Id.* ¶ 84.  These calls caused Ms. Tekle to fear for Ms. Gebreyesus's safety.  *Id.* ¶ 85.

Ms. Gebreyesus owned the home in Asmara in which Ms. Tekle's family lived.  *Id.* ¶ 11. Ms. Tekle's family feared that Ms. Gebreyesus would carry out her threat to evict them, which would render the family homeless due to a housing shortage in Asmara.  *Id.* ¶ 83.  Ms. Tekle's family felt threatened and believed something terrible would happen if Ms. Tekle did anything to challenge the Al Saud family.  *Id.* ¶ 82.  Ms. Tekle's family also feared for Ms. Tekle's safety. *Id.* ¶ 83.  These calls terrified Ms. Tekle and made Ms. Tekle fear for her family's safety.  *Id.* ¶¶ 85-86.  The calls continued until 2015, with less frequency over time.  *Id.* ¶ 86.

Ms. Tekle reasonably understood that Defendants had threatened Ms. Gebreyesus and had prevailed upon Ms. Gebreyesus to help them make contact with Ms. Tekle.  *Id.* ¶¶ 67-86. Ms. Tekle reasonably understood that these efforts were made at Defendants' instruction to deter her from filing suit against Defendants, and they did indeed deter her from filing suit.  *Id.* ¶¶ 66, 76-82, 95.

In April 2013, approximately one year after Ms. Tekle escaped, she met with federal law enforcement officials to report Defendants' crimes. *Id.* ¶ 88. Ms. Tekle understood that her testimony would be confidential, and she told her interviewers at the time that she continued to fear for the safety of Ms. Gebreyesus, who remained in Saudi Arabia. *Id.*

Defendants' efforts to deter Ms. Tekle from filing suit did not end in April 2013. Ms. Gebreyesus continued to call Ms. Tekle's family to inquire about Ms. Tekle's whereabouts, presumably on Defendants' behalf, until 2015. *Id.* ¶ 86. That year, Ms. Gebreyesus returned to Eritrea and threatened to evict Ms. Tekle's family from their home in Asmara. *Id.* ¶ 89. At the time of the attempted eviction, Ms. Tekle's family had lived in their home for 38 years. *Id.* ¶ 90. They were current on their rent payments. *Id.* Ms. Tekle's brother appealed for help to the local administrative authority, which blocked the eviction. *Id.* ¶ 89.

In addition to the calls from Saudi Arabia, two Eritrean women who lived in Saudi Arabia came to the Tekle family's home four times. *Id.* ¶ 87. Ms. Tekle's mother had never met these Eritrean women before; they were strangers to the Tekle family. *Id.* On each visit, they demanded to know Ms. Tekle's address, her whereabouts, and her phone number. *Id.* Ms. Tekle's mother did not provide them with this information. *Id.*

Ms. Tekle filed her original complaint on February 23, 2018. Dkt. 1.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), a plaintiff's allegations are accepted as true and are construed in a light most favorable to the plaintiff. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015). A complaint survives a motion to dismiss if it contains "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "To survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely; rather, she must merely advance her claim 'across the line from conceivable to plausible.'" *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 570).

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the plaintiff's claim, not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Butler v. United States*, 702 F.3d 749, 752 (4th Cir. 2012) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). For that reason, the Fourth Circuit has consistently held that courts may dismiss a claim as time-barred—an affirmative defense—on a motion to dismiss only when the "face of the complaint includes all necessary facts for the defense to prevail." *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 577 (4th Cir. 2017) (quoting *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 850–51 (4th Cir. 2016)); *see also Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) ("[A] motion to dismiss . . . generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred."); *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993) (a statute-of-limitations defense "may be raised under Rule 12(b)(6), but only if it clearly appears on the face of the complaint").

As Defendants conceded in open court, *see* September 7, 2018 Hearing Tr. at 23:17-20, to prevail on an affirmative defense at the pleadings stage, Defendants must show "that the plaintiff's potential rejoinder to the affirmative defense [i]s foreclosed by the allegations in the complaint." *Praxair*, 494 F.3d at 466. Accordingly, when the application of a defense turns on

issues of fact that are not apparent on the face of the complaint—including whether the complaint is in fact timely filed—the motion should be denied.  *See, e.g.*, *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 806–08 (E.D. Va. 2017); 5B Wright et al., *supra*, § 1357 ("the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion").  If Defendants cannot establish that equitable tolling is affirmatively foreclosed by the complaint's allegations—that is, as long as those allegations are merely consistent with equitable tolling—they cannot prevail.

## ARGUMENT

### I.   Ms. Tekle's Breach Of Contract Claim Is Timely Because Defendants Obstructed Her Filing.

Defendants contend that Ms. Tekle's breach of contract claim is barred by Virginia's five-year statute of limitations.  Defs' Mem. at 9.  But it is far too early to resolve Defendants' statute-of-limitations defense.  Ms. Tekle has plausibly alleged that her complaint was in fact timely under Virginia law because Defendants obstructed her from filing suit for at least ten months in total.

Under Virginia law, the statute of limitations for breach of a written contract is five years.  Va. Code § 8.01-246(2).  However, Section 8.01-229(D) provides that "[w]hen the filing of an action is obstructed by a defendant's . . . using any other direct or indirect means to obstruct the filing of an action, then the time that such obstruction has continued shall not be counted as any part of the period within which the action must be brought."  Va. Code § 8.01-229(D).  As the Supreme Court of Virginia has explained, Section 8.01-229(D) applies not "only when a defendant acts to conceal the existence of a cause of action."  *Newman v. Walker*, 618 S.E.2d 336, 338 (Va. 2005).  Rather, the statute applies to any "affirmative act[s]" taken to directly *or indirectly* obstruct the filing of an action.  *Grimes v. Suzukawa*, 551 S.E.2d 644, 646 (Va. 2001).

11

Finally, as Defendants concede, those affirmative acts toll the statute of limitations for as long as they reasonably deter the plaintiff from filing suit.  Defs' Mem. at 10; *see also Newman*, 618 S.E.2d at 339; *Culpeper Nat'l Bank v. Tidewater Improvement Co.*, 89 S.E. 118, 121 (Va. 1916).

It is well established that threats of reprisals and intimidation tactics "constitute affirmative acts designed to prevent [an employee] from obtaining her wages or taking steps to enforce her contractual and common law rights" under Section 8.01-229(D).  *Deressa v. Gobena*, No. 1:05CV1334(JCC), 2006 WL 335629, at *4 (E.D. Va. Feb. 13, 2006).  Moreover, the Fourth Circuit has indicated that Section 8.01-229(D) continues to apply after a plaintiff escapes from the defendants' control if the defendants take some action "to deter her from filing suit *after* her escape."  *Cruz v. Maypa*, 773 F.3d 138, 147 (4th Cir. 2014) (emphasis in original).

Even Defendants concede that tolling applied during the period before Ms. Tekle's escape, stating that "Plaintiff had until April 2017, five years after she left Defendant's' home [in April 2012], to bring her breach of contract claim." Defs' Mem. at 9.[1]  Accordingly, Ms. Tekle's complaint was timely filed under Virginia law if Defendants obstructed her from filing her breach of contract claim for at least ten months in total between April 2012 and February 2018, when Ms. Tekle filed her complaint.  *See* Va. Code § 8.01-229(D).  And in this procedural posture, Ms. Tekle need only show that her allegations, taken as true, make it *plausible* that

---

[1] Ms. Tekle resided with Defendants until April 2012.  Multiple courts have concluded that statutes of limitations are tolled at least during the period that a human trafficking victim resides with a defendant, when (as here) the defendant is alleged to have: (1) engaged in verbal and psychological abuse, Second Am. Compl. ¶¶ 45-47, 53, (2) forbidden contact with people outside the residence, *id.* ¶¶ 48-50, 53, (3) confiscated the victim's passport, *id.* ¶¶ 28, 36, 58, or (4) repeatedly threatened the victim with deportation, *id.* ¶¶ 52, 54-55, 57-58.  *See Deressa v. Gobena*, No. 1:05CV1334(JCC), 2006 WL 335629, at *4 (E.D. Va. Feb. 13, 2006); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 118 (D.D.C. 2012).

Defendants engaged in acts to obstruct Ms. Tekle's filing and that those acts reasonably deterred Ms. Tekle from filing suit.

Contrary to Defendants' claims, Defs' Mem. at 9-12, Ms. Tekle's allegations plausibly allege that tolling applied for at least ten months in total between April 2012 and February 2018. First, Ms. Tekle alleges that Defendants, using threats and intimidation tactics involving Ms. Gebreyesus, directly or indirectly acted to obstruct Ms. Tekle from suing them on multiple occasions between April 2012 and 2015.  Second Am. Compl. ¶¶ 67-97.  Second, Ms. Tekle has alleged that those actions reasonably deterred her from filing suit.  *See id.*  These issues must be resolved before the Court can determine whether Ms. Tekle's complaint was timely filed under Virginia law, and the complaint does not definitively resolve those issues in Defendants' favor. Therefore, as in *McPike*, 280 F. Supp. 3d at 807–08, "the statute of limitations defense cannot be resolved on the face of plaintiff's complaint because [she] has alleged facts that could cause reasonable jurors to disagree."  Thus, Defendants' motion should be denied.

### A. Ms. Tekle has sufficiently alleged that Defendants were involved in obstructing Ms. Tekle's filing.

Ms. Tekle has alleged that Defendants acted either directly or indirectly to induce Ms. Gebreyesus to threaten and intimidate Ms. Tekle and her family to deter Ms. Tekle from filing suit.  Second Am. Compl. ¶¶ 95, 96.  Ms. Tekle has alleged on information and belief—and has included ample supporting factual allegations—that Defendants did so by inducing Ms. Gebreyesus to threaten Ms. Tekle and her family, specifically including threats to prevent her from asserting her rights.  *Id.* ¶¶ 76-81, 95, 96.  Ms. Tekle has also alleged that Defendants used two Eritrean women who lived in Saudi Arabia to intimidate Ms. Tekle's family by visiting them at their home.  *Id.* ¶¶ 87, 97.

13

Defendants respond by contending that these "information and belief" allegations should be disregarded as conclusory. *See* Defs' Mem. at 10-12.  Not so.  Ms. Tekle is permitted to make allegations on information and belief, especially "where the facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008); *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015) ("A plaintiff is generally permitted to plead facts based on 'information and belief' if such plaintiff is in a position of uncertainty because the necessary evidence is controlled by the defendant.").  The allegations that Ms. Tekle has made on information and belief concern facts within the possession or control of Defendants or their agents, such as evidence of Defendants' state of mind and conversations they had in Saudi Arabia.

Moreover, these information and belief allegations do not stand alone, and so are not the type of conclusory allegations or "naked assertions" that are not entitled to the assumption of truth. *See Black & Decker*, 801 F.3d at 422.  Instead, Ms. Tekle has supported these allegations with ample specific factual allegations. *See* Second Am. Compl. ¶¶ 67-95.  Ms. Tekle has alleged ample facts that enable the Court to draw the reasonable inference that the Defendants acted to threaten Ms. Tekle and her family in order to deter Ms. Tekle from filing suit. *See Iqbal*, 556 U.S. at 678.  Once these allegations are accepted as true, and once all reasonable inferences from these allegations are drawn in Ms. Tekle's favor, they firmly support the conclusion that Ms. Tekle's breach of contract claim is timely.  And under established Fourth Circuit precedent, Defendants must show that Ms. Tekle's theory about the application of Section 8.01-229(D) "was foreclosed by the allegations in the complaint." *Praxair, Inc.*, 494 F.3d at 466.  Defendants have failed to do so.

14

First, Defendants knew that Ms. Gebreyesus had a relationship to Ms. Tekle's family. *See* Second Am. Compl. ¶¶ 11, 69, 93.  After all, Ms. Gebreyesus had worked for the royal family for decades and was the one who had recruited Ms. Tekle to work for Princess Maha in 2008.  *Id.* ¶¶ 11-12.  Ms. Gebreyesus had a longstanding relationship to Defendants' family, having worked in Princess Maha's household since Defendant Mrs. Al Saud's childhood, including as a nanny to Defendant Mrs. Al Saud.  *Id.* ¶¶ 11, 69.  And as a staff member to Princess Maha, Ms. Gebreyesus was expected to follow the orders of Princess Maha's family, including the Defendants.  *Id.* ¶ 15.  Thus, Ms. Gebreyesus's obvious connection between Defendants and Ms. Tekle's family would have made her the natural choice of the Defendants to indirectly convey threats to Ms. Tekle.

Second, Ms. Gebreyesus was aware that Ms. Tekle had escaped from the Defendants' compound in Virginia.  But Ms. Gebreyesus, in Saudi Arabia, could not have known about Ms. Tekle's escape unless Defendants or their agents directly or indirectly communicated that fact to Ms. Gebreyesus.  *Id*. ¶¶ 69, 92, 95.

Third, before the telephone calls at issue, Ms. Gebreyesus had rarely called Ms. Tekle's family, and she had never called to inquire about Ms. Tekle.  *Id.* ¶ 71.  Yet shortly after Ms. Tekle's escape, Ms. Gebreyesus suddenly started calling Ms. Tekle's family.  *Id.* ¶ 68.  Ms. Gebreyesus sought information about Ms. Tekle's precise whereabouts in Virginia and Ms. Tekle's future plans.  *Id.* ¶¶ 76-81.  That information was of no use to Ms. Gebreyesus personally, but it is exactly the information Defendants would have sought to discover if they were using Ms. Gebreyesus for that purpose.

Fourth, Ms. Gebreyesus expressly said that Ms. Tekle should not "go to any court or claim any rights."  *Id.* ¶ 77.  She told Ms. Tekle's family that Defendants' family would take

action against her (Ms. Gebreyesus) if Ms. Tekle did anything against the Al Saud family.  *Id.*
¶¶ 77, 79, 81.  Ms. Tekle pursuing legal action would be of grave concern to Defendants, but not
to Ms. Gebreyesus.  A reasonable explanation for Ms. Gebreyesus's sudden, specific, and
unsolicited insistence that Ms. Tekle not sue the Defendants—coming shortly after Ms. Tekle's
escape—is that Ms. Gebreyesus was acting at the Defendants' behest.

Fifth, Ms. Gebreyesus was not alone when she made these calls to Ms. Tekle's family.
*Id.* ¶¶ 72-74, 95.  She told Ms. Tekle's family that one of her employers was right there with her.
*Id.* ¶ 72.  Corroborating that statement, Ms. Tekle's family members could hear a woman's voice
speaking Arabic to Ms. Gebreyesus on the other end of the line on multiple occasions.  *Id.* ¶¶ 73-
74.  What reason would Ms. Gebreyesus's employers—the Saudi royal family—have to be
present for and involved in Ms. Gebreyesus's calls to Ms. Tekle's family if they neither directed
nor condoned the calls?

Sixth, that Defendants affirmatively acted directly or indirectly to prevent Ms. Tekle from
filing suit, is confirmed by their use of other agents besides Ms. Gebreyesus to threaten and
intimidate Ms. Tekle.  Two Eritrean women who lived in Saudi Arabia came to the home of Ms.
Tekle's family on four occasions after Ms. Tekle escaped.  *Id.* ¶ 87.  These women were
strangers to the Tekle family.  *Id.*  On each visit, they demanded to know Ms. Tekle's address,
her whereabouts, and her phone number.  *Id.*  Why would two strangers who lived in Saudi
Arabia travel to Eritrea to seek information about Ms. Tekle's whereabouts, without any
involvement from Defendants?

Ms. Tekle asks the Court to draw a highly plausible and reasonable conclusion from Ms.
Gebreyesus's behavior: Defendants and Defendants' family, lacking any other way to reach Ms.
Tekle and desperate to either find her in Virginia or prevent her from filing suit, were using Ms.

16

Gebreyesus to fish for specific information from Ms. Tekle's family and deter Ms. Tekle from taking legal action.  Ms. Tekle was reasonably "terrified" that these calls indicated that Defendants were still looking for her and would be waiting for her should she decide to file a public lawsuit.  *Id.* ¶¶ 63, 66, 85.  These allegations all support the inference that all of this was done in order to deter Ms. Tekle from filing suit.  Why else would Defendants enlist Ms. Gebreyesus in response to Ms. Tekle's escape?  Why else would Ms. Gebreyesus expressly tell Ms. Tekle's family that Ms. Tekle should not "go to any court or claim any rights?"  *Id.* ¶ 77. And why else would Ms. Gebreyesus, who continued to reside in Saudi Arabia, threaten Ms. Tekle's family with eviction when they were current on their rent payments and had been her tenants for years?  *Id.* ¶ 90.  Moreover, Defendants knew about Ms. Gebreyesus's relationship with Ms. Tekle's family, and it is thus plausible that they intended that Ms. Gebreyesus would relay these threats to Ms. Tekle's family.

By contrast, Defendants overlook the many obvious connections between Defendants and Ms. Gebreyesus and urge the Court to conclude that all of the facts Ms. Tekle alleges amount to a remarkable set of coincidences.  Defendants' apparent theory—that Ms. Gebreyesus, in Saudi Arabia, had somehow intuited that Ms. Tekle had escaped the compound in Virginia at the precise moment that she did—is fanciful.  This contention is especially absurd in light of Ms. Gebreyesus's own admission to Ms. Tekle's family that her employers were right there with her when she made the calls.  *Id.* ¶¶ 72-74.  It would have been a remarkable coincidence if the only person that Defendants could use to contact Ms. Tekle had, shortly after Ms. Tekle fled the Defendants' U.S. compound, reached out to Ms. Tekle and asked exactly the types of questions to which the Defendants would have wanted to know the answers.  Given what she had seen of the Defendants—and particularly Defendants' family's threats toward, and verbal and physical

17

abuse of, their workers—Ms. Tekle reasonably believed that it was not a coincidence.  And

Defendants' theory is directly belied by the Second Amended Complaint, which states that Ms.

Gebreyesus was calling Ms. Tekle's family as a direct result of conversations between the

Defendants' family and herself to report that she, Ms. Gebreyesus, had been threatened.  *Id.* ¶ 96.

On a motion-to-dismiss posture, Defendants are not entitled to the most favorable

inferences that could reasonably be drawn from the Complaint's allegations.  Rather, Ms. Tekle

is entitled to any such inference.  Courts have explained that "[i]f there are two alternative

explanations, one advanced by defendant and the other advanced by plaintiff, both of which are

plausible, plaintiff's complaint survives a motion to dismiss."  *Starr v. Baca*, 652 F.3d 1202,

1216 (9th Cir. 2011).  And Ms. Tekle's allegations adequately support such an inference.

Second Am. Compl. ¶¶ 67-97.  "Plaintiff's complaint may be dismissed only when defendant's

plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible."

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 152 (4th Cir. 2014).

The Fourth Circuit has made clear that on a motion to dismiss, Defendant cannot prevail by

proffering an alternate explanation for alleged facts "even if it could be disputed at some

appropriate stage of the[] proceedings."  *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th

Cir.), *cert. denied sub nom. City of Greensboro, N.C. v. BNT Ad Agency, LLC*, 138 S. Ct. 558

(2017).

For example, in *Woods*, the plaintiffs alleged that the City had administered a loan

program in a racially discriminatory manner, and that its proffered explanations for its actions

were pretext for discrimination.  *Id.* at 648–49.  The City moved to dismiss, contending that its

alternative explanation was more reasonable than the plaintiffs' allegation of discrimination.  *Id.*

at 649.  The Fourth Circuit rejected that argument explaining that although "[w]e do not doubt

that there may yet be sound, rational reasons why the City" took the actions it did, "there is nothing self-evident on the face of the City's position that is material to [plaintiff's] claim of pretext." *Id.*  In describing the plausibility standard, the court held that "[t]he question is not whether there are more likely explanations for the City's action, however, but whether the City's impliedly proffered reason . . . is so obviously and irrefutably sound . . . that it renders [the plaintiff]'s claim of pretext implausible." *Id.*

Defendants have not met this burden to "render[] . . . implausible" Ms. Tekle's claim that Defendants directly or indirectly acted to obstruct her from bringing a civil suit through their threats and intimidation tactics. *Id.*  Given that the complaint's factual allegations strongly suggest their involvement in these threats and intimidations, Defendants certainly have not met their burden of showing that their involvement is "*foreclosed* by the allegations in the complaint." *Praxair, Inc.*, 494 F.3d at 466.

**B.     Ms. Tekle has sufficiently alleged that she was reasonably deterred from filing suit by Defendants' actions.**

The Court can also reasonably infer that Ms. Tekle's fear for Ms. Gebreyesus's safety was objectively reasonable and that this fear reasonably deterred her from filing suit until at least April 2013, when Ms. Tekle sat for her first interview with federal law enforcement officers. *See Kiwanuka*, 844 F. Supp. 2d at 120 (stating that plaintiff's fear was reasonable at least until "her first contact with the FBI took place").  Ms. Tekle reasonably feared that suit would endanger Ms. Gebreyesus, who had reported—at the behest of the Defendants and/or their agents—the threats she was receiving to Ms. Tekle's family.  Second Am. Compl. ¶¶ 77, 79, 81.  Ms. Tekle knew that Ms. Gebreyesus continued to work for Princess Maha, and she knew the violence and abuse Princess Maha was capable of committing. Ms. Tekle herself had been physically and verbally abused by Princess Maha, *id.* ¶¶ 14-17, and she had witnessed Princess Maha throw a

glass at Ms. Gebreyesus, *id.* ¶ 66.  Ms. Tekle also knew that Ms. Gebreyesus had a relationship

with Defendant Mrs. Al Saud that went back to Defendant Mrs. Al Saud's childhood.  *Id.* ¶ 69.

Contrary to Defendants' assertions that these fears were made up to survive this motion to

dismiss, Defs' Mem. at 7, Ms. Tekle specifically alleges that she expressed her fears for Ms.

Gebreyesus's safety on the record to federal law enforcement officials in April 2013.  Second

Am. Compl. ¶ 88.[2]  Ms. Tekle also reasonably feared for her own and her family's safety, given

Ms. Gebreyesus's and the Eritrean women's repeated and insistent questioning regarding Ms.

Tekle's whereabouts—and the abuse Ms. Tekle experienced at the hands of Defendants and their

agents.  *Id.* ¶¶ 45-58, 87.

 Any benign inference that might be drawn from Ms. Gebreyesus's conduct—Defendants

previously argued that Ms. Gebreyesus called Ms. Tekle's family out of "a genuine concern over

Plaintiff's welfare," *see* Defs' Mem. at 6—is belied by the threats Ms. Gebreyesus made to evict

Ms. Tekle's family and Ms. Gebreyesus's specific warning that Ms. Tekle not take legal action.

Second Am. Compl. ¶¶ 11, 77, 80.  This was not an empty threat.  In 2015, Ms. Gebreyesus

returned to Eritrea and attempted to carry out her threat to evict Ms. Tekle's family from their

home in Asmara.  *Id.* ¶ 89.  At the time of the attempted eviction, Ms. Tekle's family had lived in

---

[2] Defendants insist that no threats were made against Ms. Gebreyesus and suggest that Ms.
Gebreyesus was a content employee.  Defs' Mem. at 4.  These factual assertions are no defense
at this juncture in the litigation.  Defendants will have ample opportunity to develop evidence for
those assertions through discovery and prove them at trial, but these statements are no basis for a
motion to dismiss.  Moreover, even taking Defendants' insistence into account would not
undermine Ms. Tekle's position.  Defendants could have directed Ms. Gebreyesus to tell Ms.
Tekle's family that she was threatened, whether or not that was actually true, because the
Defendants knew that Ms. Tekle would find threats to Ms. Gebreyesus credible and because
Defendants hoped to prey on her sympathies to protect Ms. Gebreyesus.

their home for 38 years and were current on their rent payments.  *Id.* ¶ 90.  Ms. Tekle reasonably

feared her family's eviction given the housing shortage in Asmara.  *Id.* ¶ 83.[3]

Finally, Defendants argue that Ms. Tekle's fear of Defendants could not have been

genuine because she eventually filed this suit in 2018 and reported Defendants to federal law

enforcement officers in April 2013.  Defs' Mem. at 12.  But Ms. Tekle does not need to

demonstrate that she reasonably feared for Ms. Gebreyesus's safety until 2018.  She needs to

show only that she reasonably feared for Ms. Gebreyesus's safety until at least February 2013 or

for some combination of ten months between April 2012 and February 23, 2018.  *See* Va. Code

§ 8.01-229(D).  That Ms. Tekle eventually summoned the courage to file this suit in 2018 has no

bearing on the plausibility of her fears in 2012 and 2013.  Moreover, Ms. Tekle has alleged

numerous facts that might explain why her fears diminished over time.  The calls from Ms.

Gebreyesus stopped in 2015.  Second Am. Compl. ¶ 86.  And in 2015, Ms. Gebreyesus threats of

eviction were rendered toothless after local authorities in Asmara blocked Ms. Gebreyesus's

attempted eviction of Ms. Tekle's family.  *Id.* ¶ 89.

Ms. Tekle has plausibly alleged that she reasonably was deterred from filing suit until at

least April of 2013, rendering her February 2018 complaint timely-filed.

\*     \*     \*

Defendants' threats and intimidation tactics continued to influence Ms. Tekle after she

escaped until at least April 2013.  Thus, Ms. Tekle's "rejoinder to the affirmative defense" that

---

[3] Defendants make much of the fact that Ms. Tekle has alleged that she was both afraid *for* Ms. Gebreyesus's sake—i.e., that Ms. Gebreyesus might be harmed by Defendants—and afraid *of* actions Ms. Gebreyesus might take against Ms. Tekle's family.  *See* Defs' Mem. at 4.  There is no rule that Ms. Tekle could only experience one type of fear.  Under the facts alleged, Ms. Tekle could plausibly have experienced both.  After all, in her calls to Ms. Tekle's family, Ms. Gebreyesus both expressed fear for her own sake, *see* Second Am. Compl. ¶¶ 77, 79, 81, and threatened Ms. Tekle's family, *id.* ¶ 80.

Defendants' raise is not "foreclosed by the allegations in the complaint;" rather, it is *supported* by those allegations. *Praxair*, 494 F.3d at 466. Accordingly, Ms. Tekle has adequately alleged a basis for tolling under Section 8.01-229(D) until at least February 23, 2013.

## II.     Ms. Tekle Has Sufficiently Alleged That Defendants Materially Breached The Parties' Contract.

Defendants also contend that Count Five should be dismissed for failure to state a claim under Rule 12(b)(6). Defs' Mem. at 13. Virginia law provides that "[t]he essential elements of a cause of action for breach of contract are (1) a legal obligation of a defendant to a plaintiff, (2) a violation or breach of that obligation, and (3) a consequential injury or damage to the plaintiff." *Hamlet v. Hayes*, 641 S.E.2d 115, 117 (Va. 2007). Ms. Tekle has sufficiently alleged all three elements.

Defendants do not dispute that Ms. Tekle has adequately alleged the existence of an employment contract or that she suffered damages. *See* Second Am. Compl. ¶¶ 19-24, 38. Yet Defendants argue that because Ms. Tekle has alleged only that she recalls some of the terms of the contract, she cannot proceed with her breach of contract claim. Defs' Mem. at 13-14. Defendants argue that Ms. Tekle has failed to identify the specific terms of that contract that were breached by Defendants. *Id.* at 15. This argument fails for two reasons.

### A.     Ms. Tekle has specifically alleged the material terms of the contract.

Defendants' argument fails because Ms. Tekle has made several specific allegations about the terms of her contract with Defendants and because those terms are fairly inferable from other allegations in the complaint. Ms. Tekle specifically alleges that Defendants made an oral promise to employ her as a nanny in the United States at a wage of $4,500 per month in exchange for forty hours of work per week. Second Am. Compl. ¶ 19. Ms. Tekle agreed to these terms. *Id.* Ms. Tekle also alleges that Defendants' agent, a male employee in Defendants'

office, escorted Ms. Tekle to the U.S. consulate in Jeddah, Saudi Arabia, and summarized the

terms of the contract aloud to her, before she signed a written contract drafted in a language she

could not read. *Id.* ¶¶ 23-24. A copy of this contract was allegedly provided to an American

official. *Id.* ¶ 23. Additionally, Ms. Tekle recalls seeing the number $4,500.00 on the written

contract. *Id.* Her recollection is confirmed by her visa application, received from the

Department of State through a FOIA request, which lists $4,500.00 as her recorded salary. *Id.*

These are the key material terms that Ms. Tekle alleges Defendants breached. Accordingly, one

can reasonably infer that the contract required Defendants to pay significantly more than Ms.

Tekle in fact received. For the purposes of Rule 12(b)(6), Ms. Tekle has more than adequately

alleged what those terms required.

> **B.** **As a matter of federal law, the contract contained mandatory terms that Defendants breached.**

Furthermore, Ms. Tekle alleges that she entered the United States on an A-3 visa. *Id.*

¶ 26. That allegation has several implications for the contractual relationship between the

parties. Because Ms. Tekle entered on an A-3 visa, federal law required that the Defendants'

contract with Ms. Tekle include certain minimum terms. *Id.* ¶¶ 25, 41. Ms. Tekle has alleged

that Defendants breached even those minimum terms. *See id.* ¶¶ 33, 36, 38, 40, 43-44, 124-28.

> **1.** **By law, applicants for A-3 visas must have contracts with their employers that contain certain terms.**

Under the Immigration and Nationality Act, the Secretary of State "may not issue" an A-

3 visa unless the applicant "has executed a contract with the employer or prospective employer"

that contains certain mandatory terms. 8 U.S.C. § 1375c(b)(1). In particular, contracts between

employers and A-3 visa recipients must include (1) "an agreement by the employer to abide by

all Federal, State, and local laws in the United States"; (2) "information on the frequency and

form of payment, work duties, weekly work hours, holidays, sick days, and vacation days"; and

(3) "an agreement by the employer not to withhold the passport, employment contract, or other personal property of the employee." *Id.* § 1375c(b)(2).  Accordingly, it is virtually certain—and thus fairly inferable—that the written contract between the parties contains all three terms. Moreover, those terms are plainly material insofar as it would have been impossible for Ms. Tekle to work for Defendants in Virginia unless their contract included such terms.  *See id.* § 1375c(b)(1).

In addition, under State Department standards for A-3 visas, "all domestic employees on an A-3 visa must, at minimum, be paid the prevailing wage."  Second Am. Compl. ¶ 41.  At the time the contract was made, an employer was permitted to withhold only up to 20% of wages "for a minimum of three daily meals."  *Id.*  Otherwise, "[n]o deductions from wages are allowable for any other expense," including lodging, "the provision of medical care, medical insurance or travel."  *Id.*  This belies Defendants' contention that Ms. Tekle has failed to allege that Defendants breached the contract because of supposed non-cash benefits.  Accordingly, Ms. Tekle has sufficiently alleged the material terms of the contract.

### 2.   Ms. Tekle has sufficiently alleged that Defendants breached those mandatory terms.

Ms. Tekle has sufficiently alleged that Defendants breached these terms of the contract in several respects.  For instance, Defendants breached the contract by withholding a copy of the contract itself from Ms. Tekle.  *See* Second Am. Compl. ¶ 27.  Ms. Tekle has also alleged that Defendants violated the terms of the contract by withholding Ms. Tekle's passport, which is also a serious federal offense and the subject of Count Three of the complaint, which Defendants have not sought to dismiss.  *See* 18 U.S.C. § 1592; Second Am. Compl. ¶¶ 27-28, 113-16.

Defendants curiously take the position that Ms. Tekle has failed to state a breach of contract claim because her allegations do not account for the possibility that Defendants failed to

comply with the requirements of federal law.  Defendants argue that Ms. Tekle's allegations that

Defendants failed to pay her the promised $4,500 monthly wages are insufficient because she

does not allege "what the contract had to say about what portion of Plaintiff's compensation

would be in cash, and what portion would be in non-cash benefits." Defs' Mem. at 15.  But if

the contract contained Defendants' theoretical terms, it would be in violation of the State

Department A-3 visa requirements.  It is plausible to infer that the contract complied with the

State Department standards, because it was reviewed by a U.S. consular official and Ms. Tekle

was granted an A-3 visa.  Second Am. Compl. ¶ 23, 26.

Furthermore, Ms. Tekle has alleged that Defendants failed to abide by their promise in

the contract to obey state and federal law, including state and federal labor laws.  *See* 8 U.S.C.

§ 1375c(b)(2).  In 2011, the minimum wage for live-in domestic employees under the Fair Labor

Standards Act was $7.25 per hour.  *See* 29 U.S.C. § 206(a), (f).  Virginia law incorporates the

federal minimum wage.  *See* Va. Code § 40.1-28.10.  As Ms. Tekle expressly alleges in her

complaint, Defendants paid her a wage of less than $2 per hour.  Second Am. Compl. ¶ 44.

### C. Ms. Tekle has sufficiently alleged her own performance of the contract.

Regarding Ms. Tekle's compliance with her end of the bargain, Ms. Tekle alleges that the

contract obligated her to work forty hours per week for Defendants as a nanny to one of their

three children.  *Id.* ¶ 19.  Ms. Tekle traveled the United States to perform under the terms of the

contract, and after she arrived, she was regularly required to work more than 80 hours per week

performing whatever tasks Defendants demanded.  *Id.* ¶¶ 35-36, 43.  Ms. Tekle continued to do

so until well after Defendants first breached the contract.  *Id.* ¶¶ 31-44.  As far as Ms. Tekle is

aware, and as far as the parties' negotiations and course of performance would indicate, her

performance satisfied all of the material terms of the contract.

If Defendants would like to allege that Ms. Tekle committed the first material breach of the contract, they may do so in their answer, and they will have ample opportunity to develop their proof in discovery.  Ms. Tekle is not required to anticipate in her complaint and rebut every conceivable defense that Defendants might assert, and she is certainly not required to plead all of the contractual terms that she did not violate.

> **D.      Defendants could resolve these concerns about the specific terms of the contract by producing a copy of the contract or cooperating with Ms. Tekle to obtain a copy of the contract.**

Ms. Tekle has alleged that Defendants never gave her a copy of the contract, a violation of federal law.  *Id.* ¶ 27.  Defendants still refuse to provide Ms. Tekle with a copy of the contract. At the hearing on the prior motion to dismiss, the Court has already described the Defendants' failure to provide Ms. Tekle with a copy of the contract as "troublesome" and unfair.  September 7, 2018 Hearing Tr. at 31:21; *see also id.* at 27:6-10 ("THE COURT: Did you ever provide the plaintiff with a copy of the contract? MR. NASH: Not to my knowledge. I don't know. THE COURT: Golly, Pete, does that strike you as fair?").  Ms. Tekle has attempted to obtain her employment contract, including through a FOIA request to the State Department.  *Id.* ¶ 98. However, the State Department refused to release the contract without authorization from Defendants, citing the confidentiality provisions of the Immigration and Nationality Act, 8 U.S.C. § 1202(f).  *Id.*  The State Department observed that it was permitted to release only those documents that were submitted to it from individuals who provided written authorizations for the release of those documents.  Ms. Tekle has consented to release of this document through FOIA. *Id.*  Ms. Tekle's counsel requested the Defendants' authorization to the FOIA release by letter of September 11 and September 14.  *Id.*  Defendants refused to provide the necessary authorization.  In other words, the Defendants have no interest in obtaining a copy of the contract from their joint State Department file with Ms. Tekle, as it might confirm the allegations Ms. Tekle has lodged.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Dated: October 25, 2018

Respectfully submitted,

/s/ Nicholas Cooper Marritz

Nicholas Cooper Marritz, VSB #89795
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 720-5607
nicholas@justice4all.org

Richard F. Levy (*pro hac vice*)
Jonathan A. Langlinais (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 923-2648
rlevy@jenner.com

Agnieszka M. Fryszman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

Le'ake Fesseha (*pro hac vice*)
LE'AKE FESSEHA LAW OFFICE
901 S. Highland Street, Suite 312
Arlington, VA 22204
(703) 302-3410
leakef@hotmail.com

Martina E. Vandenberg (*pro hac vice*)
Sarah L. Bessell (*pro hac vice*)
THE HUMAN TRAFFICKING LEGAL CENTER
1030 15th Street, NW #104B
Washington, DC 20005
(202)-716-8485
mvandenberg@htlegalcenter.org

*Counsel for Plaintiff Simret Semere Tekle*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SIMRET SEMERE TEKLE, | Case No.: 1:18-cv-211 |
| *Plaintiff*, | |
| v. | |
| NOUF BINT NAYEF ABUL-AZIZ AL SAUD, | |
| MOHAMMAD BIN ABDULLAH AL SAUD | |
| *Defendants*. | |

## <u>CERTIFICATE OF SERVICE</u>

I certify that I uploaded Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss to the Court's CM/ECF system today, which  will cause a Notice of Electronic Filing and a link to the document to be sent to all counsel of  record.


October 25, 2018

/s/ Nicholas Cooper Marritz
Nicholas Cooper Marritz, VSB #89795
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 720-5607
nicholas@justice4all.org

28