# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | | | |
|---|---|---|---|
| SIMRET SEMERE TEKLE | ) | | |
| | ) | | |
| *Plaintiff*, | ) | | |
| | ) | | |
| v. | ) | Case No.: | 1:18-cv-00211 |
| | ) | | |
| NOUF BINT NAYEF ABDUL-AZIZ AL SAUD | ) | | |
| and MOHAMMAD BIN ABDULLAH AL SAUD | ) | | |
| | ) | | |
| *Defendants*. | ) | | |
| | ) | | |

## DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF THEIR MOTION TO DISMISS

Defendants submit this Reply Memorandum in Support of their Motion to Dismiss (Dkt. 56), and in response to Plaintiff's Opposition Brief (Dkt. 59).

As set forth in Defendants' initial memorandum, Plaintiff's breach of contract claim—the Fifth Claim in the Second Amended Complaint ("SAC")—should be dismissed both because it is time-barred, and because Plaintiff does not, and cannot, allege necessary elements of a breach of contract cause of action.

### I.  Plaintiff's Breach of Contract Claim is Time-Barred, and She Has Failed to Allege Any Affirmative Act by Defendants that Would Support Equitable Tolling of the Statute of Limitations.

At the hearing on September 7, the Court dismissed Plaintiff's First Amended Complaint ("FAC") finding that it was impermissible to apply the doctrine of equitable tolling against the Defendants in the absence of any allegation demonstrating that *the Defendants* were responsible for any act that may have obstructed Plaintiff in the filing of her lawsuit.

After three bites at the apple, and now, we are told, a trip to Africa by her lawyers to gather evidence, Plaintiff *still* cannot identify a single affirmative act *committed by the Defendants* that obstructed her from filing her lawsuit after she left her employment with the al-Sauds.[1]

Plaintiff's counsel purport to catalog for the Court thirteen new "facts," uncovered during their recent trip to Africa and incorporated into the SAC, that supposedly undercut the Court's determination that there was no evidence of the Defendants' complicity in the alleged communications between Ms. Gebreyesus and Plaintiff's family.  Pl. Opp. at 1-2.  A review of those facts, however, demonstrates that *none* of them bear on the dispositive issue identified by the Court—the involvement of Mr. and Mrs. al Saud, in directing, condoning, or even knowing about, the alleged actions of Ms. Gebreyesus.  Set forth below are the supposedly new "facts" identified by Plaintiff's counsel:

### a. "Ms. Gebreyesus clearly stated that Ms. Tekle should not take legal action against Defendants."

Defense counsel has already commented, in our initial memorandum, how implausible it is that Plaintiff "forgot" to mention this fact in her prior two complaints.  In any event, it does nothing to support Plaintiff's argument that Ms. Gebreyesus was acting on instructions from the Defendants.

---

[1] Plaintiff's counsel make much of their trip to Africa to gather additional evidence.  As demonstrated below, all of the supposedly new "facts" unearthed by Plaintiff's counsel relate to the content and timing of Ms. Gebreyesus' communications with Plaintiff's family.  Since Plaintiff's mother passed away several years ago, and only Plaintiff's brother currently lives in the home in Eritrea, it appears that Plaintiff's brother is the sole source of the new "facts," and counsel could have saved themselves the time and expense of the trip by simply telephoning him.  Of course, that would have lacked the dramatic flair of a last-minute fact-finding trip to Africa.  It may also have raised questions as to why Plaintiff's counsel did not undertake that simple step prior to filing the FAC.  What Plaintiff's counsel have studiously avoided doing is making any effort to contact Ms. Gebreyesus, who steadfastly denies that anything resembling Plaintiff's story ever occurred.

#58752518_v1

**b. "Ms. Gebreyesus told Ms. Tekle's family that one of Ms. Gebreyesus's employers was present when she made the calls."**

Likewise, defense counsel has already commented regarding how implausible it is that Ms. Tekle "forgot" to mention this fact in her prior two complaints.  In any event, as the Court is aware, the Defendants were not Ms. Gebreyesus' employers.[2]  To the extent that this "fact" has any probative value regarding whether or not Ms. Gebreyesus was acting on her own initiative, it suggests that someone other than the Defendants was responsible for instigating the alleged communications.

**c. "Ms. Tekle's family could hear a woman speaking Arabic to Ms. Gebreyesus during the phone calls."**

Same as previous point.  It does nothing to implicate the Defendants.

**d. "Ms. Gebreyesus had a longstanding relationship with the Defendants as she had served as a childhood nanny to Defendant Mrs. Al Saud."**

This is simply not a new fact "discovered" by Plaintiff's counsel on their trip to Africa.  Ms. Tekle has known this fact for years.  In fact, it was alleged in the FAC.  FAC ¶ 62.  In any event, it does nothing to demonstrate that Ms. al Saud directed Ms. Gebreyesus to take any action against Plaintiff.  Ms. al Saud has never denied knowing Ms. Gebreyesus.  Indeed, the fact that Ms. al Saud has known Ms. Gebreyesus for years, including as her childhood nanny, would tend to suggest the implausibility of Plaintiff's theory that it was Ms. al Saud (or her husband) who

---

[2] Throughout the Plaintiff's Opposition, Plaintiff's counsel use inexact language in an effort to gloss over the distinction between Defendants and other involved parties.  For instance, at one point, Plaintiff's Opposition asks rhetorically, "What reason would Ms. Gebreyesus's employers—the Saudi royal family—have to be present for and involved in Ms. Gebreyesus's calls to Ms. Tekle's family if they neither directed nor condoned the calls?"  Pl. Opp. at 16.  Of course, Ms. Gebreyesus employer is not the "Saudi royal family," but one member of that family, Princess Maha bint Mohammed bin Ahmad al-Sudairi.  SAC ¶ 11.  Thus, Plaintiff's (implausible) assertion that a member of the "Saudi royal family" participated in the calls to Plaintiff's family in Eritrea has no bearing on whether *the Defendants* were involved in directing or approving those calls.

threatened to "attack" Ms. Gebreyesus, SAC ¶ 77, or "put [her] in prison," SAC ¶ 79, if she did

not do their bidding.

### e. "Ms. Gebreyesus worked for Defendant Mrs. Al Saud's mother, who lived on the same compound in Saudi Arabia as Defendant Mrs. Al Saud."

Same as previous point.  It does nothing to implicate the Defendants.

### f. "Defendants returned to Saudi Arabia after Ms. Tekle escaped."

This is simply not a new fact "discovered" by Plaintiff's counsel on their trip to Africa.

Ms. Tekle has known this fact for years.  Plaintiff apparently seeks, with this statement, to establish

an inference that, because Defendants were in the same country as Ms. Gebreyesus, they were

more likely involved in causing her to contact Plaintiff's family.  Putting aside the ridiculousness

of inferring joint criminal conduct based solely on the fact that one individual is in the same

country as another, the timing of Defendants' return to Saudi Arabia actually creates the opposite

inference from the one Plaintiff needs the Court to draw.  Defendants did not return to Saudi Arabia

until June 2013—over a year after Plaintiff left their home.  Given that Plaintiff alleges that the

calls to her family began *immediately* after she left (see below), this suggests that if anyone was

directing Ms. Gebreyesus' efforts from a physically proximate location, it was not the Defendants.

### g. "Ms. Gebreyesus called Ms. Tekle's family from Saudi Arabia."

This is simply not a new fact "discovered" by Plaintiff's counsel on their trip to Africa.  It

is difficult to see what bearing Plaintiff's counsel believes this has on the issue in question, unless

they are asking the Court to infer that Ms. Gebreyesus' alleged calls were directed by Defendants

because they happened to be in the same country as Ms. Gebreyesus (although, as discussed above,

they actually were *not*, when the calls were allegedly initiated).  Being in the same country as the

perpetrator of a crime has not generally been found to support an inference of criminal complicity

with that person.

4

**h. "Ms. Gebreyesus began calling Ms. Tekle's family immediately after Ms. Tekle escaped in 2012."**

This is not a new fact "discovered" by Plaintiff's counsel on their trip to Africa.  In any event, as discussed above, it actually tends to suggest that Defendants did *not* instigate the calls, since they were still in the United States, and remained there for another 14 months, after the calls allegedly began.  As Defendants have argued from the start, it is not surprising that Ms. Gebreyesus would reach out to Ms. Tekle's family after Ms. Tekle, who had an almost familial relationship with Ms. Gebreyesus, SAC ¶ 11, disappeared without explanation, in a foreign country.  Plaintiff has since doctored her complaint to make Ms. Gebreyesus' telephone calls appear more ominous, but the *timing* of the calls, addressed by this "new" fact, does nothing to demonstrate that the calls were initiated at the behest of the Defendants.

**i. "Ms. Gebreyesus could not have known about Ms. Tekle's escape without Defendants divulging that information."**

This is a conclusion, not a "fact."  The conclusion is unwarranted because the Defendants kept a household of more than a dozen employees, most of whom had family and/or friends in Saudi Arabia, and all of whom were aware of Ms. Tekle's departure, without explanation or notice, from the al Sauds' home.  Ms. Tekle's unexplained departure was a topic of speculation and conjecture (i.e. gossip) among the large group of people associated with the al Saud household, and with their friends and family back home.

In addition, Ms. Tekle's family was aware of her departure, since she alleges that she went to live with her relatives at their home in Northern Virginia after leaving the al Saud's home.  SAC ¶ 62.  And, of course, Ms. Tekle's mother was in constant contact with Ms. Gebreyesus, because she was living in Ms. Gebreyesus' house in Eritrea.  SAC ¶ 11.

One of the many strawman arguments Plaintiff sets up is Defendants' supposed position that Ms. Gebreyesus "somehow intuited" that Plaintiff had left the Defendants' home. Pl. Opp. at 17. Of course, this is not how Ms. Gebreyesus learned of Plaintiff's departure. Plaintiff's departure was widely known, and widely discussed, among a large group of people, and it is hardly surprising that Ms. Gebreyesus (who was, after all, responsible for Plaintiff's position with the family) was made aware of Plaintiff's departure from the home.

It is certainly more plausible that Ms. Gebreyesus learned of Plaintiff's departure from one of the al Saud's employees, or from Ms. Tekle's family, than that she was called directly by Mr. or Mrs. al-Saud.[3] Even accepting Plaintiff's less plausible alternative as true, and positing a communication between one or both of the Defendants and Ms. Gebreyesus to tell her that her "niece" had gone missing, such a communication would do nothing to further the plausibility of Plaintiff's imaginative hypothesis that the conversation then continued, ". . . and we want you to find her and threaten her on our behalf."

**j.   "Ms. Gebreyesus had rarely, if ever, called Ms. Tekle's family previously."**

This is not a new fact. Plaintiff asserted this, in her Opposition to the previous Motion to Dismiss that was granted by the Court (although, as defense counsel pointed out at the time, it was not alleged in the FAC; it has only been added to the most recent SAC).[4] It is difficult to see what

---

[3] Of course, Plaintiff's counsel could have easily absolved the Court from having to determine how it was "most plausible" for Ms. Gebreyesus to have learned this information—they could simply have asked Ms. Gebreyesus how she learned of it. For some reason, Plaintiff's counsel have been eager to insulate themselves from what Ms. Gebreyesus has to say about this whole set of allegations.

[4] As the Court may recall, in the reply brief filed in connection with the motion that was previously granted, Defendants pointed out that Plaintiff's Opposition introduced a number of new facts that did not appear in the FAC (i.e. the frequency of Ms. Gebreyesus' calls to the family, the content of those calls, Ms. Gebreyesus' demeanor during those calls). Interestingly, the facts "learned" by Plaintiff's counsel on their trip to Africa, and now incorporated into the SAC—such as this one, that Ms. Gebreyesus "rarely" called the family before her disappearance—mirror precisely what

bearing Plaintiff's counsel believes this has on the issue in question.   Obviously, Ms. Gebreyesus' closest relationship was with Plaintiff, not her family ("Ms. Tekle has long referred to Ms. Gebreyesus as her 'aunt.'"  SAC ¶ 11), and so there would have been little reason to contact Plaintiff's family until after Plaintiff's unexplained disappearance.  In any event, the timing of Ms. Gebreyesus' calls, including when the calls allegedly commenced, does nothing to demonstrate whether *the Defendants* were responsible for such calls.

> **k.  "Ms. Gebreyesus demanded specific information about Ms. Tekle, her whereabouts, and her intentions, information that Ms. Gebreyesus had never previously sought."**

Same as previous point.  It does nothing to implicate the Defendants.

> **l.  "Ms. Gebreyesus threatened Ms. Tekle's family with eviction if Ms. Tekle took any action against the Al Sauds."**

This is not a new fact.  It was expressly pled in the FAC.  FAC ¶ 60 ("In 2015, Ms. Gebreyesus . . . threatened to evict Ms. Tekle's family from their home is Asmara.").  The only change Plaintiff has made in the SAC is to add that "Ms. Tekle's brother appealed for help to the local administrative authority, which blocked the eviction."  SAC ¶ 89.  While it is possible to see how the *threat* of eviction of her family could, hypothetically, be expected to influence the Plaintiff, it is difficult to imagine how an *actual* eviction, which was only stopped by the intervention of the local authorities, would be calculated to secure the Plaintiff's silence.  The Court should further note that—while Defendants know nothing about the Eritrean business relationships between Ms. Gebreyesus and Plaintiff's family—this incident, by Plaintiff's own account, supposedly occurred *four years* after Plaintiff left her employment with the Defendants.

---

Plaintiff's counsel *wished* the FAC alleged, and erroneously told the Court the FAC alleged, when they briefed this issue the last time around.

In any event, the fact has absolutely no probative value as to whether *the Defendants* did anything to instigate or encourage Ms. Gebreyesus' alleged actions.

> **m.** **"[I]ndependent from Ms. Gebreyesus, two Eritrean women who lived in Saudi Arabia came to Ms. Tekle's family's home to demand information about Ms. Tekle on four occasions."**

This new "fact," more than any other, demonstrates the futility of Plaintiff's efforts to tie, by any means possible, the Defendants to the alleged actions of Ms. Gebreyesus. Conceding the truth of the allegation, as the Court must, by what logical chain of reasoning could the Court possibly draw a plausible inference that the Defendants had anything to do with the actions of these two unidentified Eritrean women? The answer, of course, is that no such inference is plausible.[5]

---

[5] Plaintiff alleges "[o]n information and belief" that Defendants directed the two Eritrean women to visit Ms. Tekle's family. As with all of Plaintiff's allegations made "on information and belief," Plaintiff provides the Court with no "information" that would justify such an inference, only "belief." Plaintiff asserts, in her Opposition, that she should be accorded latitude to plead matters "on information and belief" where such matters are "peculiarly within the possession and control of the defendant." Pl. Opp. at 14 (*citing Arista Records, LLC v. Doe 3*, 504 F.3d 110, 120 (2nd Cir. 2010)). Taking maximum advantage of that latitude, Plaintiff prefaces seven consecutive allegations with "on information and belief," SAC ¶¶ 96-97, asserting, without any factual basis whatsoever, that the visits by the two unidentified Eritrean women, and Ms. Gebreyesus' telephone calls to Plaintiff's family, were "directed" by the Defendants. Yet even if the Court were inclined to indulge Plaintiff's imaginatively expansive interpretation regarding the permissibility of "on information and belief" pleading, the legal basis which would justify such a position is absent. Notwithstanding Plaintiff's claims to the contrary, this evidence is not "peculiarly within [Defendants'] possession and control." There is no allegation that Ms. Gebreyesus or the unidentified Eritrean women are employees of, or controlled by, the Defendants, or are otherwise in any way unavailable to Plaintiff's counsel. Ms. Tekle describes Ms. Gebreyesus in the SAC as like an "aunt" to her. SAC ¶ 11. While defense counsel has no idea what, if anything, Plaintiff's counsel have done to locate and interview the Eritrean women, defense counsel do know, because we asked her, that Plaintiff's counsel have made *no* effort to interview Ms. Gebreyesus. *See, e.g.*, *Boy Blue, Inc. v. Zomba Recording*, LLC, 2009 WL 2970794, at *2 (E.D. Va. Sept. 16, 2009) at *6 ("Pleading 'upon information and belief' is appropriate when the factual basis supporting a pleading is *only* available to the [opposing party] at the time of pleading.") (emphasis added) (citation omitted). There is no justification to allow Plaintiff's counsel to assert these speculative allegations "on information and belief" when they have undertaken no effort to investigate the truth of these matters by contacting the most relevant witness.

*       *       *

Following the September 7 hearing, the Court correctly dismissed Plaintiff's breach of contract claim as set forth in the FAC.   Plaintiff's counsel stated at the hearing that the only new facts Plaintiff would be able to plead, if given another opportunity, related to the "specificity" of the threats, not who was responsible for them.   The Court indicated at the hearing that that would not be enough and, instead, that Plaintiff would have to plead additional facts that would "tie" the Defendants to the threats.

Plaintiff has articulated 13 "new" facts, which, arguably, provide some greater "specificity" regarding the alleged threats.   However, she has not pled *any* new information implicating the Defendants in the threats.   For the same reasons the Court set forth at the September 7 hearing, the Court should dismiss the breach of contract claim.[6]

---

[6] The Fourth Circuit's decision in *Woods v. City of Greensboro*, 855 F.3d 639 (4th Cir. 2017), cited by Plaintiff in her Opposition, Pl. Opp. at 18-19, actually supports the Defendants' position. In *Woods*, the issue before the Court was whether a municipal government had impermissibly made a contracting decision on the basis of race.  The Court first acknowledged that the "stringent pleading standard established in *Iqbal* and *Twombly* applies."  *Woods*, 855 F.3d at 648.  Even in the difficult context of assessing whether a governmental decision was discriminatory, the Court found that it was insufficient to simply allege that discrimination was the reason for the decision. Rather, the plaintiff was required to plead "additional facts to support a reasonable inference that the decision-makers were motivated by race." *Id*.  In *Woods*, the plaintiff met that standard, alleging in the complaint:  (1) the results of a disparity study demonstrating race-biased lending practices by the city; (2) facts which demonstrated that the city's professed reason for making its decision in the particular instance was factually untrue; and (3) multiple other examples of how the city had treated nonminority businesses differently from minority businesses.  In the instant case, Plaintiff's burden should have been much easier.  Plaintiff is not dealing with the internal motivations of a multi-individual governmental body. Rather Plaintiff is simply required to plead sufficient facts to show whether or not a particular event occurred in the past—that is whether Mr. or Mrs. al Saud ever directed Ms. Gebreyesus (or the unidentified Eritrean women) to threaten Plaintiff's family.  Plaintiff has not succeeded in alleging a single fact that suggests that *the Defendants* were implicated in any way in those supposed threats.

**II.  Plaintiff Does Not, and Cannot, Allege Necessary Elements of a Breach of Contract Cause of Action.**

Plaintiff continues to conflate two concepts:  what *should* have been in her employment contract, and what actually *was* in the employment contract.

Plaintiff's Fifth Claim of Relief is denominated "Breach of Contract," and its key paragraph states that "[a]s a direct and proximate result of the actions of the Defendant's breach of contract, Mr. Tekle has suffered damages . . . ."  SAC ¶ 129.  As with any breach of contract claim, Plaintiff's cause of action with respect to this claim must be grounded on the breach of a provision that was actually in the contract.

Plaintiff concedes that she never received a copy of the contract, SAC ¶ 27, and that she never read it herself, because it was in a language that she could not read, SAC ¶ 23.[7]  She now asserts for the first time, in this, the third version of her Complaint, that she actually has some limited knowledge of the contractual terms because an unidentified "U.S. Embassy official" reviewed the contract with her to make sure she understood the terms.  SAC ¶ 23.  Her supposed recollection of the contractual terms from that brief interaction eight years ago is limited to three items: (1) she would work 40 hours per week; (2) she would have two days off per week; and (3) she would earn $4500 per month.  SAC ¶ 23.

Plaintiff persists in arguing that she should be able to recover for the breach of contractual terms other than those that she now "recalls" were in the contract.  For instance, Plaintiff states in her Opposition, "Defendants made an oral promise to employ her as a nanny."  Pl. Opp. at 22.

---

[7] To be clear, Defendants do not now—seven years after the contract was signed, and six and a half years after the employment relationship ended—have a copy of the contract themselves. Defense counsel are just as much in the dark about the provisions of the contract as are Plaintiff and Plaintiff's counsel.  But it is the Plaintiff, not the Defendants, who has the burden of identifying and proving that certain, specific contractual provisions were violated in order to make out a valid cause of action.

Elsewhere, she has alleged that, upon arriving in the United States, "she was told she would work as a domestic worker, not as a nanny as originally promised."  SAC ¶ 31.  Plaintiff has never advanced a theory of recovery on the basis of an oral contract.  Nor has she asserted any basis for knowing what the written contract had to say about the scope of her job responsibilities.  As an example, the evidence might demonstrate (as we believe it will) that Plaintiff was occasionally tasked with folding the children's laundry when it came back from being washed.   Is that "nanny" work or "domestic" work?  In a typical breach of contract case, recourse would be made to the contract to determine whether the worker was asked to engage in a task outside the scope of those tasks contemplated by the contract.  In this case (assuming Plaintiff does not suddenly "recall" that folding clothes was specifically *verboten* under the contract), there is no valid basis for assessing whether either party has violated contractual terms related to the nature of Plaintiff's employment.

Similarly, Plaintiff argues that the written contract likely had provisions in it regarding the attribution of non-cash benefits, although she has no recollection of what, if anything, the contract had to say on that issue.  Even assuming Plaintiff is correct about what the law requires (and the State Department standards cited by the Plaintiff directly conflict with published standards by the Department of Labor), the fact that Plaintiff's contract *should* have contained such language is not evidence that it *did* contain such language.  Because Plaintiff can only recover for a breach of the existing contractual language, Plaintiff has insufficient knowledge even to allege that she did not receive the compensation set forth in the contract.

Plaintiff asserts that, "[i]t is plausible to infer that the contract complied with the State Department standards, because it was reviewed by a U.S. consular official and Ms. Tekle was granted an A-3 visa."  Pl. Opp. at 25.  Yet Plaintiff has not pled any allegations purporting to demonstrate what, if anything, U.S. consular officials look for in reviewing an employment

contract for purposes of granting an A-3 visa.  As Plaintiff *has* pled, one aspect of the State Department guidance provides that, in every employment agreement, the employer must "abide by all Federal, State, and local laws in the United States."  SAC ¶ 25.  It strains credulity to believe that consular officers have become conversant with the Federal, State, and local laws in every U.S. jurisdiction, and are rejecting employment contracts for failure to comply with such laws (particularly where, as here, the guidance issued by two federal agencies appear directly to contradict one another).  If the consular officers are not in a position to enforce that aspect of the State Department guidance, there is no plausible criteria for ascertaining which other parts of the guidance they enforce, and which parts they do not.

Even granting Plaintiff's premise that the contract was rigorously reviewed by the consular officer in Jeddah and found to be compliant with every imaginable provision of the laws of the United States, the Commonwealth of Virginia, and Fairfax County, Plaintiff still does not suggest what the contract actually had to say on these matters.  For instance, according to Plaintiff, the applicable State Department guidance provides for a deduction of up to 20% of wages for the provision of meals to employees.  SAC ¶ 41.  Assuming the contract was in compliance with that provision, what did the contract say about meal deductions?  Did it allow for the full 20%?  Did it prohibit such deductions entirely?  Was there a compromise somewhere in the middle?  Plaintiff does not even pretend to know.  The fact that these questions are unanswerable, and the fact that Plaintiff is not even suggesting that the answers can be found by recourse to the contract itself, is powerful evidence that, whatever this claim has morphed into at the hands of Plaintiff's counsel, it is not a breach of contract claim.

In this, as in all breach of contract claims, the Plaintiff bears the burden of pleading, and ultimately of proving, the existence, and the breach, of a specific contractual provision.  In the

absence of the contract, or sufficient firsthand knowledge of the contract by a competent witness, there is no means for Plaintiff to satisfy either of her burdens on this claim.  Accordingly, the breach of contract claim should be dismissed for failure to state a claim.[8]

### III.   The Court Should Reject Plaintiff's Position that her Continually Shifting Accounts of the Underlying Facts Should be Deemed Irrelevant to Assessing Her Credibility at Future Stages of this Litigation.

Throughout this litigation, when defense counsel, or the Court, has identified a legal impediment to Plaintiff's claims, she blithely "recalls" the exact facts necessary to address the impediment, and submits them to the Court, in a new complaint, as the latest version of her story. Brazenly, she makes no attempt to justify wholesale additions or deletions to the facts which underlie her claims.

Plaintiff is, of course, correct, as she has reminded the Court for the umpteenth time, that the Court is obliged to accept the truthfulness of her allegations, notwithstanding the dubious circumstances by which they have come before the Court, and despite the fact that the latest story flat-out contradicts facts set out in her prior complaints, which the Court was also told it was obliged to credit.

She refers to her newest pleading—a third iteration of her story as vastly different from the second iteration as the second was from the first—as the "operative complaint," a phrase with a

---

[8] Plaintiff suggests that it is the Defendants' fault that she cannot adequately plead her contract claim because, she asserts, they "withheld" a copy of the contract.   Plaintiff alleges in the SAC that she was not provided with a copy of the contract at the time that she signed it.  SAC ¶ 27.  She does not allege, however, that she ever requested from the Defendants a copy of the contract, either at that time, or at any point in the seven months she resided with the Defendants.  Nor does she allege that she ever requested a copy of the contract at any point in the six years after she left their home without notice.   Plaintiff's counsel appear to construe the phrase "withheld the contract" synonymously with the phrase "never volunteered a copy of the contract."   Defendants certainly would have provided Plaintiff with a copy of the contract if they had been asked.   However, it would hardly be surprising that it did not occur to them to volunteer to provide Plaintiff with a copy of a document written in a language that she conceded she could not read.

distinctly Nixonian flavor.  Pl. Opp. at 2.  She says that the prior complaints are "of no effect," *id.*, or as Ron Ziegler, Nixon's press secretary, famously said, "those facts are inoperative."[9]

Plaintiff is not correct, however, when she wishfully states "all that matters now are the allegations in the Second Amended Complaint."  Pl. Opp. at 3.  As much as Plaintiff and her counsel would like to wipe the slate clean, there will come a time when this Court, or a jury under the guidance of this Court, will be obliged to assess the credibility of the Plaintiff.  We beg the Court to keep in mind, for that day, the remarkable serendipity of Plaintiff's magically evolving recollections.

---

[9] Plaintiff's citation to *Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451 (4th Cir. 2017), is inapposite. The Fourth Circuit's opinion in *Fawzy* simply stands for the proposition that Defendants' Motion to Dismiss, and this Court's ruling on that motion, should be directed to the SAC, not to either of the previous iterations of the Complaint.  Defendants do not dispute that point.  *Fawzy* has nothing to say about the credibility of a litigant who files a pleading at one point in the litigation asserting that a critical series of telephone calls occurred with a call being placed "every few weeks," FAC ¶ 58, and, when that allegation proves insufficient to carry the day, files another pleading asserting that the calls occurred  "twice a week," SAC ¶ 70.  Nor has the Fourth Circuit seen fit to weigh in on a litigant who asserts that she was "imprisoned . . . in a compound," and then, without explanation or justification, says those allegations are now inoperative.

14

## IV.  Conclusion

Based on the foregoing, Defendants respectfully request that the Court dismiss the Fifth Claim of Plaintiff's Second Amended Complaint with prejudice, and award Defendants such other and further relief that the Court may deem appropriate.

Dated: October 31, 2018                                Respectfully submitted,

                                                       /s/ John L. Brownlee
                                                       John L. Brownlee (VSB# 37358)
                                                       Stuart G. Nash (*pro hac vice*)
                                                       David L. Haller (*pro hac vice*)
                                                       HOLLAND & KNIGHT LLP
                                                       1650 Tysons Boulevard, Suite 1700
                                                       Tysons, VA  22102
                                                       Telephone: 703.720.8600
                                                       Facsimile: 703.720.8610
                                                       Email: John.Brownlee@hklaw.com
                                                       Email: Stuart.Nash@hklaw.com
                                                       Email: David.Haller@hklaw.com

                                                       *Counsel for Defendants Nouf bint Nayef*
                                                       *Abdul-Aziz al Saud and Mohammad bin*
                                                       *Abdullah al Saud*

15

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 31st day of October, 2018, a true copy of the foregoing was served via

electronic case filing to:

Nicholas Cooper Marritz,
Legal Aid Justice Center
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
nicholas@justice4all.org

Richard F. Levy
Jenner & Block LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
rlevy@jenner.com

Jonathan A. Langlinais
Jenner & Block LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
jalanglinais@jenner.com

Agnieszka M. Fryszman
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
afryszman@cohenmilstein.com

Le'ake Fesseha
Le'ake Fesseha Law Office
901 S. Highland Street, Suite 312
Arlington, VA 22204
leakef@hotmail.com

Martina Elizabeth Vandenberg
The Human Trafficking Legal Center
1030 15th Street NW, Suite 1048
Washington, DC 20005
mvandenberg@htlegalcenter.org

Sarah Linnell Bessell
The Human Trafficking Legal Center
1030 15th Street NW, Suite 1048
Washington, DC 20005
sbessell@htlegalcenter.org

*Counsel for Plaintiff Simret Semere Tekle*

/s/ John L. Brownlee
John L. Brownlee

16

#58752518_v1