# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

SIMRET SEMERE TEKLE,

|  |  |
|---|---|
| *Plaintiff*, | Case No.: 1:18cv211 |
| v. | |
| NOUF BINT NAYEF ABUL-AZIZ AL SAUD, MOHAMMAD BIN ABDULLAH AL SAUD | |
| *Defendants*. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO SET ASIDE A PORTION OF THE MAGISTRATE JUDGE'S MAY 10, 2019 DISCOVERY ORDER

# TABLE OF CONTENTS

I. Background ....................................................................................................................1

II. STANDARD OF REVIEW ...........................................................................................3

III. Argument......................................................................................................................4

    A.    Local Civil Rule 30(A) requires all counterclaimants to submit to
          deposition in the Eastern District of Virginia.........................................................4

          1.    The Plain Language of the Local Rule Does Not Exempt
               Counterclaimants, Compulsory or Not, From its Deposition
               Requirement...................................................................................4

          2.    Defendants are not involuntary plaintiffs .................................................4

          3.    Local Rule 30(A) does not distinguish between compulsory and
               non-compulsory counterclaimants ...........................................................7

    B.    Magistrate Judge Anderson's alternative ruling that Plaintiff's counsel
          would not be required to travel to Saudi Arabia is correct on the facts and
          the law.....................................................................................................................9

          1.    Defendants fail to acknowledge counsel's legitimate safety
               concerns – concerns that are shared by the State Department, as
               Judge Anderson recognized ......................................................................9

          2.    Jenner & Block's other business in Saudi Arabia has no bearing on
               the concerns faced by Plaintiff's counsel arising out of their
               representation of Plaintiff in this matter..................................................14

          3.    It is Unsafe and Unreasonable to Require Plaintiff's Primarily
               Female Counsel to Travel to Saudi Arabia..............................................16

          4.    Filing Letters Rogatory with the State Department does not
               commit counsel to travel to Saudi Arabia ...............................................17

          5.    Judge Anderson applied the correct legal standard and his factual
               findings were not clearly erroneous when he held Defendants
               should be deposed in Virginia...................................................................18

    C.    Video conference depositions are not an adequate substitute for party
          depositions where credibility is a key issue ........................................................22

Magistrate Judge Anderson found that the Local Rule requires Defendants, as counterclaimants, to appear for deposition in this district. But despite the Local Rule's unambiguous language, Defendants argue that the Rule does not apply to them, either because their counterclaim was compulsory or because they are "involuntary plaintiffs." Both of these arguments fail: Local Rule 30(A) makes no distinction between compulsory and non-compulsory counterclaimants—it just says "counterclaimants." And Defendants cannot credibly argue that they are "involuntary plaintiffs," a well-defined term of art borrowed from Federal Civil Rule 19.

Moreover, Magistrate Judge Anderson found, after a careful review of the facts, including State Department warnings and reports by non-governmental organizations, that under the unique circumstances of this case, Plaintiffs' counsel would not be required ordered to travel to Saudi Arabia for the depositions.  His decision is consistent with that of other courts to have considered this issue and with declarations submitted by Plaintiffs, including from the former Deputy Assistant Secretary of State for Near Eastern Affairs (Exhibit 1) and by senior advisors for Human Rights First (Exhibit 2) and Amnesty International USA (Exhibit 3), all advising that it would be unwise and risky for Plaintiff's attorneys to travel to Saudi Arabia.

Magistrate Judge Anderson's ruling was not clearly erroneous or contrary to law, and the Court should affirm it.

## I.  <u>BACKGROUND</u>

Defendants filed a counterclaim against Plaintiff in this Court.  Dkt 69.

During discovery, Plaintiff noticed Defendants' depositions for late April 2019, to be held in Falls Church, Virginia. Exhibit 4.  Without seeking a protective order, Defendants informed Plaintiff that they would not appear. Defendants proposed taking the depositions in Jeddah, Saudi Arabia or by video conferencing. After Defendants' counsel made their proposal,

Plaintiff's counsel researched the possibilities of remote teleconferencing the depositions, and found it would be prohibitively expensive, as a team of court reporters and videographers would have to be flown to and housed in Jeddah, and it is likely that at least one member of Plaintiffs' legal team would need to be present to ensure the logistics were set up.  Plaintiffs determined this was not a viable or fair alternative.

Plaintiff's consulted with experts on the middle east, including well-regarded human rights organizations, journalists who had covered the middle east, colleagues with expertise in the middle east, former State Department staff, and other experts regarding their own safety; the risks of deposing member of the royal family on claims that include allegations of human trafficking and allegations that counsel had personally defamed the defendant; the particular risks facing women in Saudi Arabia; the elevated risk if the Defendants served as Plaintiffs' counsel "sponsor" and could control counsel's ability to depart the country; the likelihood of being refused entry and getting turned away at the border; and general country conditions. Based on the advice obtained, Plaintiffs' counsel concluded that travel to Saudi Arabia was too dangerous.

Plaintiffs sought to compromise by offering a neutral location, London, where both parties' counsel have offices as a possible site for depositions. Dkt. 120-2.  Defendants refused.

Plaintiff then moved to compel Defendants' appearance, arguing that this Court's Local Civil Rule 30(A) requires counterclaimants (like Defendants) to submit to deposition in this judicial district. Dkt. 120.  Magistrate Judge Anderson agreed, ruling that Defendants must either appear for deposition in Virginia or drop their counterclaim.

Plaintiffs then re-noticed Defendants depositions.  Exhibit 5.  Defendants once again did not seek a protective order and did not appear for their depositions.

Instead, Defendants filed this motion to overturn Judge Anderson's decision.

The Court should decline Defendants' invitation and order them to appear for deposition as the Local Rule requires.

## II. <u>STANDARD OF REVIEW</u>

Rule 72(a) allows a party object to a magistrate judge's ruling on non-dispositive matters. Magistrate Judge Anderson's order requiring the al Sauds to be deposed in this district—a pretrial discovery order—is a non-dispositive matter. *See U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 561, 565 (E.D. Va. 2010) (discovery rulings are non-dispositive). As such, his decision is entitled to substantial deference. "Only if a magistrate judge's decision [on a non-dispositive matter] is 'clearly erroneous or contrary to law' may a district court judge modify or set aside any portion of the decision." *Carlucci v. Han*, 292 F.R.D. 309, 311–12 (E.D. Va. 2013), quoting Fed. R. Civ. P. 72(a). "The 'contrary to law' standard ordinarily suggests a plenary review of legal determinations, but many courts have noted that decisions of a magistrate judge concerning discovery disputes and scheduling should be afforded great deference. *In re Outsidewall Tire Litig.*, 267 F.R.D. 466, 470 (E.D. Va. 2010). Defendants bear the burden of showing that Magistrate Judge Anderson's ruling was clearly erroneous, and that burden is a heavy one: "The leading treatise on federal practice and procedure describes altering a magistrate's non-dispositive orders as 'extremely difficult to justify.'" *Carlucci*, 292 F.R.D. at 312 (quoting 12 Wright & Miller, Federal Practice & Procedure § 3069 (2d ed. 1997)). Under Rule 72(a)'s deferential standard, the Court may not reverse "simply because it would have decided the case differently. Rather, a reviewing court must ask whether ... it is left with the definite and firm conviction that a mistake has been committed." *DietGoal Innovations LLC v. Wegmans Food Markets, Inc.*, 993 F. Supp. 2d 594, 600 (E.D. Va. 2013), quoting *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012) (quotation and punctuation omitted). And as shown below, Magistrate Judge Anderson's ruling was based on sound reasoning. The Court should affirm it.

### III. <u>ARGUMENT</u>

**A.**     **Local Civil Rule 30(A) requires all counterclaimants to submit to deposition in the Eastern District of Virginia**

>     1.      **The Plain Language of the Local Rule Does Not Exempt Counterclaimants, Compulsory or Not, From its Deposition Requirement**

Local Rule 30(A) states:

> (A) Discovery: Any party, or representative of a party (e.g., officer, director, or managing agent), filing a civil action in the proper division of this Court must ordinarily be required, upon request, to submit to a deposition at a place designated within the division … **A defendant, who becomes a counterclaimant, cross-claimant, or third-party plaintiff, shall be considered as having filed an action in this Court for the purpose of this Local Rule. This subsection shall not apply to an involuntary plaintiff or an interpleader plaintiff.**

(emphasis added).

Local Rule 30(A) controls this dispute.  The Rule, by its plain language, exempts only an involuntary plaintiff (*see* Fed. R. Civ. P. 19) or an interpleader plaintiff (*see* Fed. R. Civ. P. 22). Defendants here are neither involuntary plaintiffs nor interpleader plaintiffs, and did not argue otherwise before Magistrate Anderson.  Pl.'s Reply Mem. In Supp. of Her Mot. To Compel, Dkt. 133 at 4; Defs.' Opp. to Pl.' Mot. to Compel, Dkt. 131.

Local Rule 30(A) does not exempt compulsory counterclaimants.  Thus, much of Defendants' argument is irrelevant.  The unambiguous plain text of Rule 30(A) requires counterclaimants – compulsory or not – to submit to deposition within the Eastern District.

>     2.      **Defendants are not involuntary plaintiffs**

By its terms, Local Rule 30(A) does not apply "to an involuntary plaintiff or an interpleader plaintiff."  Although they did not make this argument to Magistrate Judge Anderson, Defendants now argue that they are "involuntary" plaintiffs, and thus exempt from the Local

Rule's requirement, because they never wished to be sued in this district in the first place and filed their counterclaim only reluctantly. *See* Dkt. 190 at 9–10.  Citing nothing but a dictionary, they argue that compulsory counterclaims are always brought "involuntarily," because the counterclaimant faced a choice to either bring suit or risk losing the counterclaim forever. *See id.*

This argument is specious. As Defendants recognize, "involuntary plaintiff" is a legal term of art derived from Federal Rule of Civil Procedure 19, which involves the rules for mandatory joinder. *See* Dkt. 190 at 10.  And under Rule 19, "involuntary" truly means *involuntary*.  As courts uniformly recognize, an involuntary plaintiff is a non-party ordered by the court to be made a party.  *See* Fed. R. Civ. P. 19; *see generally Independent Wireless Telegraph Co. v. Radio Corporation of America*, 269 U.S. 459 (1926) (allowing licensee to make non-party patent owner co-plaintiff against its will), *Duplan Corp. v. Deering Milliken Research Corp.*, 522 F.2d 809, 812 (4th Cir.) (discussing necessary joinder of non-party), *Horder v. Pharmacists Mut. Ins. Co.*, No. 3:10cv597, 2010 WL 5677695 (E.D.Va.) at 1-2 (evaluating involuntary joinder of non-party); *Commercial Union Ins. Co. v. Cannelton Indus., Inc.*, 154 F.R.D. 164, 168 (W.D. Mich. 1994); 7 Wright Miller, Fed. Prac. & Proc. § 1606 (3rd. ed.) ("involuntary plaintiffs quite properly have not been burdened by all of the obligations associated with party status. Thus, it has been held that defendant may not depose an involuntary plaintiff on notice as is possible with other parties, but must subpoena the involuntary plaintiff under Rule 45.")  Here, defendants/counterclaimants are already parties to the case and have not been joined by the court as a necessary party.  The al Sauds plainly do not qualify as involuntary plaintiffs.

Defendants nonetheless insist that "there is no evidence that the drafters of E.D. Va. Local Rule 30(A) had Federal Rule 19[] in mind when they used the term 'involuntary

plaintiff,'" and that the term should thus be accorded its "everyday, plain language meaning." Dkt. 190 at 10. This argument fails, however, because there is good reason to think that the authors of Local Rule 30(A) drafted it with Federal Rule 19 in mind. After all, the Local Rules track the subject-matter of the Federal Rules, so it makes sense to think that a term that appears in the Local Rules should be interpreted in the same manner as in the Federal Rules. And Federal Rule 19 makes clear that in the civil-procedure context, "involuntary plaintiff" is a legal term of art. For this reason, simply looking up "involuntary" in Merriam-Webster is unpersuasive. Because as the Supreme Court has observed, where a phrase has become a legal term of art, using a general-purpose dictionary to break down the term into its constituent words "is not apt to illuminate its meaning." *See Sullivan v. Stroop*, 496 U.S. 478, 482–83 (1990) (construing the term "child support" in Title IV of the Social Security Act). The dictionary is simply the wrong place to look.

Finally, the case law is squarely on Plaintiff's side. Defendants do not cite a single case where any court has interpreted the phrase "involuntary plaintiff" as Defendants ask this Court to read it. This is unsurprising, because Federal Rule 19 provides an adequate and complete description of what an "involuntary plaintiff" is for civil-procedure purposes. Given the context in which the phrase appears in Local Rule 30(A), there is simply no need to consult authorities other than the Federal Rules to discover its meaning, including a dictionary.[1] Defendants may be

---

[1] Even under Defendants' proposed definition of voluntariness, Defendants would still be wrong in their assertion that all compulsory claims are necessarily brought "involuntarily." Some defendants with compulsory counterclaims may bring those claims reluctantly—but others might do so eagerly, grateful for the chance to go on the offensive. Still others may opt not to bring their counterclaims at all. In any case, it would be the defendant's (voluntary) choice which route to pursue.

"reluctant counterclaimants" but they are not "involuntary plaintiffs" under Federal Rule 19 or

Local Rule 30(A), and thus they must submit to deposition in this judicial district.

3.   **Local Rule 30(A) does not distinguish between compulsory and non-compulsory counterclaimants**

Defendants claim that L.R. 30(A) applies only to *permissive* counterclaimants, and that

*compulsory* counterclaimants (like Defendants) are exempt. But the language of L.R. 30(A)

makes no such distinction. To the contrary, the Rule is clear and unqualified: all parties filing

civil actions in the Alexandria Division must submit to deposition there as well—including

counterclaimants.

As Magistrate Judge Anderson observed, if the drafters of Local Rule 30(A) wished to

exclude compulsory counterclaimants, they certainly knew how to do so; after all, they excluded

involuntary plaintiffs and interpleader plaintiffs from the Local Rule's requirement. (*See* Ex. 6,

May 10, Hr'g Tr. at 10:15–19. But the drafters require "counterclaimants"—without

qualification—to appear for deposition in Virginia. Thus, there is no reason to release

Defendants from the Local Rule's requirement merely because their counterclaim is compulsory

rather than permissive.  As Magistrate Judge Anderson observed, his ruling is consistent with the

practice in this jurisdiction.  (*See Id.* at 14:10 – 15:13 (also noting many decisions are issued

from the bench)).

Defendants rely heavily upon *Swimways Corp. v. Zuru, Inc.*, No. 2:13cv334, 2014 WL

12603190 (E.D. Va. June 6, 2014) (Leonard, M.J.), which departs from customary practice in

this jurisdiction to hold that compulsory counterclaimants *are* exempt from Local Rule 30(A).

But as an unpublished decision of a magistrate judge, the *Swimways* decision does not bind this

Court today. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011) ("federal district

judges…lack authority to render precedential decisions binding other judges, even members of

the same court"). And more importantly, as Magistrate Judge Anderson observed, the *Swimways* court simply got it wrong.

In *Swimways*, M.J. Leonard cited two cases in support of his holding: the first, *Zuckert v. Berkliff Corp.*, 96 F.R.D. 161, 162 (N.D. Ill. 1982), is from a jurisdiction that—like all the other non-EDVA cases cited in Defendants' brief—does not have a Local Rule requiring counterclaimants to be deposed in the forum district. Thus, Magistrate Judge Anderson correctly found that *Zuckert* provides no support for the *Swimway* court's decision. (Ex. 6, Hr'g Tr. At 14:1–6). The second case cited by the *Swimways* court, *In re: Outsidewall Tire Litigation*, 267 F.R.D. 466, 470 (E.D. Va. 2010), is also unavailing. In *Swimways*, M.J. Leonard cited *Outsidewall Tire* for the proposition that "a foreign corporate defendant/compulsory counterclaimant" is entitled to have its Rule 30(b)(6) deposition occur in the country where it has its principal place of business. But the corporate defendant in the *Outsidewall Tire* case *was not a counterclaimant at all*—much less a compulsory one. Thus, the case gives no support for the proposition that compulsory counterclaimants are exempt from Local Rule 30(A)'s requirement. Moreover, this case, of course, does not involve a foreign corporation whose headquarters and officers are all located overseas; it concerns a wealthy family who lived in and have continued to own a home in Northern Virginia for years. (*See* Ex. 6, Hr'g Tr. At 20:10–16; *id.* at 36:2–18). More importantly, Magistrate Judge Anderson was right—*Swimways* was wrongly decided, and, pursuant to Rule 30A, Defendants must appear for deposition in Virginia.

a.     **Defendants' cited cases from outside of this district are inapposite, because those jurisdictions do not have a Local Rule requiring counterclaimants to submit to deposition in the forum district**

Defendants cite cases from 10 judicial districts outside of this one, each of them holding that compulsory counterclaimants need not travel to the forum district for their depositions.

These cases all share a fatal flaw, however: none of those 10 jurisdictions has a Local Rule equivalent to this Court's Local Rule 30(A). The Eastern District of Virginia is well-known for its unique rules governing local practice, and all parties must abide by them—including counterclaimants. Local Rule 30(A) is no exception. Thus, if Defendants wish to maintain their counterclaim in this district, they must be willing to submit to deposition here as well.

**B.      Magistrate Judge Anderson's alternative ruling that Plaintiff's counsel would not be required to travel to Saudi Arabia is correct on the facts and the law**

      1.      **Defendants fail to acknowledge counsel's legitimate safety concerns – concerns that are shared by the State Department, as Judge Anderson recognized**

Magistrate Judge Anderson correctly held, based on a careful review of the materials submitted by counsel, including the State Department reports and reports of well-regarded non-governmental organizations, that under the unusual circumstances of this case – including allegations that Plaintiffs' counsel personally defamed the Defendants, members of Saudi Arabia's royal family – that the depositions should take place outside Saudi Arabia.  Defendants provide no basis for disturbing his carefully considered ruling, a decision consistent with the warnings issued by the State Department and with the decisions issued by other courts, which routinely reach the same conclusion upon similar facts.  Plaintiffs supplement that record here. The declaration from Tamara Wittes, former Deputy Assistant Secretary of State for Near Eastern Affairs and Senior Fellow in the Center for Middle East Policy at Brookings unequivocally confirms that "given the regular and recent practice in the Kingdom, lawyers for the plaintiff could be in danger of arrest on Saudi territory merely for articulating or asking questions about the allegations at issue in this case … it would be ill-advised for these attorneys to travel to Saudi Arabia."  Exhibit 1, Wittes Decl. ¶¶ 10 - 11.  Similarly, Brian Dooley, Senior Advisor at Human Rights First, points out that ties to the United States do not protect human

rights advocates, that Saudi Arabia has tortured U.S. citizens, and that individuals who have insulted the royal family have faced dire consequences: "for these reasons, travel to Saudi Arabia by U.S. human rights lawyers presents significant risks and is not advisable."  Exhibit 2, Dooley Decl. ¶¶ 6 - 10.  Finally, Zoya Walainy, the Amnesty International USA, Saudi Arabia Country Specialist, states that "the fact that the Defendants in this case, both members of the Saudi royal family, have counterclaimed against Ms. Tekle for defamation makes travel to Saudi Arabia particularly risky for Ms. Tekle's attorneys."  Exhibit 3, Wailany Decl. ¶ 13.

Judge Anderson had before him the United States Department of State Country Report on Human Rights Practices for Saudi Arabia, which warns that statements construed "as constituting defamation of the king, monarchy, governing system or *Al Saud family*," have "resulted in criminal charges" in Saudi Arabia.  U.S. Dep't of State, *Saudi Arabia 2018 Human Rights Report*, at 23, https://www.state.gov/wp-content/uploads/2019/03/SAUDI-ARABIA-2018.pdf (emphasis added).  He also had before him information showing that Saudi law prohibits criticism of Saudi royal family members, such as Defendants here.  *Id.* at 14; Freedom House, *Saudi Arabia Freedom in the World 2019 Report*, https://freedomhouse.org/report/freedom-world/2019/saudi-arabia; *see also* Human Rights Watch, *World Report 2018: Saudi Arabia* (2018), https://www.hrw.org/world-report/2019/country-chapters/saudi-arabia ("judges and prosecutors can convict people on a wide range of offenses under broad, catch-all charges such as 'breaking allegiance with the ruler' or 'trying to distort the reputation of the kingdom.'").  The submitted State Department documents also report on the prevalence of arbitrary arrests and detentions for violations of this law.  *Saudi Arabia 2018 Human Rights Report*, at 13.

10

The al Saud family Defendants in this case have alleged that Plaintiff, through the actions of her attorneys – the same attorneys who will be conducting the deposition – have defamed them.  Indeed, Defendants sought discovery from these attorneys, going so far as to notice the attorneys for deposition, and the discovery revealed that the Plaintiff's attorneys, not Plaintiff, took the step that the Defendants assert defamed them.  Moreover, the deposition of the al Saud Defendants will necessarily consist of questions that the Defendants, or Saudi authorities, are likely to view as critical of the al Saud family.  Plaintiff has alleged that Defendants engaged in illegal employment practices and human trafficking. Deposition questions on these topics would undoubtedly amount to criticism of members of the royal family. After all, Defendants themselves have described Ms. Tekle's claims as accusing them of "detestable" and "criminal" activities. Amended Counterclaim, Dkt. 75 ¶ 26.

Tamara Wittes explains in her declaration that criticizing members of the royal family – like the Defendants here – could be considered grounds for arrest or prosecution, including for merely asking questions at the deposition on the allegations at issue in this case.  Ex 1, Wittes Decl. ¶¶ 5, 10.  Specifically, she concludes that the attorneys for Plaintiff Tekle could be in danger of arrest. *Id.* ¶ 10.

The State Department, Freedom House, Human Rights Watch and other organizations have documented the sensitivity of the Saudi monarch to criticism.  The State Department Country Report on Human Rights Practices for 2018 documents the harsh treatment, including unlawful killings, torture, arbitrary arrest and detention, perpetuated by the regime against its critics. *Saudi Arabia 2018 Human Rights Report*, at 1, *et seq.*

Zoya Waliany, of Amnesty International, reports that torture is widely used in Saudi Arabian prisons and that women's rights activists in particular have been detained, imprisoned,

held without charge and abused  Ex. 3, Waliany Decl. ¶¶ 5, 6.  Amnesty International has

received testimony that the women activists – who were accused of "promoting women's rights"

and "calling for the end of the male guardianship system" -- were repeatedly tortured by

electrocution and flogging, leaving some unable to walk or stand properly.  *Id.* ¶ 6.

      In addition, the regime arrested at least 30 women who advocated lifting the ban on

women *driving*, subjecting the women to lashes, sexual assault, waterboarding and other abuse.

*Saudi Arabia 2018 Human Rights Report*, at 25; Nicholas Kristof, *She Wanted to Drive, so Saudi

Arabia's Ruler Imprisoned and Tortured Her*, N.Y. Times (Jan 26, 2019); Alia Al-Hathloul, *My

Sister is in a Saudi Prison, Will Mike Pompeo Stay Silent*, N.Y. Times, (Jan. 13, 2019).

      Human Rights Watch reports that "Saudi authorities stepped up their arbitrary arrests,

trials and convictions of peaceful dissidents and activists in 2018, including a large-scale

coordinated crackdown against the women's rights movement."  Human Rights Watch, *World

Report 2018: Saudi Arabia* (2018) at 1, https://www.hrw.org/world-report/2019/country-

chapters/saudi-arabia.  As it happens, one of Plaintiff's counsel is a former researcher at Human

Rights Watch and a well-known women's rights advocate.  Another is the chair of her firm's

Human Rights practice group.

      The Saudi regime appears to have little concern for the niceties of nationality when

meting out torture and other punishment.  The *New York Times* recently published an article

headlined, *Saudi Arabia Is Said to Have Tortured an American Citizen*:

> Guards dragged Walid Fitaihi, a Harvard-trained physician, to another room [of the
> Ritz Carlton Hotel], according to a friend who took down the prisoner's detailed
> account of his treatment. Dr. Fitaihi told the friend he was slapped, blindfolded,
> stripped to his underwear and bound to a chair. He was shocked with electricity in
> what appears to have been a single session of torture that lasted about an hour.
>
> His tormentors whipped his back so severely that he could not sleep on it for days,
> his friend said, speaking on condition of anonymity to avoid reprisals. The doctor

had described the physical abuse, in general terms, to his relatives as well, a person close to them said.

David. D. Kirkpatrick, *Saudi Arabia Is Said to Have Tortured an American Citizen*, N.Y. Times (Mar. 2, 2019) https://www.nytimes.com/2019/03/02/world/middleeast/saudi-arabia-torture-american-citizen.html.  Brian Dooley of Human Rights First detailed several examples of U.S. citizen, residents, and green card holders who were arrested, tortured, executed, and/or sentenced to prison for long sentences for, among other things "communicating with foreign entities."  Ex. 2, Dooley Decl. ¶¶ 6-8. He based his declaration on Human Rights First's extensive advocacy on human rights violations by the government of Saudi Arabia as well as on his own personal experience. *Id.* ¶¶ 3 – 5.

In addition, as the United States Department of State explains, "private Saudi citizens may also initiate travel bans against foreign citizens for various reasons." U.S. Dep't of State, *Saudi Arabia: Travel Information*, Travel.State.Gov (last updated May 1, 2019), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SaudiArabia.html.  When placed under a travel ban, a person cannot exit the country, even if they are a U.S. citizen.  *Id.*  The State Department also notes that travel bans can be issued by the Saudi government on persons who are involved in financial or labor disputes. *Id.*  Separately, the guardianship system restricts women's ability to travel to and from Saudi Arabia without a male sponsor.  Ex. 3, Wailany Decl. ¶ 8.  The U.S. Department of State notes that this system applies to American women visiting Saudi Arabia, warning they may need a male guardian's permission to leave the country.  *Id.* citing U.S. Dep't of State, Saudi Arabia: Travel Information, Travel.State.Gov (last updated May 1, 2019).

Finally, Defendants also play down the State Department's general safety warnings. Individual risk tolerances may vary, but the State Department just this year clearly stated: "Rebel

groups operating in Yemen have fired missiles and rockets into Saudi Arabia, specifically targeting populated areas and civilian infrastructure …. Missile attacks have targeted major cities such as Riyadh and Jeddah, Riyadh's international airport…"  U.S. Dep't of State, *Saudi Arabia Travel Advisory*, (Feb. 21, 2019),

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/saudi-arabia-travel-advisory.html (last visited May 9, 2019).

Ample evidence supports Magistrate Judge Anderson's conclusion that it would be unsafe for Plaintiff's attorneys to travel to Saudi Arabia for these depositions.

2. **Jenner & Block's other business in Saudi Arabia has no bearing on the concerns faced by Plaintiff's counsel arising out of their representation of Plaintiff in this matter**

Defendants make much of Jenner & Block's business in Saudi Arabia.  But the primary attorney handling the depositions will not be one of the young Jenner & Block associates assigned to this case, but an attorney from Cohen Milstein Sellers & Toll, which does no business whatsoever in Saudi Arabia and is best known for its ground-breaking work in negotiating a global settlement for victims of Holocaust-era forced and slave labor.  Another attorney staffing the depositions will be Martina Vandenberg, the founder and President of the Human Trafficking Legal Center.  Ms. Vandenberg was a researcher at Human Rights Watch, a well-regarded organization that is harshly critical of the human rights abuses by the Saudi regime, and served as a researcher for the Israel Women's Network when she lived in that country.  Zoya Wailany of Amnesty International writes in her declaration that "even with a sponsor to obtain a visa, there is no guarantee that an individual – and in particular, a U.S. human rights attorney, will be allowed entry into Saudi Arabia.  It is more than likely that the lawyers for Plaintiff Tekle will not be allowed entry into Saudi Arabia."  Exhibit 3 at ¶ 9.

14

Defendants do not rebut or even address in their brief the challenges faced by attorneys who are Jewish or who have traveled to Israel – challenges that have been recognized by the courts. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 941 F. Supp. 2d 513, 519 (D.N.J. 2005) (refusing to order deposition in Saudi Arabia when deposing attorneys were Jewish, had traveled to Israel, and would potentially be denied travel visa on that basis); *Sharif v. Int'l Dev. Grp.*, No. 02 C 5430, 2003 WL 21995166, at *1 (N.D. Ill. Aug. 21, 2003). Indeed, courts have refused to order depositions in Saudi Arabia based on inconvenience alone.  *E.g., Bd. of Governors of Fed. Reserve Sys. v. Pharaon*, No. 91 CIV 6250 HB DFE, 1999 WL 760205, at *1 (S.D.N.Y. Sept. 27, 1999).

It is no secret that Jenner & Block maintains a Foreign Corrupt Practices Act (FCPA) practice with international reach. As part of its FCPA practice, Jenner & Block represents multinational corporations whose cross-border business dealings trigger compliance concerns with U.S. anticorruption laws. Defendants correctly point out that Jenner & Block conducts "FCPA investigations, compliance reviews and due diligence counseling for major corporate clients across the world." But they incorrectly cite this practice area as part of their attempt to cast doubt upon Plaintiff's counsel's candor and Plaintiff's safety concerns.

FCPA due diligence is entirely non-adversarial—the corporate client arranges all necessary logistics, serves as a sponsor, and ensures safe passage for Jenner & Block's attorneys. Upon the attorneys' arrival, the client assists its attorneys with navigating the logistical and legal frameworks at play in Saudi Arabia. It is in the client's clear interest to try to ensure its attorneys' safety and efficiency. While the client cannot guarantee total safety for Jenner's attorneys, it plays an indispensable role in lowering the likelihood of its attorneys being harmed while in the jurisdiction.  A review of firm records indicates that Jenner & Block attorneys have

15

made a single trip to Saudi Arabia since at least January 1, 2016.  Exhibit 10, Decl. of Keisha N. Stanford, at ¶ 5.  That trip was made by two Jenner & Block attorneys in conjunction with the client's in-house attorneys and compliance personnel. Id. ¶ 2.  The corporate client sponsored the attorney's work visas and provided in-country assistance.  *Id*.

The same does not apply here.  No Jenner & Block attorney in this matter is traveling to Saudi Arabia with the sponsorship of its client to provide compliance counseling.  This case is a heated and highly adversarial matter.  Plaintiff's counsel will be in Saudi Arabia to depose members of the Saudi royal family about accusations of human trafficking.

### 3.   It is Unsafe and Unreasonable to Require Plaintiff's Primarily Female Counsel to Travel to Saudi Arabia

Whether counsel will be able to travel to a deposition location and be able to conduct business there unimpeded is a relevant factor.  *See Exxon Mobil Corp.*, 941 F. Supp. 2d at 519 (refusing to order deposition in Saudi Arabia when deposing attorneys were Jewish, had traveled to Israel, and would potentially be denied travel visa on that basis).  The leading members of Ms. Tekle's legal team are female and have both traveled to and lived in Israel, which further diminishes the prospects of those attorneys being permitted to enter the Kingdom.  *See Id*. at 519.

All but one of Ms. Tekle's attorneys who would travel to Saudi Arabia for the depositions are female.  The lone male attorney, Mr. Cherry, is an associate at Jenner & Block.  As junior staff, Mr. Cherry will not be responsible for deposing the Defendants.  Defendants argue that Plaintiff has "six male attorneys at her disposal," Dkt. 190 at 20, but that is not so. The remainder of Plaintiff's male attorneys will not be participating in the depositions and have not participated in any of the depositions, except, in the case of Mr. Fesseha, to provide Tringya translation assistance which will not be needed in Saudi Arabia.  Mr. Fesseha is an immigration lawyer, not a litigator.  Mr. Langlinais has been assigned to another matter, is unavailable for international

16

travel, and has not participated in this case for some time.  Mr. Levy graduated from law school

in 1954 and his health does not permit him to travel to Saudi Arabia.  Mr. Marritz and Mr.

Sandoval Moshenberg are local counsel and have not participated in any depositions in this case.

Finally, a "party is entitled to the benefit of all of its counsel, whenever and wherever it wishes."

*Exxon Mobil Corp.*, 941 F. Supp. 2d at 519. Plaintiff has determined that her lead counsel, who

are female, will conduct the depositions of the Defendants.

As Defendants themselves concede, Plaintiff's female attorneys will need a sponsor in

Saudi Arabia.  Dkt. 131 at 16.  The prospect of Defendants controlling whether or not female

opposing counsel is permitted to depart the country should give this Court pause.  Taking the

depositions in Saudi Arabia would be risky and unduly burdensome for Plaintiff's female-led

legal team.

4.      **Filing Letters Rogatory with the State Department does not commit counsel to travel to Saudi Arabia**

Defendants cite the Letters Rogatory request filed by Plaintiff as evidence that counsel's

security concerns are "clearly manufactured."  Dkt. 190 at 21.  As an initial matter, Defendants'

brief, suffused with scorn for counsel's legitimate safety concerns – concerns shared by the

United States Department of State and well-regarded human rights advocates – should give this

Court pause.  Second, Magistrate Judge Anderson correctly rejected Defendants' interpretation

of the Letters Rogatory request.  Plaintiffs filed Letters Rogatory on April 29, 2019.[2]  A Letter

Rogatory is a request for judicial assistance.  It does not mandate that counsel travel to Saudi

Arabia.  The procedure for taking testimony under letters rogatory is governed by the law of the

---

[2] The State Department website notes that the "Execution of letters rogatory may take a year or more" and notes that foreign governments may refuse to execute letters rogatory. https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html

foreign country.  *E.g. U.S v. Parrafin Wax, 2255 Bags,* 23 F.R.D. 289, 290 (E.D.N.Y. 1959).  A foreign country may require counsel to submit written questions, appoint a commissioner to obtain evidence, or have a magistrate ask the witness questions.  *E.g. U.S. v. Salim*, 664 F.Supp. 682, 685 (E.D.N.Y. 1987); *U.S. v. Trout*, 633 F.Supp. 150, 152 (N.D.Cal. 1985); *Branyan v. Koninklijke Luchtvaart Maatschappij*, 13 F.R.D. 425 (S.D.N.Y. 1953).  As the declaration submitted herewith confirms, these alternatives are routinely employed.  Exhibit 7, Declaration of Marco Simons (describing practice of taking evidence abroad including by retaining local counsel or having magistrate ask written questions).   Magistrate Judge Anderson correctly observed that Plantiff's counsel could also seek to have the depositions taken in a more convenient location or hire local counsel to take these third party depositions.  Ex. 6, Hr'g Tr. 47:21-48:6.  The Letters Rogatory themselves simply request an interview "at a time and place convenient for the Witnesses sometime before May, 24, 2019." Dkt. 114. Defendants misinterpretation of the Letters Rogatory procedure provides no basis for reversing Magistrate Judge Anderson's ruling.

5. **Judge Anderson applied the correct legal standard and his factual findings were not clearly erroneous when he held Defendants should be deposed in Virginia**

      a.     It is well established that fear of criminal prosecution is not a basis for avoiding deposition in the jurisdiction

Defendants claim that they have a "legitimate fear" of criminal prosecution in the United States and that this constitutes an "extraordinary circumstance" that justifies holding their depositions in Saudi Arabia. (Dkt. 190 at 24–25).  But it is well settled that even fear of arrest is not a legitimate reason to avoid deposition in the United States. *See Banks v. City of San Bernardino*, 201 F.3d 443 (9th Cir. 1999) (plaintiff not entitled to ignore a deposition notice to evade an outstanding warrant); *Collazos v. United States*, 368 F.3d 190, 194–195 (2nd Cir. 2004)

(alien required to be deposed in the United States despite pending criminal charges there); *Erichsen v. Cty. of Orange*, No. CV 14-2357 JAK (SS), 2016 WL 6921610, at *5 (C.D. Cal. Mar. 31, 2016); *United States v. All Funds on Deposit at Old Mut. of Bermuda Ltd. Contract No. CX4011696 in Bermuda*, No. 2:13-CV-294, 2014 WL 1912091, at *2 (S.D. Tex. May 13, 2014); *Molina v. Media News Grp.*, No. 11–CV–939, 2012 WL 3136805, at *2 (D. N.M. July 27, 2012); *Lowe v. Boone County*, No. 07–183–DLB, 2009 WL 3413973, at *3 n.2 (E.D. Ky. Oct. 21, 2009); *United States v. All Monies, Negotiable Instruments & Funds in Account No. ALE 238254 F.Z., Swiss Bank Corp.*, No. 4:93CV336, 1996 WL 807890, at *2 (E.D. Tex. Jan. 25, 1996); *In re Yensen*, 187 B.R. 676, 677–78 (Bankr. D. Idaho 1995).  Defendants cite *Farquhar v. Shelden*, 116 F.R.D. 70, 72 (E.D. Mich. 1987), but that case involved a *de bene esse* deposition noticed by defendant's own counsel, and the defendant was not also, as here, a counterclaimant.  Here, Defendants' professed fear cannot be very strong, because they decided to file a defamation claim against Ms. Tekle in a Virginia federal court—a claim that will require them to appear in the United States for trial.  Defendants cannot claim to be too afraid deposition but brave enough for trial.

If a party cannot avoid appearing for deposition even when the forum jurisdiction has issued an *active warrant for their arrest*, Defendants' generalized and inchoate claims of "legitimate fear" of arrest cannot excuse their attendance.  Magistrate Judge Anderson's finding is consistent with the well-established consensus and is not clearly erroneous.

      b.      Under *In re Outsidewall Tire,* Defendants should be deposed in Virginia

Even if the Defendants were not counterclaimants, it would be appropriate to depose them in this jurisdiction.  Defendants cite *In re Outsidewall Tire Litig.*, 267 F.R.D. 466, 471 (E.D. Va. 2010), in support of their argument, but that decision explains that courts have crafted a standard that focuses on the convenience of the party being deposed and the degree to which

the deponent has "availed himself or herself of the protections of the laws of the place of the proposed deposition." *Id.* The decision further explains that the presumption in favor of deposing a defendant at his or her residence can be overcome. *Id*.

For example, the presumption can be overcome where the governing law of the defendant's principal place of business would operate to frustrate the deposing party's legitimate discovery-related objectives. *Id*. at 472. As discussed above, because the law of Saudi Arabia prohibits defaming or insulting the royal family and prosecutors have wide latitude to try individuals on such charges, "lawyers for the plaintiff could be in danger of arrest on Saudi territory merely for articulating or asking questions about the allegations at issue in this case." Ex. 1, Wittes Decl. Fear of arrest for asking questions relevant to the claims and defenses in this suit would certainly "operate to frustrate the deposing party's legitimate discovery related objectives." *In re Outsidewall Tire Litig*., 267 F.R.D. at 272

Another grounds for overcoming the presumption is where the "foreign deponents had previously disregarded deposition orders and thus close judicial supervision of the deposition was necessary to ensure they occurred without further violations of court orders." *In re Outsidewall Tire Litig*., 267 F.R.D. at 472. That is the case here. Ms. Tekle initially noticed depositions of the Defendants for April 23-24 and 25-26, 2019. Ex. 4. The Defendants refused to appear in Virginia, insisting that the depositions occur in Saudi Arabia. On May 3, 2019, Ms. Tekle moved to compel (Dkt. 119), and on May 10, 2019, this court ordered the Defendants to appear for their depositions in Virginia. Ms. Tekle immediately re-noticed the depositions, for May 22 and May 23, 2019. *See* Ex. 5. Once again, Defendants refused to appear for these depositions without seeking a protective order or a stay pending appeal. In addition, while the depositions defended by Plaintiff's counsel have not resulted in the need for calls to Chambers,

20

the same is not true for depositions defended by Defendants' counsel where Plaintiff's counsel had to obtain a ruling on improper attorney-client privilege instructions during the course of a third party witness deposition, and anticipates that similar judicial supervision will be necessary during Defendants' depositions.

Finally, the presumption is overcome "when the deponent regularly conducts business in the place where his deposition is sought." *In re Outsidewall Tire Litig.*, 267 F.R.D. at 470. Again, that is the case here.  Defendants own a multi-million dollar mansion in this jurisdiction. Ex. 8, Mar. 29, 2019 Hr'g Tr. at 31:18-23.  After purchasing the property, Defendants made it their primary residence, employing an expansive security and domestic staff to keep the home running. During the time period that gave rise to this ligation, Defendants employed more than a dozen staff members.  As recently as 2016, Defendants spent their summer at this residence.  Ex. 9, Abdelhafiz Dep. Tr. at 76:15-17; 77:2-10.  Thus, this is not a case where the defendant "never set foot" in this jurisdiction.  *In re Outsidewall Tire Litig.*, 267 F.R.D. at 473.  To this day, Defendants continue to expend resources and employ caretakers to maintain and upkeep their Virginia property. Ex. 9, Abdelhafiz Dep. Tr. at 77:17-78:16.  Indeed, Defendants continue to pay one of the drivers more than $4000 per month to keep an eye on the property and maintain it, as well as to be available in case they require his services. *Id*.  In addition, Defendants employ a lawn service to maintain the property's grounds.  *Id*. at 78:14-16. Defendants also employ a real estate agent to manage their home in Virginia. *Id*. at 77:19-24; 78:24-25.  It cannot be disputed that Defendants continue to conduct business in this jurisdiction.

Defendants face no financial burden.  They have private jets and would be traveling to their own home.  It is less burdensome for both Defendants to fly on their private jet to their own home to be deposed than for both sets of attorneys to travel overseas.

21

**C.      Video conference depositions are not an adequate substitute for party depositions where credibility is a key issue**

Plaintiffs offered to take the depositions at a convenient neutral location, such as London where both counsel have offices.  Defendants refused, saying they were not inclined to travel to London.  Decl. of Satenik Harutyunyan, Dkt. 120-2 at 3.  Defendants suggested instead deposition by videoconference, an option that would severely prejudice Ms. Tekle.  Ms. Tekle has a profound interest in deposing these parties in person, just as Defendants deposed her in person over two days.  Credibility is a crucial issue in this case and, as court's routinely recognize, live testimony is essential to assessing credibility particularly when the deponent is party.

The Defendants are the key witnesses in this case[3], which turns on their credibility. Video depositions are not a suitable substitute for an in-person deposition in such circumstances, as courts routinely find. *See U.S. v. 2003 BMW X5 SUV, VIN 5UXFB93573LN80798*, No. CIV. WDQ-14-0912, 2015 WL 2330292, at *2 (D. Md. May 15, 2015) (requiring claimant to appear in person despite her offer to be deposed by video, because the government would not be able to "observe claimant's demeanor, gauge the authenticity of her response to questions, [or] determine whether claimant was being coached by another person present"); *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14-CV-3078-JSC, 2015 WL 13423886, at *3 (N.D. Cal. Aug. 11, 2015) (finding remote deposition of critical witness will prejudice defendant because it is insufficient to test credibility); *United States v. Approximately $57,378 in U.S. Currency*, No. C08-5023 MMC BZ, 2010 WL 4347889, at *1 (N.D. Cal. Oct. 27, 2010) (deposition by video

---

[3] Indeed, Defendants rely primarily on their own declarations in their summary judgment motion, submitting one employee declaration relevant to tolling and one relevant to the security cameras.  They are the primary witnesses in this case.

conference would be prejudicial because the Government will use Sims' deposition to examine her credibility) *See also* Deposition by remote means, 3 Bus. & Com. Litig. Fed. Cts. § 24:13 (4th ed.) ("experienced questioners find that witnesses (and particularly adverse or hostile witnesses) will more readily yield admissions to a live questioner. Most practitioners agree that remote depositions are best suited for shorter depositions and depositions of less important witnesses.")  *Cf. United States v. Kivanc*, 714 F.3d 782, 791 (4th Cir. 2013) (rejecting foreign national's request to provide trial testimony electronically from overseas; desire for live testimony outweighed inconvenience to claimant); *Maryland v. Craig*, 497 U.S. 836, 851 (1990) (noting the drawbacks of allowing trial testimony via videoconference, such as the subtleties inherent in face-to-face contact).

Video conferences are also not appropriate when the deposition is likely to be "emotionally charged." *See Eckles v. United States*, No. 1:11CV459, 2012 WL 3962664, at *1 (M.D.N.C. Sept. 10, 2012) (noting that a video conference was particularly ill-suited for a woman being deposed about her husband's death because it was likely to be intensely emotional and difficult to observe her mannerisms).

Courts confronted with requests for video depositions have disallowed this option when witnesses' statements are diametrically opposed, as in this case.  E.g., *U.S. v.2003 BMW X5 SUV, VIN 5UXFB93573LN80798*, 2015 WL 2330292, at *2 (denying claimant's request for video deposition because her credibility was at issue given "diametrically opposed statements" by witnesses).  Courts have also declined to permit video depositions when the witness had a critical role in the dispute.  E.g., *Markets Int'l, Inc. v. Booz Allen Hamilton, Inc.*, No. 1:11CV1299 TSE/JFA, 2013 WL 5537817, at *1 (E.D. Va. Sept. 16, 2013) (noting court had

previously denied request for video deposition based on significance of the witness' role in the dispute).

The complex nature of these two depositions also militates against video-conferencing. Defendants' entire production consists largely of video recordings and photographs. These exhibits are extremely complicated to load remotely for a video-conferenced deposition.[4] Courts do not look favorably upon requests to give a deposition by video conference when a large number of documents or exhibits must be discussed during the deposition. *See Webb v. Green Tree Servicing LLC*, 283 F.R.D. 276, 280 (D. Md. 2012) (noting the difficulties of examining plaintiff about "voluminous documents" when not physically in the same room as her, despite her offer to be deposed by video conference); *see also U.S. v. 2003 BMW X5 SUV, VIN 5UXFB93573LN80798*, 2015 WL 2330292, at *1 (denying claimant's request to be deposed by video because the government needed to be able to "present her with documents"); *United States v. All Funds on Deposit at Old Mut. of Bermuda Ltd. Contract No. CX4011696 in Bermuda*, No. 2:13-CV-294, 2014 WL 1912091, at *2 (S.D. Tex. May 13, 2014) (denying request for video deposition because of, inter alia, possibility of creating a murky record, potential technical difficulties, obstruction, and more discovery disputes).

Nor can these Defendants claim poverty.  Defendants, who have refused to provide an estimate of their net worth, cannot claim extreme financial hardship. *See Estate of Harvey ex. rel. Dent. V. Roanoke City Sheriff's Office*, No. CIV.A. 7:06CV603, 2007 WL 2821536, at *1 (W.D.

---

[4] At the deposition of Florence Burke, expert witness for Plaintiff, Holland & Knight arranged the videographer and logistics for the video and photographic exhibits.  Technical difficulties with loading the photographs and videos for the deposition took nearly half an hour to remedy.  These technical difficulties occurred at a live deposition, held at the offices of a major law firm.  The potential technical difficulties in an international video deposition requiring video and photographic exhibits are exponentially higher.

Va. Sept. 26, 2007) (citing to a case where a party was allowed to give their deposition via video conference only after demonstrating extreme poverty).

Defendants cite just two cases.  Neither supports Defendants' arguments here.  *United States v. One Gulfstream G-V Jet Aircraft Displaying Tail No. VPCES*, 304 F.R.D. 10, 14 (D.D.C. 2014) involved the deposition of the sitting vice-president of a foreign country: "The uniqueness of Nguema's top-level government position distinguishes this matter from most other discovery disputes involving foreign litigants, and 'special protections' must be afforded to him." The al Saud's are not Heads of State.  *Gee v. Suntrust Mortg., Inc.,* No. 10-CV-01509 RS NC, 2011 WL 5597124, at *2 (N.D. Cal. Nov. 15, 2011), is also inapposite. That case involved the depositions of three named Plaintiffs and 24 opt-in Plaintiffs in an FLSA collective action.  The court found that "one of the chief advantages of opting into a collective action," is that it lowered the individual costs, a benefit that would be lost if the Plaintiffs had to travel to Defendants' chosen deposition locations.  This is not a collective action and defendants are not opt-in plaintiffs, but the Defendants and Counterclaimants in a hotly contested human trafficking case.

Finally, given the logistical issues, it is likely at least one person from Plaintiff's legal team would have to travel to Saudi Arabia to set up the depositions – which, as discussed above is unsafe.

Defendants have access to private jets and the world's finest hotels, as well as a residence in Virginia.  Their demand that they be permitted to participate in their own party depositions by videoconference should be rejected.

Dated: June 7, 2019

Respectfully submitted,

/s/ Nicholas Cooper Marritz
Nicholas Cooper Marritz, VSB #89795
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 720-5607
nicholas@justice4all.org

Richard F. Levy (*pro hac vice*)
Andrew B. Cherry (*pro hac vice*)
Sati Harutyunyan (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 923-2648
rlevy@jenner.com

Agnieszka M. Fryszman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

Le'ake Fesseha (*pro hac vice*)
LE'AKE FESSEHA LAW OFFICE
901 S. Highland Street, Suite 312
Arlington, VA 22204
(703) 302-3410
leakef@hotmail.com

Martina E. Vandenberg (*pro hac vice*)
Sarah L. Bessell (*pro hac vice*)
THE HUMAN TRAFFICKING LEGAL CENTER
1030 15th Street, NW #104B
Washington, DC 20005
(202) 716-8485
mvandenberg@htlegalcenter.org

*Counsel for Plaintiff Simret Semere Tekle*